UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BITLER INVESTMENT VENTURE II, LLC, ) <br> BITLER INVESTMENT VENTURE III, LLC, ) <br> BITLER INVESTMENT VENTURE V, LLC, ) <br> BITLER INVESTMENT VENTURE VI, LLC, ) <br> MELCHING INVESTMENT VENTURE II, LLC, ) <br> MELCHING INVESTMENT VENTURE III, LLC, ) <br> MELCHING INVESTMENT VENTURE V, LLC, ) <br> MELCHING INVESTMENT VENTURE VI, LLC, ) <br> and TWO PORTLAND PROPERTIES #1, LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MARATHON ASHLAND PETROLEUM, LLC, ) <br> SPEEDWAY SUPERAMERICA, LLC, and ) <br> MARATHON OIL COMPANY, ) <br> ) <br> Defendants. ) | CAUSE NO.: 1:04-CV-477-TS |

## OPINION AND ORDER

In this lawsuit, which was instituted in 2004, the Plaintiffs seek recovery under the theories of breach of contract and waste. The Defendants and/or their predecessors in interest leased several gasoline stations from the Plaintiffs, and the Plaintiffs claim that the Defendants and their predecessors in interest neglected and destroyed the leased commercial properties and thereby injured the Plaintiffs' rights and interests in the properties. In late 1992, the parties' predecessors in interest entered into a written agreement cancelling the lease of the Celina, Ohio, property and releasing the Defendants and their predecessors in interest from any and all claims of any character or nature whatsoever arising out of or in connection with the lease, but the parties' predecessors in interest agreed to one exception to this broad release.

On March 8, 2007, the Defendants filed a Motion for Partial Summary Judgment on All

Issues Regarding the Celina, Ohio Property (Counts 23 and 24) [DE 91], arguing that these two claims are barred by the release agreement and the applicable statutes of limitations. On April 17, the Plaintiffs filed a Response [DE 107], and on May 4, the Defendants filed a Reply [DE 110]. Thus, this Motion is fully briefed and now ripe for ruling.

## BACKGROUND

On December 17, 2004, the Plaintiffs instituted this lawsuit. In their twenty-eight count Complaint [DE 1], they named Marathon Ashland Petroleum as Defendant. On January 21, 2005, they filed an Amended Complaint [DE 17], adding Speedway SuperAmerica LLC and Marathon Oil Company as additional Defendants. The Plaintiffs premise this Court's subject matter jurisdiction on diversity of citizenship pursuant to 28 U.S.C. § 1332.

Counts 23 and 24 of the Amended Complaint relate to commercial property in Celina, Ohio, which is currently owned by Plaintiffs Bitler Investment Venture III and Melching Investment Venture III. The Plaintiffs contend that the Defendants left the property in a deplorable condition with remaining environmental uncertainties, that the Defendants returned the property to the owners in a condition that was both unsaleable and untenantable at fair market rates, that the Defendants breached the commercial lease agreement, that the Defendants destroyed, misused, altered, mutilated, and damaged the property and left it in a damaged condition, and that the Plaintiffs have suffered damages.

On February 28, 2005, the Defendants filed their Answer [DE 34], and on March 15, they filed their Amended Answer [DE 40]. On March 8, 2007, the Defendants filed their Motion for Partial Summary Judgment on All Issues Regarding the Celina, Ohio Property (Counts 23 and

2

24) [DE 91], a Brief in Support [DE 92], a Submission of Evidence [DE 93] (with Exhibits), and an Appendix/Statement of Material Facts [DE 94]. On April 17, the Plaintiffs filed a Response [DE 107] and an Appendix/Statement of Genuine Issue [DE 108] (with Exhibits). On May 4, the Defendants filed a Reply [DE 110].

The Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Celina, Ohio Property (Counts 23 and 24) is the first in a series of summary judgment motions (seven in total) filed by the Defendants that together seek summary judgment on each of the claims asserted by the Plaintiffs. The Defendants have also filed a series of motions *in limine* and motions to strike. This Opinion and Order addresses only the first of these summary judgment motions filed by the Defendants.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." If appropriate,

3

summary judgment should be entered against a party who fails to so respond. Fed. R. Civ. P. 56(e)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that a court should enter summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

## FACTS

On December 1, 1968, George O. and Mary Eleanor Bitler and Max and J. Maxine Melching entered into a lease agreement entitled "Indenture of Lease" with Colonial Oil Company, Inc., involving the subject property in Celina, Ohio, which the Bitlers and Melchings owned. At that time, George Bitler and Max Melching were officers of Colonial Oil Company. At some point, which is not critically important to the present issues in this case, Rock Island Refining Company acquired Colonial Oil Company, and eventually Colonial Oil Company was merged into R.I. Marketing. The property was used as a retail gasoline station.

On October 27, 1983, Mary Eleanor Bitler and J. Maxine Melching entered into a lease agreement entitled "Indenture of Lease" with R.I. Marketing, Inc., involving the Celina, Ohio,

property. This lease included an eleven-year term, running from December 1, 1983, to November 30, 1994. The lease included the following term regarding use of the leased premises: "During the lease term, the Lessee shall use the leased premises in a careful and proper manner and for lawful purposes only, and shall, at its own expense, comply with any and all applicable statutes, ordinances, rules and regulations relating to the occupancy or use of the leased premises . . . ." (Gilbert Aff., Ex. A-3 at 4.) In July 1989, Marathon Oil Company (then known as Marathon Petroleum Company) acquired Rock Island Refining Corporation, and Emro Marketing Company (a wholly-owned subsidiary of Marathon Petroleum Company) then acquired the lease on the Celina, Ohio, property.

New federal regulations governing underground storage tanks used to store gasoline and other petroleum produces were promulgated in the late 1980s. These regulations required upgrades or replacement of existing tanks and pipes by December 22, 1998.

On December 19, 1991, an Emro Marketing Company employee working at the service station operated on the Celina, Ohio, property reported a slow product flow in the premium unleaded system caused by the continuous tripping of the leak detector. The premium supply line failed a tightness test and a repeat confirmatory test. On December 20, 1991, Emro Marketing Company reported a confirmed gasoline product release to the Ohio Bureau of Underground Storage Tank Regulations. After excavating the lines and finding the leak and corrosion in the supply line, Emro Marketing Company reported that the system was shut down, that it was deciding whether to re-pipe the station, remove the tanks/lines, or close the station, and that the tanks were installed in 1968. By March 1992, Emro Marketing Company decided to remove all underground storage tanks, pipes, and islands, and not to install new tanks or pipes. Thus, the

company decided to discontinue business operations at the Celina, Ohio, site and to have the property remediated. The Company communicated its plans to George Bitler and Max Melching, and apparently no objection to these plans was made by the Bitlers or the Melchings. The Ohio Bureau approved the work relative to the underground storage tanks. In May 1992, Emro Marketing Company through an environmental remediation firm began the work of removing the underground storage tanks, pipes, and islands, and the work was completed.

In a letter dated September 11, 1992, the Ohio Bureau of Underground Storage Tank Regulations advised Emro Marketing Company as follows regarding the underground storage tank issue at the Celina, Ohio, property:

> The [Bureau] has received all required information regarding corrective actions of an underground storage tank (UST) release at the aforementioned location. Upon review of the analytical results and required reports, at this time [the Bureau] is not requiring further corrective actions of any contamination resulting from petroleum UST activity at the facility.
>
> Due to information potentially not discovered or revealed, nothing in this letter should be interpreted as a guarantee or warrantee that no problems exist at the aforementioned location. In addition, this letter does not release the responsible party from future responsibility and liability under sections 3737.88 through 3737.89 of the Ohio Revised Code and other state laws and regulations or under the Federal Clean Water Act, Resource Conservation and Recovery Act, or Comprehensive Environmental Response, Compensation, and Liability Act for remedying conditions resulting from any release of contaminants to the environment.

(Gilbert Aff., Ex. A-7.)

