# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| BITLER INVESTMENT VENTURE II, LLC, | ) | |
| BITLER INVESTMENT VENTURE III, LLC, | ) | |
| BITLER INVESTMENT VENTURE V, LLC, | ) | |
| BITLER INVESTMENT VENTURE VI, LLC, | ) | |
| MELCHING INVESTMENT VENTURE II, LLC, | ) | |
| MELCHING INVESTMENT VENTURE III, LLC, | ) | |
| MELCHING INVESTMENT VENTURE V, LLC, | ) | |
| MELCHING INVESTMENT VENTURE VI, LLC, | ) | |
| and TWO PORTLAND PROPERTIES #1, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:04-CV-477-TS |
| | ) | |
| MARATHON ASHLAND PETROLEUM, LLC, | ) | |
| SPEEDWAY SUPERAMERICA, LLC, and | ) | |
| MARATHON OIL COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In this lawsuit, which was instituted in 2004, the Plaintiffs seek recovery under the theories of breach of contract and waste. The Defendants and/or their predecessors in interest leased several gasoline stations from the Plaintiffs and/or their predecessors in interest, and the Plaintiffs claim that the Defendants and their predecessors in interest neglected and destroyed the leased commercial properties and thereby injured the Plaintiffs' rights and interests in the properties.

In August 1994 and August 1995, the parties' predecessors in interest entered into written agreements cancelling their lease agreements involving properties in Huntington, Indiana, and Ligonier, Indiana and releasing the Plaintiffs, the Defendants, and their predecessors in interest from all claims arising out of or in connection with the leases. Almost ten years later, the

Plaintiffs instituted this legal action seeking to recover damages from the Defendants for alleged breaches of contract and waste.

On July 18, 2007, the Defendants filed a Motion for Partial Summary Judgment on All Issues Regarding the Huntington, Indiana Property (Counts 5 and 6) and Ligonier, Indiana Property (Counts 25 and 26) [DE 119], arguing that these claims are barred by the release agreement and the applicable statute of limitation. On September 10, the Defendants filed a Motion to Strike the Affidavit of Dr. Ravi Nagarajan [DE 159]. These motions are fully briefed and ripe for ruling.

## BACKGROUND

On December 17, 2004, the Plaintiffs instituted this lawsuit. In their twenty-eight count Complaint [DE 1], they name Marathon Ashland Petroleum as Defendant. On January 21, 2005, they filed an Amended Complaint [DE 17], adding Speedway SuperAmerica LLC and Marathon Oil Company as additional Defendants. The Plaintiffs premise this Court's subject-matter jurisdiction on diversity of citizenship pursuant to 28 U.S.C. § 1332.

Counts 5 and 6 of the Amended Complaint relate to commercial property in Huntington, Indiana, which is currently owned by Plaintiffs Bitler Investment Venture III and Melching Investment Venture III. Counts 25 and 26 of the Amended Complaint relate to commercial property in Ligonier, Indiana, which is currently owned by Plaintiffs Bitler Investment Venture III and Melching Investment Venture III. The Plaintiffs contend that the Defendants left these properties in a deplorable condition with remaining environmental uncertainties, that the Defendants returned the properties to the owners in a condition that was both unsaleable and

untenantable at fair market rates, that the Defendants breached the commercial lease agreements, that the Defendants destroyed, misused, altered, mutilated, and damaged the properties and left them in a damaged condition, and that the Plaintiffs have suffered damages.

On February 28, 2005, the Defendants filed their Answer [DE 34], and on March 15, they filed their Amended Answer [DE 40]. On July 18, 2007, the Defendants filed their Motion for Partial Summary Judgment on All Issues Regarding the Huntington, Indiana Property (Counts 5 and 6) and Ligonier, Indiana Property (Counts 25 and 26) [DE 119], a Brief in Support [DE 120], a Submission of Evidence [DE 121] (with Exhibits), and an Appendix/Statement of Material Facts [DE 122]. On August 24, the Plaintiffs filed a Response [DE 149] and a Submission of Evidence [DE 150] (with Exhibits). On September 10, the Defendants filed a Reply [DE 161]. On September 10, the Defendants also filed a Motion to Strike the Affidavit of Dr. Ravi Nagarajan [DE 159] and Brief in Support [DE 160]. On September 28, the Plaintiffs filed a Response [DE 177], and on October 12, the Defendants filed a Reply [DE 185].

The Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Huntington, Indiana Property (Counts 5 and 6) and Ligonier, Indiana Property (Counts 25 and 26) is the second in a series of summary judgment motions (seven in total) filed by the Defendants that together seek summary judgment on each of the claims asserted by the Plaintiffs. The Defendants have also filed a series of motions *in limine* and motions to strike. This Opinion and Order addresses only the second of these summary judgment motions and one of the motions to strike filed by the Defendants.

# SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." If appropriate, summary judgment should be entered against a party who fails to so respond. Fed. R. Civ. P. 56(e)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that a court should enter summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

## FACTS

**A.      The Relevant Parties and the Leases**

On December 1, 1965, George O. and Mary Eleanor Bitler and Max E. and J. Maxine Melching entered into a lease agreement entitled "Indenture of Lease" with Colonial Oil Company, Inc., involving the subject property in Ligonier, Indiana, which the Bitlers and the Melchings owned. On August 1, 1975, George O. Bitler and Max E. Melching entered into a lease agreement entitled "Indenture of Lease" with Colonial Oil Company, Inc., involving the subject property in Huntington, Indiana, which Mr. Bitler and Mr. Melching owned. At times during this period, George Bitler and Max Melching were officers of Colonial Oil Company. At some point, which is not critically important to the present issues in this case, Rock Island Refining Company acquired Colonial Oil Company, and eventually Marathon Oil Company acquired Rock Island Refining Corporation and its wholly-owned subsidiary or affiliate R.I. Marketing Company, Inc. The Huntington and Ligonier properties were used as retail gasoline stations.

On October 27, 1983, George O. Bitler and Max E. Melching entered into separate lease agreements both entitled "Indenture of Lease" with R.I. Marketing, Inc., involving the Huntington and Ligonier properties. These leases were for terms of eleven-years, running from December 1, 1983, to November 30, 1994, and included renewal options. Both leases included the following term regarding use of the leased premises: "During the lease term, the Lessee shall use the leased premises in a careful and proper manner and for lawful purposes only, and shall, at its own expense, comply with any and all applicable statutes, ordinances, rules and regulations relating to the occupancy or use of the leased premises . . . ." (Second Gilbert Aff., Ex. A-4 at 4

and Ex. A-5 at 4.) Within several months of executing these agreements, Mr. Bitler and Mr. Melching met with William Gilbert, an employee and representative of Marathon Oil Company and Marathon Petroleum Company who managed real estate and leases in the region during the relevant period. Mr. Bitler and Mr. Melching informed Mr. Gilbert that Mr. Melching would be the primary contact person regarding the Huntington and Ligonier properties. In July 1989, Marathon Oil Company (then known as Marathon Petroleum Company) acquired Rock Island Refining Corporation and R.I. Marketing, and Emro Marketing Company (a wholly-owned subsidiary of Marathon Petroleum Company) eventually acquired the leases on the Huntington and Ligonier properties.