The Celina, Ohio, property was not included in the Master Amendment to Leases agreement entered into on October 6, 1992, between J. Maxine Melching and Mary E. Bitler and Emro Marketing Company.

On or about November 6, 1992, Emro Marketing Company (as successor lessee to R.I.

Marketing, Inc.) and Mary Eleanor Bitler and J. Maxine Melching (as lessor) entered into an agreement entitled "Cancellation of Agreements and Release of Claims" (1992 Cancellation and Release). It included the following relevant provisions:

> WHEREAS, R.I. Marketing, Inc., an Indiana corporation, and Mary Eleanor Bitler and J. Maxine Melching ("Lessor"), entered into a Lease and Agreement dated October 7, 1983, covering [certain] real property . . . [in Celina, Ohio] . . . .
>
> WHEREAS, R.I. Marketing, Inc. was subsequently merged into Emro Marketing Company, the surviving corporation becoming successor lessee ("Lessee") and
>
> WHEREAS, it is now the desire of the parties that such agreement be cancelled.
>
> NOW, THEREFORE, in consideration of the premises, it is hereby agreed as follows:
>
> 1. Said agreement is cancelled and terminated effective on October 31, 1992.
>
> 2. Attached hereto as Exhibit A and incorporated herein is the letter of the Ohio Bureau of Underground Storage Tank Regulations dated September 11, 1992 advising that it is not requiring further corrective actions of any contamination resulting from petroleum UST activity at subject property.
>
> 3. Each of the parties hereto hereby expressly discharges and releases the other from any and all claims, debts, demands, causes of action and obligations of any character or nature whatsoever arising out of or in connection with said agreement, *
>
> 4. This agreement shall be binding upon and inure to the benefit of the respective heirs, representatives, executors, administrators and successors and assigns of the parties hereto.
>
> *subject to any further liability which may result from additional requirements for corrective action by the Ohio Bureau of Underground Storage Tank Regulations, which corrective actions are a result of the use of the Premises by Lessee.

(Gilbert Aff., Ex. A-7.) The 1992 Cancellation and Release was signed by Mrs. Bitler, Mrs.

Melching, and a representative of Emro Marketing Company, and it was witnessed by four individuals, including Mr. George Bitler and Mr. Max Melching. It was notarized in Ohio on October 22, 1992, and in Indiana on November 6, 1992.[1]

In early November 1992, Mary Eleanor Bitler and J. Maxine Melching leased the Celina, Ohio, property to Kevin C. and Mariann Hines for use as a used car lot. From the First Amended Complaint, it appears that the Celina, Ohio, property has been re-let to Superior Auto for use as a used car lot, and that use of the property has continued.

In October 2001, Bitler Investment Venture III acquired its 50% ownership interest in the Celina, Ohio, property from Carl G. Bitler, as successor trustee of the Mary E. Bitler Declaration of Trust dated November 6, 1998. In July 2002, Melching Investment III acquired its 50% ownership interest in the property from J. Maxine Melching.

From the First Amended Complaint and the parties' submissions, it appears that the State of Ohio has not demanded further remediation of the property.

## ANALYSIS

The Defendants seek summary judgment on Counts 23 and 24 based on several different grounds, but the first is dispositive.[2] The Defendants contend that any claim for breach of

---

[1] The Defendants identify October 22, 1992, the date when the 1992 Cancellation and Release was notarized in Ohio, as the date of the agreement, but the Plaintiffs identify the date of the agreement as November 6, 1992, when the document was notarized in Indiana.

[2] In the alternative, the Defendants argue that the Plaintiffs' breach of contract claim and claim for waste are time-barred under the applicable statutes of limitation, and the Plaintiffs disagree. The parties dispute whether Indiana or Ohio statutes of limitation apply to the claims; whether the general statute of limitation, the injury to real property and actions on use, rents, and profits of real property statute of limitation, or the action on written contracts statute of limitation applies; and when the causes of action would have accrued. Because the Court has found that the release executed in 1992 bars Counts 23 and 24 and that the Defendants' Motion for Partial Summary Judgment should be granted on the release issue, the Court does not need to reach the issues related to the statutes of limitation,

8

contract or waste related to the Celina, Ohio, property is barred by the 1992 Cancellation and Release. The Defendants urge that the 1992 Cancellation and Release is a contract under both Indiana and Ohio law and that it unambiguously bars the claims asserted by the Plaintiffs in Counts 23 and 24. The Plaintiffs respond that Counts 23 and 24 are not so barred and that they are unaware of any differences between Indiana and Ohio law related to releases.