New federal regulations governing underground storage tanks used to store gasoline and other petroleum products were promulgated in the late 1980s. These regulations required upgrades or replacement of existing tanks and pipes by December 22, 1998.

On October 6, 1992, Max E. Melching and George O. Bitler entered into a Master Amendment to Leases (Master Amendment) agreement with Emro Marketing Company. This Master Amendment included the Huntington and Ligonier properties in the leased premises covered by that document. The Master Amendment transferred to Emro Marketing ownership of the underground storage tanks and all related piping at these premises, and Emro Marketing assumed responsibility for removing from these premises the underground storage tanks and all related piping, prior to the end of each lease term and subject to extension as provided in the Master Amendment. Emro Marketing agreed that its tank and piping removal would fully comply with all applicable laws, rules, regulations, and ordinances, and that it would backfill holes and trenches, leave the premises in a condition reasonably useful for future commercial

use, and replace any asphalt, concrete, or other surface damaged or destroyed in the removal process. Emro Marketing agreed to assume all responsibility "for any and all liability, losses, damages, costs and expenses resulting from its use of the Premises and the removal of the underground storage tanks and piping, as said liability may be determined by all applicable federal, state, and local laws, rules and regulations." (Second Gilbert Aff., Ex. A-6 at 2.) Accordingly, it would "indemnify, defend, and hold [Mr. Melching and Mr. Bitler] harmless from and against any and all liability, claim, action, cause of action, loss, damage, cost and expense, . . . which [Mr. Melching and Mr. Bitler] may incure by reason of the occupation, leasing, subleasing, or use of the Premises by [Emro Marketing], or any other party, up to and including the termination date of the Lease, or the last day of any lease extension period." (Second Gilbert Aff., Ex. A-6 at 2.) This agreement to indemnify and hold harmless extended to any liability, loss, or damage arising out of Emro Marketing's failure to conform to or comply with applicable laws in connection with its occupation, leasing, subleasing, or use of the premises up to and including the lease termination date or the last day of any lease extension period. The agreement imposed certain notice requirements on Mr. Melching and Mr. Bitler when they had knowledge of any act or occurrence involving a liability, claim, demand, or costs. The Master Agreement included a term regarding a rent-free occupancy period in the event Emro Marketing elected to discontinue the business operations on the premises on or before the termination date of the applicable lease or any extension. It also provided as follows regarding environmental issues related to the Plaintiffs' claims:

4.      [Emro Marketing] agrees that prior to vacating the Premises, it shall, at its
        own expense, clean up any petroleum related or petroleum caused
        contamination discovered at the Property provided that: a) the
        contamination exceeds acceptable or legal levels established by the state

in which the property is located or the United States Environmental Protection Agency; and b) the cleanup will be to a level existing in law, regulations, or ordinances established by . . . the State of Indiana or the Untied States Environmental Protection Agency or, if no such level is established, the cleanup will be to a level adequately protective of public health and safety, as determined by a scientific consultant retained by Emro. All remediation work in this regard, including, but not limited to, that work required by the removal of the underground storage tanks, shall be performed in accordance with all laws, rules and regulations applicable to such remediation, and [Emro Marketing] shall return the premises to [Mr. Melching and Mr. Bitler] as nearly as possible in the same condition as it was in prior to such remediation work, subject only to the removal of the contamination and normal wear from reasonable use of the property.

5.    [Emro Marketing] shall undertake the underground storage tank and piping removal during the Occupancy Period, and in the event the complete removal, remediation and restoration project is not completed by the conclusion of the Occupancy Period, said Occupancy Period shall be extended on a month-to-month basis in consideration of the payment by [Emro Marketing to Mr. Melching and Mr. Bitler] of the monthly sum of money specified . . . until such time as the entire project is completed. Any governmental or otherwise required continuing groundwater monitoring or pumping or treating shall not be deemed to extend the remediation and restoration project or the obligation of [Emro Marketing] to pay rent to [Mr. Melching and Mr. Bitler] unless said monitoring or pumping or treating materially interferes with [Mr. Melching and Mr. Bitler's] use of the premises or [their] ability to sell or lease the same. [Emro Marketing] agrees to provide [Mr. Melching and Mr. Bitler] with copies of any and all documents related to the removal, remediation and restoration project, and [Mr. Melching and Mr. Bitler] shall have the further right to review and obtain copies of all documentation related to said project during the course of the same and after its conclusion.

(Second Gilbert Aff., Ex. A-6 at 3–4.) The Master Agreement also included a lease buyout term when the conclusion of the occupancy period preceded the termination date of the relevant lease. Emro Marketing agreed to provide copies of all environmental reports submitted to state agencies, copies of correspondence received from state agencies related to such reports, and periodic status reports relative to remediation. The parties also agreed that the leases remained in full force and effect, except as amended by the Master Amendment.

**B.      The Closure and Release Regarding the Huntington Property**

By letter dated April 29, 1993, Emro Marketing notified Mr. Bitler and Mr. Melching that it would be permanently closing the gas station operated on the Huntington premises, on May 15, 1993; that the rent-free occupancy period would begin on July 1, 1993, and continue through August 31, 1995; that it remained responsible for the real estate taxes; and that in the event the occupancy period were to extend beyond the lease termination date, it would have no rental obligation other than the effective rental on a month-to-month basis for the period of the extended occupancy. Growth Environmental Services, Inc., prepared a UST System Closure Report on the Huntington property for Emro Marketing. That report is dated July 20, 1994, and reflects the removal of five underground storage tanks. In a letter dated August 3, 1994, to Emro Marketing, Growth Environmental Services provided the closure report and indicated that a copy of the closure report had been submitted to the Indiana Department of Environmental Management (IDEM).

R.I. Marketing, Inc., predecessor in interest to Emro Marketing, entered into a Mutual Cancellation of Lease Agreement with George O. Bitler and Max E. Melching involving the existing lease of the Huntington property. The Mutual Cancellation specifies that Indiana law would govern the agreement and that its effective date was August 31, 1994. Emro Marketing signed the agreement on August 22, 1994, and its execution of the agreement was witnessed by a notary public. Both Mr. Bitler and Mr. Melching signed the agreement on July 21, 1994, and their execution of the agreement was witnessed by a notary public who attested that both men personally appeared and "acknowledged the execution [of the cancellation agreement] as [their] free act[s] and deed[s] for the uses and purposes therein mentioned." (Second Gilbert Aff., Ex.