As to the issue of the applicable substantive law, a federal court siting in diversity applies state law to resolve substantive questions. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). "When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits." *Id.*

---

for the parties released each other from any accrued and not-yet-accrued claims, with the narrow exception that the Court will discuss later in this Opinion and Order.

Nevertheless, if the Court had been required to reach the statute of limitation issues, the Court would look to Indiana's statutes of limitations based upon the substantial body of caselaw in Indiana supporting the view that, under Indiana law, statutes of limitations are procedural in nature, rather than substantive, and are therefore not subject to choice of law disputes. See *Ormond v. Anthem, Inc.*, No. 1:05-CV-1908, 2009 WL 102539, *6 (S.D. Ind. Jan. 12, 2009); *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*, No. 1:04-CV-1432, 2007 WL 2904591, *10 (S.D. Ind. Sept. 28, 2007); *Owner-Operators Indep. Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, No. IP98-457-C, No. IP98-458-C, 2006 WL 4552833, at *5 (July 7, 2006 S.D. Ind. 2006); *Miller v. Javitch, Block & Rathbone, LLP*, 397 F.Supp.2d 991, 1002–03 (N.D. Ind. 2005); *McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C, 2004 WL 1629603, *45–46 (S.D. Ind. Feb. 18, 2004). Indiana statutes set the following time limitations for bringing causes of action: 10 years under the general statute of limitation (Ind. Code § 34-11-1-2(a)); 6 years for actions for use, rents, and profits of real property and for actions for injuries to property other than personal property (Ind. Code § 34-11-2-7(2) & (3)); and 10 years for actions upon written contracts (Ind. Code § 34-11-2-11). Under Indiana's discovery rule, a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in exercise of ordinary diligence should have known of the injury. *Pflanz v. Foster*, 888 N.E.2d 756, 759–61 (Ind. 2008) (analyzing the application of several Indiana statutes of limitations in a case involving underground storage tanks and remediation).

In this case, the remediation work was completed before the 1992 Cancellation and Release was executed on November 6, 1992. Additionally, the September 11, 1992, letter from the Ohio Bureau of Underground Storage Tank Regulations was attached to and expressly incorporated into the 1992 Cancellation and Release, which was signed by Mary Eleanor Bitler and J. Maxine Melching and witnessed by George Bitler and Max Melching and which showed their knowledge of environmental issues with the property they owned. With the cancellation of the 1983 lease agreement on November 6, 1992, the Plaintiffs' predecessors in interest gained possession and control of the subject premises, and they then leased the premises to Kevin C. and Mariann Hines for use as a used car lot, which would have permitted them to discover any diminution in property value related to the Defendants' use and the remediation of the property. For these reasons, the Plaintiffs' breach of contract claim and claim for waste would have accrued no later than November 6, 1992, which is more than twelve years before they instituted this lawsuit on December 17, 2004. As a consequence, the Plaintiffs failed to bring their claims within any statutory periods of limitation identified above, and the Defendants' Motion for Partial Summary Judgment could also be granted on this basis.

In this case, the Defendants raise a conflict of law issue, argue that Indiana has the most intimate contact to the facts of this case (based upon the facts that Mary Eleanor Bitler and J. Maxine Melching resided in Indiana when they negotiated and signed the 1992 Cancellation and Release, and that R.I. Marketing was incorporated and had its principal place of business in Indiana when it entered into the 1983 Indenture of Lease), and suggest that a choice of law analysis would favor the application of Indiana law. The Defendants, nevertheless, state that a choice of substantive law analysis is not necessary because a release of claims is treated the same under both Indiana and Ohio law. The Plaintiffs do not dispute the application of Indiana substantive law and rely upon the Indiana case law cited by the Defendants. Because no real dispute exists among the parties regarding the application of Indiana substantive law regarding releases, the Court will apply Indiana substantive law, which is the law of the forum state. *Cf. Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994) (instructing that "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states. Where there is no disagreement among the contact states, the law of the forum state applies.") (internal citations and quotation marks omitted).