A-10, at 5.) The Mutual Cancellation indicates that "[t]his instrument [was] prepared by Peter G. Mallers, Attorney at Law." (Second Gilbert Aff., Ex. A-10, at 5.) Mr. Mallers was an attorney retained by Mr. Bitler and Mr. Melching. The Mutual Cancellation states that "it is now the desire of [Mr. Bitler and Mr. Melching] and Emro to terminate the Lease before the expiration of its term on November 30, 1994," and that "in consideration of the covenants contained herein, the parties agree that the Lease is terminated, canceled and of no further force and effect, subject to the following terms, conditions and exceptions." (Second Gilbert Aff., Ex. A-10, at 1.)

The Mutual Cancellation indicates that Mr. Bitler and Mr. Melching intended to lease the Huntington property to Superior Auto and that lease was to commence "as soon as possible." (Second Gilbert Aff., Ex. A-10, at 1.) The Mutual Cancellation also includes the following terms, conditions, and exceptions, which are relevant to the issues raised by the parties relative to the Defendants' Motion for Partial Summary Judgment:

> 2.      Emro has extended no other right, title or interest in and to the property or the Lease and agrees to return possession of the same to [Mr. Bitler and Mr. Melching], subject to its rights and responsibilities to remediate any contamination which may exist on the Property, as evidenced by the environmental report dated July 20, 1994 (the "Remediation Work").
> 3.      [Mr. Bitler and Mr. Melching] and Emro agree to discharge and release each other from any and all liability, losses, damages, claims and obligations of any character or nature whatsoever arising out of or in connection with the Lease, and [Mr. Bitler and Mr. Melching] and Emro further acknowledge full and complete performance under the terms of the Lease on the part of the other party, except that Emro shall remain fully and completely obligated and bound to perform any and all Remediation Work.
> 4.      [Mr. Bitler and Mr. Melching] hereby grants to Emro the right of limited possession of the Property for the sole purpose of performing the Remediation Work.
> 5.      Emro acknowledges and agrees that [Mr. Bitler and Mr. Melching] shall have the right to lease the Property to any party for any purpose whatsoever, so long as said lease and use by [Mr. Bitler and Mr. Melching's] tenant does not interfere with the Remediation Work to be performed by Emro.
> 6.      In consideration of this agreement and [Mr. Bitler and Mr.

Melching's] right to lease the Property, [Mr. Bitler and Mr. Melching] ha[ve], pursuant to this Cancellation Agreement, released Emro of all further rent-payment obligations.

7.       Emro is aware of no contamination existing on the Property other than that required by the Remediation Work.

8.       In performing the Remediation Work, Emro will comply with all federal, state and local laws, rules and ordinances pertaining to the clean up of hazardous substances.

9.       Emro agrees to perform the Remediation Work forthwith and will proceed in a timely manner. Further, Emro agrees that in undertaking the Remediation Work it will use its best efforts to do so in a manner that will not disturb the use of the Property by [Mr. Bitler and Mr. Melching's] new tenant.

10.      Emro will indemnify, defend and hold harmless [Mr. Bitler and Mr. Melching], [their] tenant, and [their] tenant's lender, if any, (the "Indemnified Parties") from any and all liability, losses, damages, costs, claims and expenses, including attorney fees, which may be incurred by any of the aforesaid indemnified parties, due to Emro's failure to fully perform the Remediation Work as referenced herein in accordance with all applicable laws and regulations. In order for any of the Indemnified Parties to receive the protection of this paragraph, such Indemnified Parties must first give Emro written notice, by notice to the undersigned and to Quentin H. Wood, Marathon Oil Company . . . of the claim, lawsuit or other matter which is claimed to be covered by this paragraph. Emro will then be given a reasonable period of time to cure the matter giving rise to the claim, lawsuit or other matter before having to provide the protections granted by this paragraph, but in no event shall the cure period result in default or other judgment against any of the Indemnified Parties.

11.      Emro's obligations under this agreement are conditional upon the following:

a.       The obligations of Emro provided for in this agreement are effective so long as Indemnified Parties covenant not to sue and release Emro, its parent or subsidiary corporations, officers or employees, for any claim based upon any of the environmental contamination caused by operations of Emro Marketing or its predecessors. The covenant not to sue and release provided for by this paragraph are self-executing upon the approval of this agreement but are conditional upon Emro's continuation and completion of the Remediation Work as required by this agreement.

b.       [Mr. Bitler and Mr. Melching] and [their] tenant hereby grant Emro and its agents access to the Property to conduct any assessment or Remediation Work that Emro may need to conduct to comply with federal, state or local law. Emro shall provide a representative of [Mr. Bitler and Mr. Melching] and [their] tenant (as appropriate at the time) at

least 24 hours notice before conducting any such work on the Property. Emro agrees to use its best efforts not to interfere with or disrupt [Mr. Bitler and Mr. Melching's] or [their] tenant's use of the Property.

12. This agreement shall inure to the benefit of and shall be binding on the parties hereto, their heirs, successors and assigns.

(Second Gilbert Aff., Ex. A-10, at 1–3.)

In a letter dated August 29, 1994, Emro Marketing responded to the specific comments portion of a UST System Closure Report Review Checklist received from IDEM. Emro Marketing informed IDEM of the following:

There has never been a suspected or confirmed release from the UST system at this facility. The quantity of soil removed was based on field readings from a PID meter. In addition, product piping was removed from the subsurface rather than being left in place. Any soil that exhibited elevated PID readings in the piping trench areas was removed as well. We do not feel that there has been a reportable release.

(Second Gilbert Aff., Ex. A-14.) With a letter dated December 2, 1994, Emro Marketing provided Max Melching with a copy of IDEM's UST System Closure Report Review Checklist. This letter also referenced a letter (which was enclosed with Emro Marketing's December 2, 1994, letter) to IDEM from Emro Marketing addressing the specific comments portion of IDEM's Checklist. The December 2, 1994, letter and the Checklist indicate that Emro Marketing had submitted all of the required information and that this information was adequate. With a letter dated April 14, 1995, to Mr. Bitler and Mr. Melching, Marathon Oil Company provided a copy of Emro Marketing's August 29, 1994, letter to IDEM regarding the Checklist.