As to the standards governing release agreements, the Indiana Court of Appeals recently summarized the applicable law in Indiana:

> A separate release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action. Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes. Interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. Absent an ambiguity, release provisions are interpreted as a matter of law, and we look only to the instrument to ascertain the parties' intent.

*Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009) (quotation marks and internal citations omitted). Additionally, "'[a] release executed in exchange for proper consideration works to release only those parties to the agreement unless it is clear from the document that others are to be released as well.'" *Evan v. Poe & Assocs., Inc.,* 873 N.E.2d 92, 98 (Ind. Ct. App. 2007) (quoting *Huffman v. Monroe County Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992)).

The standards for reviewing contracts are well established. Under Indiana law, contracts are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement, and if the language of the contract is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four corners of the agreement, and courts determine the meaning of a contract from an examination of all of the contract's provisions, and not from a consideration of individual words, phrases, or paragraphs read alone. *Moore*, 903 N.E.2d at 531. Parol, or extrinsic evidence, is inadmissible to add to, vary, or explain clear and unambiguous terms of a written instrument. *Evan,* 873 N.E.2d at 101. An ambiguity does not arise simply because the parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable people could come to different conclusions about its meaning. *Id.* at 98; *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.,* 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005). An ambiguity in a contract may be patent or latent. A patent ambiguity is "apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning," but a latent ambiguity "arises only upon attempting to

11

implement the contract." *Id.* at 1070–71 (quotation marks and internal citations omitted).

In this case, the 1992 Cancellation and Release is clear and unambiguous. The parties intended to "cancel[] and terminate[]" the 1983 lease agreement, which included the terms on which the Plaintiffs rely in asserting Counts 23 and 24. They also intended to "discharge[] and release[]" each "other from any and all claims, debts, demands, causes of action and obligations of any character or nature whatsoever arising out of or in connection with [the 1983 lease] agreement." (Gilbert Aff., Ex. A-7.) In discharging and releasing each "other from any and all claims, debts, demands, causes of action and obligations of any character or nature whatsoever arising out of or in connection with [the 1983 lease] agreement," the parties intended broadly to release each other from any and all claims and causes of action, whether sounding in tort or contract, that may arise out of or in connection with the lease.[3] They intended this release to "bind[] . . . and inure to the benefit of the respective heirs, representatives, executors, administrators and successors and assigns of the parties hereto." (Gilbert Aff., Ex. A-7.) In binding their "respective heirs, representatives, executors, administrators and successors and

---

[3] The Defendants argue that this case is similar to the release addressed by this Court in *Rodenbeck v. Marathon Petroleum Co.*, 742 F.Supp. 1448 (N.D. Ind. 1990). The Court in *Rodenbeck* granted summary judgment in favor of the oil company defendant and found that the release, which "discharge[d] and release[d] the other [party] from all claims and obligations of any character or nature whatsoever arising out of or in connection with said agreements," bars "all claims whether sounding in tort or contract or whether based on a statute such as CERCLA." *Id.* at 1453, 1457 (emphasis omitted). The Plaintiffs argue that *Rodenbeck* is inapplicable because the parties in this case included the carve-out or exception. The Plaintiffs argue that the carve-out or exception is more explicit than the release language at issue in *Wright Motors, Inc. v. Marathon Oil Co.*, 631 N.E.2d 923 (Ind. Ct. App. 1994), in which the Indiana Court of Appeals reversed the trial court's granting of summary judgment in favor of the oil company defendant. The Indiana Court of Appeals determined that the release, which provided that the oil company defendant "shall have no further liability of any nature whatsoever under the terms of the Lease," was merely a release of contractual obligations under the lease, not of common law liability or liability based upon a statute. *Id.* at 925, 926–27 (emphasis omitted). The Court finds that neither case is directly on point with this case. The *Rodenbeck* case involved a broad release very similar to the release in this case, but the exception in this case presents unique issues not resolved in *Rodenbeck*. The *Wright Motors* case involved a limited release of contractual obligations, and that limited release is different from the broad release in this case. In this case, the Court is confronted with a broad release that includes a narrow exception as to liability related to additional requirements of corrective action by the Ohio Bureau of Underground Storage Tank Regulations.