Mr. Gilbert, on behalf of the Defendants, had dealt with the Bitlers and the Melchings for nearly a decade and a half regarding various leased properties, and these dealings included the Huntington property during the relevant time period. Mr. Gilbert was the person to whom

complaints regarding the leased properties would have been directed. Neither George or Mary Bitler, nor Max or Maxine Melching communicated to Mr. Gilbert (in writing or orally) any dissatisfaction with the condition of the Huntington property when it was returned to them upon the cancellation of the lease. Before the Complaint was filed in this case, no concerns were raised or dissatisfaction expressed to Mr. Gilbert regarding the environmental work at or status of the Huntington property. Additionally, neither George or Mary Bitler, nor Max or Maxine Melching communicated, either in writing or orally, dissatisfaction with renting the Huntington property as a used car lot.

**C.     The Closure and Release Regarding the Ligonier Property**

By letter dated March 22, 1994, Emro Marketing notified George and Mary Bitler and Max Melching that it did not intend to exercise the lease extension at the Ligonier property; and that, under the terms of the Master Amendment, the rent-free occupancy period would begin on December 1, 1994, and extend for 22.2 months (or until approximately September 6, 1996) at the Ligonier property. George Bitler signed an authorization to remove a canopy at the Ligonier property that was provided at the bottom of a letter dated February 28, 1995, from Marathon Oil Company to Mr. Bitler.

In a letter dated July 24, 1995, William Gilbert of Marathon Oil Company informed Mr. Bitler and Mr. Melching that Marathon Oil Company desired to "relinquish control and all responsibilities for the Ligonier station effective August 31, 1995." (Second Gilbert Aff., Ex. A-17.) The letter indicated that the property had been remediated to IDEM's satisfaction. Mr. Gilbert also asked Mr. Bitler and Mr. Melching to sign and return to him the enclosed Mutual

Cancellation of Agreements and Release of Claim. The documentation enclosed with the letter included July 12, 1995, Intracompany Correspondence that included two copies of an Underground Storage Tank Closure Report on the Ligonier property prepared by ATEC Associates, Inc., an environmental consultant retained by Emro Marketing. The Report addressed the closure and removal of underground storage tank system (which included four tanks) at the Ligonier property.

Mr. Bitler and Mr. Melching were interested in renting the Ligonier property to Superior Auto for use as a used car lot. R.I. Marketing, Inc., predecessor in interest to Emro Marketing, entered into a Mutual Cancellation of Agreements and Release of Claims with George O. Bitler and Max E. Melching involving the existing lease of the Ligonier property. The Mutual Cancellation and Release specifies that its effective date was August 31, 1995. Emro Marketing signed the agreement on August 17, 1995, and its execution of the agreement was witnessed by a notary public. Both Mr. Bitler and Mr. Melching signed the agreement on August 8, 1995, and their execution of the agreement was witnessed by Maxine Melching and a notary public who attested that both men personally appeared and "acknowledged the execution [of the cancellation and release agreement] as [their] free act[s] and deed[s] for the uses and purposes therein set forth." (Second Gilbert Aff., Ex. A-19, at 2.) The Mutual Cancellation and Release states that the "lease as amended has now expired and a final assessment dated July 6, 1995, indicates that the site is satisfactory to the Indiana Department of Environmental Management, it is now the desire of the surviving parties to said agreements that all of such agreements be mutually canceled." (Second Gilbert Aff., Ex. A-19, at 1.) It also includes the following terms:

> [I]n consideration of the mutual covenants and obligations in said agreements and
> in this Agreement contained, it is hereby agreed that the agreements listed below

14

are canceled and held for naught:

1.     Indenture of Lease dated October 27, 1983, covering Emro's unit 6081 at 1110 Lincoln Way South, Ligonier, Indiana.

2.     Master Amendment to Leases dated October 6, 1992 as applicable to said Indenture of Lease.

    Each party hereto expressly discharges and releases the other from all claims and obligations of any character or nature whatsoever arising out of or in connection with said agreements and acknowledges full and complete performance on the part of the other party.

(Second Gilbert Aff., Ex. A-19, at 1.)

An IDEM UST System Closure Report Review Checklist dated November 8, 1995, summarized the information provided by Emro Marketing, identified the information that was adequate, and indicated that some additional information was needed. In a letter dated November 21, 1995, ATEC Associates responded to IDEM's Checklist and supplied the additional information. A reissued IDEM UST System Closure Report Review Checklist dated November 29, 1995, reflected receipt of the additional information and showed that the information provided was adequate. In a letter dated February 3, 2006, the Defendants requested official closure and No Further Action status related to a petroleum hydrocarbon release reported on June 15, 1995, at the Ligonier property. The Defendants supplied information and documents dated May 24, 1995, July 6, 1995, and November 21, 1995. For whatever reason, the incident had never been officially closed by IDEM. In a letter dated February 9, 2006, IDEM granted the request and stated its conclusion that no further response actions are required. Neither George or Mary Bitler, nor Max or Maxine Melching communicated, either in writing or orally, dissatisfaction with renting the Ligonier property as a used car lot.


**D.**     **The Relevant Post-Cancellation Factors**

The properties were re-let to Superior Auto for use as a used car lot (and the Ligonier property subsequently to Mexicar), and this use of the properties has continued. According to the First Amended Complaint, Bitler Investment Venture III and Melching Investment III, as tenants in common, own the Huntington and Ligonier properties.

## ANALYSIS

The Defendants seek summary judgment on Counts 5, 6, 25, and 26 based on several different grounds. They argue that each of these claims is barred by the cancellation/release agreements, that each of these claims is time-barred under the applicable statute of limitation, and that the Plaintiffs have no admissible evidence to support their claims of breach of contract and waste at either the Huntington property or the Ligonier property. The Court finds the first two dispositive, and the Court will address these grounds beginning with the statute of limitation argument.

**A.      The Claims Asserted in Counts 5, 6, 25, and 26 Are Barred by the Statute of Limitation**

The Defendants contend that the Plaintiffs' breach of contract claims related to the Huntington property and the Ligonier property (Counts 5 and 25 respectively) are barred by the six-year statute of limitation governing actions for injuries to property other than personal property and for lost use, rents, and profits of real property. They also urge that the Plaintiffs' claims for waste related to these properties (Counts 6 and 26 respectively) are barred by the same six-year statute of limitation. The Plaintiffs respond that issues of fact exist as to when the cause of action for breach of lease and waste accrued at these properties, and they urge that the ten-

16

year written contract statute of limitation applies.