assigns," they intended their 1992 Cancellation and Release to release the claims of their heirs, representatives, executors, administrators, and successors, and assigns. Thus, the release executed by the parties in the 1992 Cancellation and Release covers the claims asserted by the Plaintiffs in Counts 23 and 24, unless the claims can fit within the only exception to this broad release.

The 1992 Cancellation and Release creates an exception from this release for "any further liability which may result from additional requirements for corrective action by the Ohio Bureau of Underground Storage Tank Regulations, which corrective actions are a result of the use of the Premises by Lessee." (Gilbert Aff., Ex. A-7.) The Plaintiffs attempt to characterize this exception as a broad carve-out and their breach of contract claim and their claim for waste as the sort of "further liability" contemplated by the parties in the release agreement. They argue that the "uncertainty" reflected in the September 11, 1992, letter, and "the obligation under the lease to conduct remediation" were "the subject of the carve-out." (Pls.' Response 9.) Although their argument is less than clear, they contend that the "further liability" referenced in the exception is "separate and distinct from 'additional requirements for corrective action'" and that "[t]he only limitation on the additional requirements for corrective action is that they relate to the use of the premises by the Defendants." (Pls.' Response 9, 10.) They also seem to assert that the terms of the exception permit liability to attach apart from the Ohio Bureau's review, approval, and orders. In elaborating on their argument, they point to the opinion of Andrew A. Gremos that additional corrective action is required and to "facts" suggesting that "there is further liability that may result from additional requirements for corrective action by the Ohio [Bureau], whether or not the Ohio [Bureau] has ordered such testing and closure already." (Pls.' Response 10.)

13

The Court is unpersuaded by the Plaintiffs' attempt to fit Counts 23 and 24 into the exception. Reading the contract as a whole, the Court finds that the exception carved out from the parties' broad release is "further" or additional "liability" resulting from corrective action that is required by the Ohio Bureau of Underground Storage Tank Regulations and that is a result of the Defendants' use of the subject premises.[4] The exception must be read in the context of the September 11, 1992, letter from the Ohio Bureau of Underground Storage Tank Regulations. This letter was attached to and incorporated in the 1992 Cancellation and Release, and the 1992 Cancellation and Release explained that the letter "advis[ed] that [the Bureau] [wa]s not requiring further corrective actions of any contamination resulting from petroleum UST activity at subject property." (Gilbert Aff., Ex. A-7.) Considering these provisions of the contract and the overarching purpose of the agreement (namely, to cancel the 1983 lease agreement and to release the parties from "any and all claims, debts, demands, causes of action and obligations of any

---

[4] The exception is inartfully drafted in its use of the term "which" and the construction of the related clauses. Another district judge has explained the difference between the uses of "which" and "that" as follows:

> "Which" is nonrestrictive; in other words, it introduces a clause that merely adds information. Strunk & White, *The Elements of Style* 59 ("*That* is the defining, or restrictive pronoun, *which* the nondefining, nonrestrictive."); *Manual on Usage & Style* I:41:1 (Texas Law Review Assn. ed., 8th ed. 1995) (If the information contained in the relative clause is meant to define the modified word or clause or to limit the sense in which the modified word or clause is used, the relative clause is restrictive and should be introduced by *that*. . . . Use *which* to introduce a nonrestrictive clause—one that merely adds information about the person, thing, or idea to which the clause refers.").

*Northern Crossarm Co. v. Chemical Specialties, Inc.*, No. 03-C-415-C, 2004 WL 602648, at *6 (Mar. 16, 2004).