Under the familiar rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938), a federal court sitting in diversity applies the substantive law of the state in which it sits. *See Land v. Yamaha Motor Corp.,* 272 F.3d 514, 516 (7th Cir. 2001). Statutes of limitation are considered substantive matters for purposes of the *Erie* doctrine. *Guaranty Trust v. York,* 326 U.S. 99, 110 (1945). Moreover, "[l]ike the statute of limitations itself, rules that are an 'integral part of the statute of limitations,' such as tolling and equitable estoppel, are treated as substantive for purposes of the *Erie* doctrine." *Hollander v. Brown,* 457 F.3d 688, 694 (7th Cir. 2006) (quoting *Walker v. Armco Steel Corp.,* 446 U.S. 740, 751–53 (1980)).

Statutes of limitation seek to provide security against stale claims, which promotes judicial efficiency and advances the peace and welfare of society. *Cooper Indus. v. City of South Bend*, 899 N.E.2d 1274, 1279 (Ind. 2009). Indiana statutes set the following time limitations (among others) for bringing causes of action: 10 years under the general statute of limitation, Ind. Code § 34-11-1-2(a); 6 years for actions for use, rents, and profits of real property and for actions for injuries to property other than personal property, Ind. Code § 34-11-2-7(2) & (3); and 10 years for actions upon written contracts, Ind. Code § 34-11-2-11. The substance of a cause of action (i.e., how parties characterize facts in their pleadings), rather than its form, determines the applicability of the statute of limitation. *Cooper Indus.*, 899 N.E.2d at 1284–85.

In a relatively recent case involving underground storage tanks and remediation that required the Indiana Supreme Court to determine which of several Indiana statutes of limitation applied to the claims, the court determined that the six-year statute of limitation in Indiana Code § 34-11-2-7 applies to claims for stigma damages, as well as claims for waste and negligence

related to real property, but that the ten-year statute of limitation in Indiana Code § 34-11-1-2(a) applies to contribution claims. *Pflanz v. Foster*, 888 N.E.2d 756, 759–61 (Ind. 2008). It is helpful to consider how that court distinguished among the claims in reaching its conclusions. According to the court, a contribution or indemnification claim is not a claim for damage to the property itself; rather, it seeks damages for the monetary obligation incurred as a result of another party's actions (such as the costs of cleanup required by a state agency). *Id.* at 759. Such claims are not brought until after the obligation to pay is incurred. *Id.* Under Indiana law, recovery of stigma damages is permitted for losses in the fair market value of property after remediation of environmental contamination, and such damages are warranted where the plaintiff can show that an imperfect market rendered the property less valuable despite complete restoration. *Id.* Such a claim ripens only after remediation has been substantially completed because only then can the parties determine the impact of environmental contamination on property value. *Id.* Claims for stigma damages are similar to contribution claims in that the damage is not the environmental contamination itself, but a diminution in property value despite acceptable remediation of the environmental contamination. *Id.* at 760.

Considering the potentially relevant Indiana statutes of limitation, the Indiana Supreme Court's application of these statutes, and the substance of the claims asserted by the Plaintiffs, the Court finds that the Plaintiffs claims for breach of contract and waste regarding the Huntington property and the Ligonier property (Counts 5 and 6 and Counts 25 and 26, respectively) are governed by the six-year statute of limitation in Indiana Code § 34-11-2-7. In the prefatory allegations to these claims in the First Amended Complaint, the Plaintiffs allege that "[t]he rent Superior Auto and other potential tenants have been willing to pay has been

adversely impacted by the deplorable condition in which [the Defendants] had left the building and grounds—as well as by remaining environmental uncertainties," (Pls.' First Am. Compl. ¶ 91), and that "the rent Superior Auto and the subsequent or other potential tenants have been willing to pay has been adversely impacted by the deplorable condition in which [the Defendants] had left the building and grounds, as well as by remaining environmental uncertainties," (Pls.' First Am. Compl. ¶ 266). They also allege that these properties were "returned to the owners in a condition both unsaleable and untenantable at fair market rates" and that given their location in active commercial areas, they "could have been converted to more profitable commercial use, were it not for [the Defendants'] wrongful conduct." (Pls.' First Am. Compl. ¶¶ 92, 267.) The Plaintiffs' allegations regarding their breach of contract claims conclude by stating that, as a result of the Defendants' breach, the "Plaintiffs have suffered damages, consisting of lost rents, costs of returning the [properties] to the condition in which [they] would have been had [the Defendants] performed [their] obligations, and miscellaneous expenses." (Pls.' First Am. Compl. ¶¶ 97, 272.) Similarly, their allegations regarding their claims for waste allege that the Defendants "destroyed, misused, altered, mutilated and damaged the [properties] and left [them] in a damaged condition," that the "Plaintiffs have been damaged because they must spend their own monies to restore the [properties] to a condition suitable for reasonable commercial use," and that the "Plaintiffs have been damaged because the [properties] ha[ve] declined in value and/or ha[ve] not increased in value relative to comparable commercial properties." (Pls.' First Am. Compl. ¶¶ 100–02, 275–77.) Accordingly, these claims by the Plaintiffs are in the same categories of claims the Indiana Supreme Court in *Pflanz* found to be governed by the six-year statute of limitations in Indiana Code § 34-11-2-7.

Indiana Code § 34-11-2-7 required the Plaintiffs to bring these claims within six years after the cause of action accrued. Under Indiana's discovery rule, a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in exercise of ordinary diligence should have known of the injury. *Cooper Indus.*, 899 N.E.2d at 1280; *Pflanz*, 888 N.E.2d at 759. The determination when a cause of action accrues is generally a question of law. *Cooper Indus.*, 899 N.E.2d at 1280. Additionally, third parties are usually held accountable for the time running against their predecessors in interest. *Id.* at 1279.

The Plaintiffs commenced this action on December 17, 2004. As a consequence, if their claims accrued before December 17, 1998, then the statute of limitation bars their claims. The Court finds that the Plaintiffs' claims did in fact accrue well before this date and that they are, therefore, time-barred.

As to the claims related to the Huntington property, the effective date of the Mutual Cancellation of Lease Agreement executed by the parties was August 31, 1994, and Mr. Bitler and Mr. Melching gained possession and control of the property by that date, subject to a narrow exception related to the Defendants' completion of the remediation work. The Mutual Cancellation expressly provided that the agreement would inure to the benefit of and be binding on the parties and their heirs, successors, and assigns. Around the same time, the Plaintiffs' predecessors in interest leased the property to Superior Auto for use as a used car lot, which would have permitted them to discover any diminution in property value related to the Defendants' use and the remediation of the property, and that use has continued. Additionally, the Mutual Cancellation specifically references the July 20, 1994, UST System Closure Report, which shows that Mr. Bitler and Mr. Melching had knowledge of the environmental issues. Emro

Marketing's December 2, 1994, letter provided Max Melching with a copy of IDEM's UST System Closure Report Review Checklist and Emro Marketing's August 29, 1994, letter to IDEM addressing the specific comments portion of IDEM's Checklist, which also shows knowledge of the environmental issues. Furthermore, Marathon Oil Company's April 14, 1995, letter to Mr. Bitler and Mr. Melching provided a copy of Emro Marketing's August 29, 1994, letter to IDEM regarding the Checklist.