With the exception in the 1992 Cancellation and Release, the first "which" is used in a restrictive or defining way because the information contained in the clause that follows (i.e., "may result from additional requirements for corrective action by the Ohio Bureau of Underground Storage Tank Regulations") is intended to define the modified word (i.e., "any further liability") and to limit the sense in which "any further liability" is used, and thus the word "that" should have been used. If the first "which" were given a non-restrictive sense, the clause would merely add information about the term "any further liability," but that would render the discharge and release clause largely ineffective and meaningless. *See DLZ Ind., LLC v. Greene County*, 902 N.E.2d 323, 327 (Ind. Ct. App. 2009) (stating that courts "interpret a written contract by reading the contract as a whole" and "attempt to construe the language so as to not render any words, phrases, or terms ineffective or meaningless"). Similarly, the second "which" in the exception is used in a restrictive or defining way because the information contained in the clause that follows (i.e., "corrective actions are a result of the use of the Premises by [the Defendants]") is intended to define the modified term (i.e., "corrective action") and to limit the sense in which the term is used.

character or nature whatsoever arising out of or in connection with" the lease agreement), the most natural reading of the term "any further liability" in the exception is that it referred to additional corrective action required by the Ohio Bureau that related to the Defendants' use of the subject property. The Plaintiffs are correct that the letter did not guarantee "that no problems existed at the aforementioned location" and that the letter should not be understood to "release the responsible party from future responsibility and liability under sections 3737.88 through 3737.89 of the Ohio Revised Code and other state laws and regulations or under the Federal Clean Water Act, Resource Conservation and Recovery Act, or Comprehensive Environmental Response, Compensation, and Liability Act for remedying conditions resulting from any release of contaminants to the environment."[5] (Gilbert Aff., Ex. A-7.) However, the letter's reference to possible future responsibility and liability is modified by the use of prepositional phrases identifying state and federal laws (including Ohio statutes addressing corrective action and liability for corrective action related to underground storage tanks). Thus, the letter itself also supports a narrower reading of the "any further liability" language than the Plaintiffs propose.

Finally, the Plaintiffs have not come forward with evidence that would tend to show that the Ohio Bureau of Underground Storage Tank Regulations is requiring corrective action (or will require any corrective action anytime soon) related to the Defendants' use of the leased premises. To the contrary, the Plaintiffs concede that "[t]here are no orders presently nor have the Plaintiffs or the Defendants informed the Ohio [Bureau] of the issues raised by Mr. Gremos," and they admit that there is simply "a possibility" that the Ohio Bureau will order further testing

---

[5] Although the parties do not indicate what Sections 3737.88 through 3737.89 specifically provided in 1992, the current version of section 3737.88 of the Ohio Revised Code addresses Ohio's underground storage tank and corrective action programs for releases, and the current version of section 3737.89 addresses liability for costs of corrective or enforcement action.

or well closure.[6] (Pls.' Response 10.) As a consequence, the breach of contract claim and claim for waste asserted by the Plaintiffs in Counts 23 and 24 do not fall within this exception, and thus the broad release applies to bar these claims.

For these reasons, the Court finds that the 1992 Cancellation and Release bars the Plaintiffs from bringing the claims alleged in Counts 23 and 24. The Court will, therefore, grant the Defendants' Motion for Summary Judgment on the release issue.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Celina, Ohio Property (Counts 23 and 24) [DE 91].

SO ORDERED on April 24, 2009.

                                         S/ Theresa L. Springmann
                                         THERESA L. SPRINGMANN, JUDGE
                                         UNITED STATES DISTRICT COURT

---

[6] In addressing the failure of the Plaintiffs to show any request for further corrective action by the Ohio Bureau of Underground Storage Tank Regulations, the Defendants argue that the Plaintiffs have no cause of action and thus lack standing. The Court, having reviewed the cases cited by the Defendants and considered the Defendants' argument regarding standing, is not persuaded to grant the Defendants' Motion for Partial Summary Judgment on this basis.