Accordingly, the Plaintiffs' causes of action regarding the Huntington property accrued, and the statute of limitation began to run, no later than April 14, 1995, when the Plaintiffs' predecessors in interest knew or in exercise of ordinary diligence should have known of their alleged injury. By not bringing their claims for breach of contract and waste regarding the Huntington property until December 17, 2004, which is over nine and a half years after their causes of action accrued, the Plaintiffs failed to bring these causes of action within six years of their accrual, and thus these claims are time-barred under the statute. The Court will, therefore, grant the Defendants' Motion for Partial Summary Judgment as to Counts 5 and 6 of the Plaintiffs' First Amended Complaint.

As to the Ligonier property, Mr. Gilbert's July 24, 1995, letter informed Mr. Bitler and Mr. Melching that the property had been remediated to IDEM's satisfaction. Included with the letter was a copy of the Underground Storage Tank Closure Report on the Ligonier property prepared by ATEC Associates, which shows that Mr. Bitler and Mr. Melching had knowledge of the environmental issues. The effective date of the Mutual Cancellation of Agreements and Release of Claim was August 31, 1995, and Mr. Bitler and Mr. Melching gained possession and control of the property by that date. Around that time, Mr. Bitler and Mr. Melching rented the

Ligonier property to Superior Auto for use as a used car lot, which would have permitted them to discover any diminution in property value related to the Defendants' use and the remediation of the property, and that use has continued. The Mutual Cancellation and Release specifically references the July 6, 1995, UST Closure Report, but it did not require additional remediation work by the Defendants, although the Defendants did provide IDEM with additional information in response to IDEM's UST System Closure Report Review Checklist dated November 8, 1995. Finally, a reissued IDEM UST System Closure Report Review Checklist dated November 29, 1995, indicated that the information provided by the Defendants was adequate.

Accordingly, the Plaintiffs' causes of action regarding the Ligonier property accrued, and the statute of limitation began to run, no later than August 31, 1995, when the Plaintiffs' predecessors in interest knew or in exercise of ordinary diligence should have known of their alleged injury. By not bringing their claims for breach of contract and waste regarding the Huntington property until December 17, 2004, which is over nine years after their causes of action accrued, the Plaintiffs failed to bring these causes of action within six years of their accrual, and thus these claims are time-barred under the statute. The Court will, therefore, grant the Defendants' Motion for Partial Summary Judgment as to Counts 25 and 26 of the Plaintiffs' First Amended Complaint.

**B.      The Claims Asserted in Counts 5, 6, 25, and 26 Are Barred by the Parties' Mutual Cancellations and Releases**

The Defendants argue that the Plaintiffs' claims for breach of contract and waste are barred by the mutual cancellation and release agreements executed by the Plaintiffs' predecessors in interest. The Plaintiffs respond by arguing that these agreements are not

enforceable because there was a lack of consideration, because Mr. Bitler lacked the mental

capacity to execute the agreements, and because Mr. Bitler and Mr. Melching were subject to

undue influence in executing these agreements. The Plaintiffs also contend that the Huntington

Mutual Cancellation is not binding because the Defendants did not deliver the August 11, 1994,

IDEM letter to Mr. Bitler and Mr. Melching before that Mutual Cancellation became effective.

Although the Plaintiffs' argument is not clear, they also seem to think that the "carve-out"

regarding remediation work in the Huntington Mutual Cancellation reflects an ambiguity and

creates an issue of fact. The Plaintiffs also suggest that issues of fact exist regarding the Ligonier

Mutual Cancellation because Emro Marketing made some payment after the Mutual Cancellation

was signed and because the Defendants continued to report to the Plaintiffs and their

predecessors in interest regarding the property.

As noted above, a federal court siting in diversity applies state law to resolve substantive

questions, and when neither party raises a conflict of law issue in a diversity case, the applicable

law is that of the state in which the federal court sits. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d

384, 390 (7th Cir. 2008). There is no dispute among the parties that Indiana substantive law

governs questions related to the parties mutual cancellation and release agreements involving the

Huntington property and the Ligonier property, and thus the Court will apply Indiana substantive

law, which is the law of the forum state.

As to the standards governing release agreements, the Indiana Court of Appeals recently

summarized the applicable law in Indiana:

> A separate release agreement is a species of contract that surrenders a
> claimant's right to prosecute a cause of action. Our supreme court has stated that
> upholding releases serves an important public policy because it facilitates the
> orderly settlement of disputes. Interpretation of a release, like any other contract,

is determined by the terms of the particular instrument, considered in light of all facts and circumstances. Absent an ambiguity, release provisions are interpreted as a matter of law, and we look only to the instrument to ascertain the parties' intent.

*Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009) (quotation marks and internal citations omitted). Additionally, "'[a] release executed in exchange for proper consideration works to release only those parties to the agreement unless it is clear from the document that others are to be released as well.'" *Evan v. Poe & Assocs., Inc.,* 873 N.E.2d 92, 98 (Ind. Ct. App. 2007) (quoting *Huffman v. Monroe County Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992)).

The standards for reviewing contracts are well established. Under Indiana law, contracts are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement, and if the language of the contract is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four corners of the agreement, and courts determine the meaning of a contract from an examination of all of the contract's provisions, and not from a consideration of individual words, phrases, or paragraphs read alone. *Moore*, 903 N.E.2d at 531. Parol, or extrinsic evidence, is inadmissible to add to, vary, or explain clear and unambiguous terms of a written instrument. *Evan,* 873 N.E.2d at 101. An ambiguity does not arise simply because the parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable people could come to different conclusions about its meaning. *Id.* at 98; *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.,* 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005).

In this case, the Mutual Cancellation of Lease Agreement involving the Huntington

property and the Mutual Cancellation of Agreements and Release of Claims involving the Ligonier property are clear and unambiguous,[1] and the Court declines the Plaintiffs' invitation to consider parol or extrinsic evidence. With the Huntington Mutual Cancellation, the parties sought to terminate the lease and agreed to terminate, cancel, and render the lease of no further force and effect. The parties expressly agreed "to discharge and release each other from any and all liability, losses, damages, claims and obligations of any character or nature whatsoever arising out of or in connection with the Lease," and they acknowledged "full and complete performance under the terms of the Lease on the part of the other party, except that Emro shall remain fully and completely obligated and bound to perform any and all Remediation Work." (Second Gilbert Aff., Ex. A-10 at 1.) They expressly agreed that the agreement "shall inure to the benefit of and shall be binding on the parties" to the agreement and to their heirs, successors, and assigns. (Second Gilbert Aff., Ex. A-10 at 3.) Likewise, with the Ligonier Mutual Cancellation of Agreements and Release of Claims, the parties sought to mutually cancel all agreements related to the lease of the Ligonier property, and they agreed that the lease agreements (the Indenture of Lease and the Master Amendment) were canceled and held for naught. They also expressly agreed to discharge and release each other "from all claims and obligations of any character or nature whatsoever arising out of or in connection with said

---

[1] Although the Plaintiffs' argument is not entirely clear, it appears that they are trying to create an ambiguity regarding Emro Marketing's obligation to perform remediation work under the Huntington Mutual Cancellation. It is important to note that an attorney retained by George Bitler and Max Melching drafted the Huntington Mutual Cancellation, and the Plaintiffs may not now exploit any such possible ambiguity in the agreement. Additionally, the term regarding remediation work is defined in the agreement by reference to remediation of contamination evidenced by the July 20, 1994, UST System Closure Report, and the agreement states that Emro Marketing is aware of no contamination existing on the property other than that required by the remediation work. Additionally, Paragraph 2 of the underlying Master Amendment references liability determined by applicable federal, state, and local laws, rules, and regulations. The Court is unpersuaded by the Plaintiffs' less than cogent argument that an ambiguity remains in the Huntington Mutual Cancellation regarding the Defendants' obligations relative to remediation work.

agreements," and they acknowledged "full and complete performance on the part of the other party." (Second Gilbert Aff., Ex. A-19 at 1.) Thus, it is manifestly apparent that the parties to these mutual cancellation/release agreements intended to cancel the lease agreements regarding the Huntington property and the Ligonier property, to acknowledge the other parties' full and complete performance, and to release the other party from any and all claims and obligations arising out of or in connection with the leases. As a consequence, the Court should give effect to the intent of the parties as reasonably manifested in the mutual cancellation/release agreements, unless the Plaintiffs can prevail in showing that consideration was lacking, that Mr. Bitler lacked mental capacity, or that Mr. Bitler and Mr. Melching were subjected to undue influence.

Indiana law is well-settled that offer, acceptance, plus consideration make up the basis for a contract. *Zimmerman v. McColley*, 826 N.E.2d 71, 76 (Ind. Ct. App. 2005). Because consideration consists of any bargained-for exchange, the consideration requirement is satisfied if there is "a benefit accuring to the promisor or a detriment to the promisee." *B-Day Owners Ass'n v. B-Dry Sys., Inc.*, 636 N.E.2d 161, 163 (Ind. Ct. App. 1994). "A detriment occurs when the promise[e] forbears a legal right, and a benefit results when the [promisor] receives a legal right to which he would not otherwise be entitled." *Hastetter v. Fetter Props., LLC*, 873 N.E.2d 679, 684 (Ind. Ct. App. 2007). Under Indiana law, the mental capacity required to enter into a contract "'is whether the person was able to understand in a reasonable manner the nature and effect of his act'" on the date of the agreement. *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 227 (Ind. Ct. App. 2009) (quoting *Wilcox Mfg. Group, Inc. v. Mktg. Servs. of Ind., Inc.*, 832 N.E.2d 559, 562–63 (Ind. Ct. App. 2005)). Under Indiana law, "undue influence" is "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy

his free agency and constrain him to do what he would not have done if such control had not been exercised." *Nichols*, 910 N.E.2d at 228 (quotation marks and citations omitted). Weakness of mind when combined with other factors is sufficient to support a finding of undue influence. *Id.* at 229. Certain legal and domestic relationships (i.e., attorney-client, guardian-ward, principal-agent, pastor-parishioner, and parent-child) raise a presumption of trust and confidence as to the subordinate and a corresponding influence as to the dominant party on the other. *Hamilton v. Hamilton*, 858 N.E.2d 1032, 1036 (Ind. Ct. App. 2006). The law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void if the plaintiff's evidence establishes (1) the existence of such a relationship, and (2) the questioned transaction between the parties resulted in an advantage to the dominant party in whom the subordinate party had placed his or her trust and confidence. *Id.*

As to the lack of consideration alleged by the Plaintiffs, the cancellation/release agreements executed by Mr. Bitler and Mr. Melching and Emro Marketing were mutual. The parties mutually cancelled the underlying lease agreements and mutually released the other party. Both parties acknowledged the other party's full and complete performance (thereby yielding any potential claims under the lease agreements) and relieved the other party of potential liabilities, claims, and obligations. As to both the Huntington property and the Ligonier property, the parties cut short the Defendants' rent-free occupancy period, permitting Mr. Bitler and Mr. Melching to rent these properties to Superior Auto. The Court thus finds that the Huntington Cancellation of Lease Agreement and the Ligonier Mutual Cancellation of Agreements and Release of Claims were supported by adequate consideration.

As to Mr. Bitler's alleged lack of mental capacity and the alleged undue influence, the Huntington Mutual Cancellation of Lease Agreement and the Ligonier Mutual Cancellation of Agreements and Release of Claims were signed by both Mr. Bitler and Mr. Melching, who had known each other well from the many business dealings (including building a profitable gasoline distribution system, selecting sites for gasoline stations, developing gas stations, entering into lease agreements regarding gasoline stations, jointly owning properties, and serving as oil company officers) they had engaged in together for several decades. The signatures of Mr. Bitler and Mr. Melching on both agreements were witnessed by notaries public, who indicated that Mr. Bitler and Mr. Melching personally appeared and acknowledged the execution of these agreements as free acts and deeds for the uses and purposes set forth in the agreements.

In their attempt to undermine George Bitler's mental capacity, the Plaintiffs point to health problems experienced by Mr. Bitler, including polio, a heart attack, weight loss, lost energy, confusion, a stroke, and post-polio syndrome. The Plaintiffs also rely upon the Affidavit of Dr. Ravi Nagajaran, Mr. Bitler's treating physician up to Mr. Bitler's death on November 27, 2000. Dr. Nagajaran practices internal medicine. In his Affidavit, he states his awareness of Mr. Bitler's health issues going back to the 1970s and his medical opinion that Mr. Bitler was not competent to enter into contracts at the times when the Huntington Mutual Cancellation of Lease Agreement and the Ligonier Mutual Cancellation of Agreements and Release of Claims were signed.

The rule governing summary judgment requires that a supporting or opposing affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). On a

motion for summary judgment, a court must not consider parts of an affidavit that fail to comply with Rule 56(e). *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004); *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987). The following statements do not comply and should be disregarded: (1) conclusory allegations lacking supporting evidence; (2) legal argument; (3) self-serving statements without factual support in the record; (4) inferences or opinions not grounded in observation or other first-hand experience; and (5) mere speculation or conjecture. *Heltzel v. Dutchmen Mfg., Inc.*, No. 3:06-CV-227, 2007 WL 4556735, at *4 (N.D. Ind. Dec. 20, 2007) (quotation marks and citations omitted). Although "self-serving statements in affidavits without factual support in the record carry no weight," *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis omitted), "a self-serving affidavit supported by facts in the record [can] defeat summary judgment," and the record "may include the self-serving affidavit itself, provided that the affidavit meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial," *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (quotation marks and citations omitted). If it meets these requirements, "a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003); *see also U.S. Gypsum Co. v. LaFarge N. A., Inc.*, 508 F. Supp. 2d 601, 626 (N.D. Ill. 2007) ("Most affidavits and much testimony are self-serving. Like any other testimony, self-serving testimony is to be accepted on summary judgment as long as it is based on personal knowledge, sufficiently specific, not disputed by contrary evidence of the nonmovant, and in compliance with any other evidentiary criteria applicable to the particular testimony.").

The Plaintiffs' recitation of Mr. Bitler's health problems does not create a reasonable

inference that he lacked the mental capacity to enter into binding contracts in 1994 and 1995, and neither Carl Bitler nor Philip Rodenbeck is qualified to give a medical opinion regarding George Bitler's mental capacity based upon his health issues. Additionally, the Affidavit of Dr. Nagarajan fails to meet Rule 56(e) standards and will be stricken, as the Defendants' request in their Motion to Strike the Affidavit of Dr. Ravi Nagarajan. It does not appear that Dr. Nagarajan's conclusory opinion regarding Mr. Bitler's mental capacity in 1994 and 1995 is based on his personal knowledge or is grounded in observation or other first-hand experience during the relevant period. Additionally, although Dr. Nagarajan identifies himself as a practitioner of internal medicine, he does not provide any qualifications establishing his competence to diagnose mental incapacity, dementia, or other mental conditions. It also warrants noting that the record before the Court includes evidence that Mr. Bitler continued to engage in real estate transactions in the years following his execution of the Huntington and Ligonier mutual cancellation/release agreements. As a consequence, the Plaintiffs have failed to come forward with evidence that creates a triable issue of material fact regarding Mr. Bitler's mental capacity at the time of contracting, and the evidence before the Court shows that Mr. Bitler was able to understand in a reasonable manner the nature and effect of his actions when he executed the mutual cancellation/release agreements related to the Huntington and Ligonier properties in 1994 and 1995.

In support of their claim of undue influence, the Plaintiffs argue that Mr. Bitler and Mr. Melching "were old and feeble at the time the Huntington Document and Ligonier Document were executed" and recite some of their health issues. (Pls.' Brief in Response 17.) The record before the Court does not show that the Defendants exercised control over Mr. Bitler and Mr.

Melching such that their free agency (to which the notaries public specifically and affirmatively attested in each document) was overborne and such that they were constrained to do what they would not have done if such control had not been exercised. The Plaintiffs have not come forward with evidence sufficient to show weakness of mind on the part of Mr. Bitler and Mr. Melching. They have also not shown that some sort of special relationship existed between the parties that would create a presumption of trust and confidence as to the subordinate (assumed to be Mr. Bitler and Mr. Melching for purposes of the Motion for Partial Summary Judgment) and a corresponding influence as to the dominant party (assumed to be the Defendants for purposes of the Motion for Partial Summary Judgment) on Mr. Bitler and Mr. Melching. They have not demonstrated with evidence that the two mutual cancellation/release agreements resulted in an advantage to the Defendants or that Mr. Bitler and Mr. Melching placed their trust and confidence in the Defendants. Because the Plaintiffs have not established with evidence the two factors under Indiana undue influence law (namely, the existence of a special relationship, and a questioned transaction resulting in an advantage to the dominant party), no presumption arises that the transactions were the result of undue influence exerted by the Defendants. As a consequence, the Plaintiffs have failed to come forward with evidence that creates a triable issue of material fact regarding undue influence, and the evidence before the Court shows that the parties negotiated at arm's length, that the Defendants did not have a special relationship of trust and confidence with Mr. Bitler and Mr. Melching that resulted in their control or influence over Mr. Bitler and Mr. Melching, that Mr. Bitler's attorney drafted the Huntington Mutual Cancellation of Lease Agreement, and that the parties' mutual cancellation/release agreements related to the Huntington and Ligonier properties were the result of their free agency.

The Court need not address at length the Plaintiffs' argument that the Huntington Mutual Cancellation of Lease Agreement is somehow negated by the Defendants' apparent failure to provide IDEM's August 11, 1994, letter to Mr. Bitler and Mr. Melching before they executed the Mutual Cancellation. Assuming without deciding that this omission constituted a breach, it was not material, and the Defendants substantially performed under the Huntington lease agreement. *See Puller Mortg. Assoc., Inc. v. Keegan*, 829 F. Supp. 1507, 1518 (S.D. Ind. 1993) ("A party who acts in good faith and who performs substantially all that is required of him by a contract may recover from the other party—less any damage sustained by the other party for minor defects in performance. Substantial performance is something less than full strict performance, but only in some nonessential way and is practically as good as strict performance.") (citing *McConnell v. Fulmer*, 230 Ind. 576, 103 N.E.2d 803 (1952)). The Mutual Cancellation specifically references the July 20, 1994, UST System Closure Report, which attests to the information that Mr. Bitler and Mr. Melching had received from the Defendants, and IDEM's concerns were quickly and easily answered by the Defendants. Additionally, no action resulted, and the Defendants provided the relevant documentation and information in the December 2, 1994, letter to Mr. Melching.

For these reasons, the Court finds that the Mutual Cancellation of Lease Agreement involving the Huntington property, and the Mutual Cancellation of Agreements and Release of Claims involving the Ligonier property bar the Plaintiffs from bringing the claims alleged in Counts 5, 6, 25, and 26 of the First Amended Complaint. The Court will, therefore, grant the Defendants' Motion for Partial Summary Judgment on this basis.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Huntington, Indiana Property (Counts 5 and 6) and Ligonier, Indiana Property (Counts 25 and 26) [DE 119]. The Court also GRANTS the Defendants' Motion to Strike the Affidavit of Dr. Ravi Nagarajan [DE 159].

SO ORDERED on August 31, 2009.

S/ Theresa L. Springmann
THERESA L. SPRINGMANN, JUDGE
UNITED STATES DISTRICT COURT