**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| BITLER INVESTMENT VENTURE II, LLC, | ) | |
| BITLER INVESTMENT VENTURE III, LLC, | ) | |
| BITLER INVESTMENT VENTURE V, LLC, | ) | |
| BITLER INVESTMENT VENTURE VI, LLC, | ) | |
| MELCHING INVESTMENT VENTURE II, LLC, | ) | |
| MELCHING INVESTMENT VENTURE III, LLC, | ) | |
| MELCHING INVESTMENT VENTURE V, LLC, | ) | |
| MELCHING INVESTMENT VENTURE VI, LLC, | ) | |
| and TWO PORTLAND PROPERTIES #1, LLC, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|     v. | ) | CAUSE NO.: 1:04-CV-477-TS |
| | ) | |
| MARATHON ASHLAND PETROLEUM, LLC, | ) | |
| SPEEDWAY SUPERAMERICA, LLC, and | ) | |
| MARATHON OIL COMPANY, | ) | |
| | ) | |
|     Defendants. | ) | |

## OPINION AND ORDER

In this lawsuit, the Plaintiffs seek recovery under the theories of breach of contract and waste for alleged damage to fourteen different pieces of commercial property in Indiana, Michigan, and Ohio. The Defendants and/or their predecessors in interest leased several gasoline stations from the Plaintiffs and/or their predecessors in interest, and the Plaintiffs claim that the Defendants and their predecessors in interest neglected and destroyed the leased commercial properties and thereby injured the Plaintiffs' rights and interests in the properties. As to some of the properties, years before this lawsuit was instituted, the parties' predecessors in interest entered into written agreements cancelling their lease agreements involving the properties and releasing the Plaintiffs, the Defendants, and their predecessors in interest from all claims arising out of or in connection with the leases.

This matter is before the Court on a Motion for Partial Summary Judgment [ECF No. 125] filed by the Defendants that seeks judgment on the Plaintiffs' claims as to three Michigan properties. Also before the Court is the Defendants' Motion to Strike [ECF No. 172] certain evidentiary materials submitted by the Plaintiffs. These motions are fully briefed and ripe for ruling.

## BACKGROUND

On December 17, 2004, the Plaintiffs instituted this lawsuit. In their twenty-eight count Complaint [ECF No. 1], they named Marathon Ashland Petroleum as the Defendant. On January 21, 2005, they filed an Amended Complaint [ECF No. 17], adding Speedway SuperAmerica, LLC and Marathon Oil Company as additional Defendants. The Plaintiffs premise this Court's subject-matter jurisdiction on diversity of citizenship pursuant to 28 U.S.C. § 1332. On February 28, 2005, the Defendants filed their Answer [ECF No. 34], and on March 15, they filed their Amended Answer [ECF No. 40].

On July 31, 2007, the Defendants filed their Motion for Partial Summary Judgment on All Issues Regarding the Hillsdale, Michigan (Counts 11 and 12), Monroe, Michigan (Counts 13 and 14), and Sturgis, Michigan (Counts 27 and 28) Properties [ECF No. 125], a Brief in Support [ECF No. 126], a Submission of Evidence [ECF No. 127] (with attached Exhibits), and an Appendix/Statement of Material Facts [ECF No. 128]. Counts 11 and 12 of the Amended Complaint relate to commercial property in Hillsdale, Michigan, which is owned by Plaintiffs Bitler Investment Venture V, LLC and Melching Investment Venture V, LLC. Counts 13 and 14 of the Amended Complaint relate to commercial property in Monroe, Michigan, which is owned

by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC.[1]

Counts 27 and 28 of the Amended Complaint relate to commercial property in Sturgis, Michigan, which is owned by Plaintiffs Bitler Investment Venture V, LLC and Melching Investment Venture V, LLC. In their First Amended Complaint, the Plaintiffs allege generally that the Defendants left these three properties in a damaged condition with remaining environmental uncertainties and that the Defendants returned the properties to the owners in a condition that was both unsaleable and untenantable at fair market rates. In their breach of contract claims (Counts 11, 13, and 27), the Plaintiffs allege that the Defendants failed to perform their obligations under the commercial lease agreements and that by their breach they have caused the Plaintiffs to suffer damages. In their waste claims (Counts 12, 14, and 28), the Plaintiffs allege that the Defendants occupied the subject properties under valid and binding lease agreements, destroyed, misused, altered, mutilated, and damaged the properties, and left the properties in a damaged condition, that the Plaintiffs have had to spend their own monies to restore the properties, that the Plaintiffs have suffered damages in the value of the properties, and that the Plaintiffs are entitled to double the amount of their actual damages under Michigan Compiled Laws § 600.2919.

On August 24, the Plaintiffs filed a Response [ECF No. 152] and a Submission of Evidence [ECF No. 153] (with attached Exhibits). On September 24, the Defendants filed a Reply [ECF No. 171] and evidentiary materials. Also on September 24, the Defendants also filed a Motion to Strike Portions of the Affidavit of Philip Rodenbeck and the First Affidavit of J.

---

[1] The Amended Complaint provides the following address for the Monroe property: 1111 North Telegraph Road, Frenchtown, Michigan. It appears that Frenchtown is a township in the Monroe, Michigan area. The parties refer to this property as the Monroe property, and the documentary materials before the Court identify the address as 1111 N. Telegraph Road, Monroe, Michigan.

Maxine Melching in Its Entirety [ECF No. 172] and a Brief in Support [ECF No. 173]. On

October 12, the Plaintiffs filed a Response [ECF No. 184], and on October 26, the Defendants

filed a Reply [ECF No. 188].

The Defendants' Motion for Partial Summary Judgment on All Issues Regarding the

Hillsdale, Michigan (Counts 11 and 12), Monroe, Michigan (Counts 13 and 14), and Sturgis,

Michigan (Counts 27 and 28) Properties is the third in a series of summary judgment motions

filed by the parties that together seek summary judgment on each of the twenty-eight claims

asserted by the Plaintiffs. The Defendants have also filed a series of motions *in limine* and

motions to strike. This Opinion and Order addresses only the third of these summary judgment

motions and one of the motions to strike filed by the Defendants.


## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that a court shall grant a motion for

summary judgment "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue

of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605,

608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). A

court's role on summary judgment is not to weigh the evidence, make credibility determinations,

or decide which inferences to draw from the facts, but instead to determine whether there is a

genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543,

550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court in ruling on a

summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

## FACTS

**A.      The Relevant Parties and the Leases**

On December 1, 1968, George O. and Mary Eleanor Bitler and Max E. and J. Maxine Melching entered into a lease agreement entitled "Indenture of Lease" with Progressive Oil Company, Inc., involving the subject property in Hillsdale, Michigan, which the Bitlers and the Melchings owned. On October 1, 1966, George O. and Mary Eleanor Bitler and Max E. and J. Maxine Melching entered into a lease agreement entitled "Indenture of Lease" with Progressive Oil Company, Inc., involving the subject property in Sturgis, Michigan, which the Bitlers and the Melchings owned. The record before the Court does not appear to include a similar indenture of lease for the Monroe property from the 1960s or 1970s, but a ledger sheet in the record suggests that Mr. Bitler and Mr. Melching had begun leasing the Monroe property to Progressive Oil Company for use as a gasoline station as early as 1971. At times during this period, George Bitler and Max Melching were officers of Progressive Oil Company. At some point, which is not critically important to the present issues in this case, Rock Island Refining Company acquired Progressive Oil Company, and eventually Marathon Oil Company acquired Rock Island Refining Corporation and its wholly-owned subsidiary or affiliate R.I. Marketing Company, Inc. The Hillsdale, Monroe, and Sturgis properties were used as retail gasoline stations.

On October 27, 1983, George O. Bitler and Max E. Melching entered into separate lease agreements entitled "Indenture of Lease" with R.I. Marketing, Inc., involving the Hillsdale,

Monroe, and Sturgis properties. These leases were for eleven-year terms, running from December 1, 1983, to November 30, 1994, and included renewal options. The leases included the following term regarding use of the leased premises: "During the lease term, the Lessee shall use the leased premises in a careful and proper manner and for lawful purposes only, and shall, at its own expense, comply with any and all applicable statutes, ordinances, rules and regulations relating to the occupancy or use of the leased premises." (Third Gilbert Aff., Ex. A-4 at 4, Ex. A-5 at 3–4, & Ex. A-6 at 4.) Another term of the lease agreements provided in part as follows regarding buildings and improvements: "No building or improvement now or hereafter located or constructed on the leased premises shall be removed or materially altered (except by way of addition) without the prior written consent of the Lessors, except that existing buildings or improvements may be replaced, rehabilitated or restored if the resulting improvements are worth at least as much after the replacement, rehabilitation or restoration as before." (Third Gilbert Aff., Ex. A-4 at 6–7, Ex. A-5 at 6, & Ex. A-6 at 7.) Within several months of executing these agreements, Mr. Bitler and Mr. Melching met with William Gilbert, an employee and representative of Marathon Oil Company and Marathon Petroleum Company who managed real estate and leases in the region during the relevant period. Mr. Bitler and Mr. Melching informed Mr. Gilbert that Mr. Melching would be the primary contact person regarding the properties.

In July 1989, Marathon Oil Company (then known as Marathon Petroleum Company) acquired Rock Island Refining Corporation and R.I. Marketing, and Emro Marketing Company (a wholly-owned subsidiary of Marathon Petroleum Company) eventually acquired the leases to the Hillsdale, Monroe, and Sturgis properties. New federal regulations governing underground storage tanks used to store gasoline and other petroleum products were promulgated in the late

1980s. These regulations required upgrades or replacement of existing tanks and piping by December 22, 1998.

In July 1991, Mr. Bitler and Mr. Melching entered into an Amendment to Lease (Monroe Amendment) with Emro Marketing involving the Monroe property. On October 6, 1992, Mrs. Bitler and Mrs. Melching entered into a Master Amendment to Leases (Hillsdale Master Amendment) agreement with Emro Marketing involving the Hillsdale property. On October 6, 1992, Mr. Bitler and Mr. Melching also entered into a Master Amendment to Leases (Sturgis Master Amendment) agreement with Emro Marketing Company involving the Sturgis property. The Monroe Amendment and the Hillsdale and Sturgis Master Amendments transferred to Emro Marketing ownership of the underground storage tanks and all related piping at these premises, and Emro Marketing assumed responsibility for removing from these premises the underground storage tanks and all related piping, prior to the end of the lease term and subject to extension as provided in the Master Amendment. Emro Marketing agreed that its tank and piping removal would fully comply with all applicable laws, rules, regulations, and ordinances. In addition to replacing any asphalt, concrete, or other surface damaged or destroyed in the removal process, Emro Marketing also agreed to backfill holes and trenches in compliance with all applicable laws, rules, regulations, and ordinances and in a good business-practice manner so as to leave the premises in a condition reasonably useful for future commercial use. Emro Marketing agreed to assume all responsibility "for any and all liability, losses, damages, costs and expenses resulting from its use of the Premises and the removal of the underground storage tanks and piping, as said liability may be determined by all applicable federal, state, and local laws, rules and regulations." (Third Gilbert Aff., Ex. A-7 at 1–2, Ex. A-8 at 2, & Ex. A-9 at 2.) Accordingly, it

would "indemnify, defend, and hold [Mrs. Melching and Mrs. Bitler or Mr. Melching and Mr. Bitler] harmless from and against any and all liability, claim, action, cause of action, loss, damage, cost and expense, . . . which [Mrs. Melching and Mrs. Bitler or Mr. Melching and Mr. Bitler] may incure by reason of the occupation, leasing, subleasing, or use of the Premises by [Emro Marketing], or any other party, up to and including the termination date of the Lease, or the last day of any lease extension period." (Third Gilbert Aff., Ex. A-7 at 2, Ex. A-8 at 2, & Ex. A-9 at 2.) This agreement to indemnify and hold harmless extended to any liability, loss, or damage arising out of Emro Marketing's failure to conform to or comply with applicable laws in connection with its occupation, leasing, subleasing, or use of the premises up to and including the lease termination date or the last day of any lease extension period. The agreement imposed certain notice requirements on Mrs. Melching and Mrs. Bitler or Mr. Melching and Mr. Bitler when they had knowledge of any act or occurrence involving a liability, claim, demand, or costs. The Monroe Amendment and the Hillsdale and Sturgis Master Amendments included a term regarding a rent-free occupancy period in the event Emro Marketing elected to discontinue the business operations on the premises on or before the termination date of the applicable lease or any extension.

The Monroe Amendment provided as follows regarding environmental issues related to the Plaintiffs' claims:

> 4.      [Emro Marketing] agrees that prior to vacating the Premises, it shall, at its own expense, remove from the Premises any and all existing environmental contamination, which shall be defined as the uncontained presence of any hazardous substance, pollutant or contaminant or the presence of waste of any kind in, on or under the Premises which may require remediation under any applicable law. All remediation work in this regard, including, but not limited to, that work required by the removal of the underground storage tanks, shall be performed in

accordance with all laws, rules and regulations applicable to such remediation, and [Emro Marketing] shall return the Premises to [Mr. Melching and Mr. Bitler] as nearly as possible in the same condition as it was in prior to such remediation work, subject only to the removal of the contamination.

. . .

6.    [Emro Marketing] shall undertake the underground storage tank and piping removal during the Occupancy Period, and in the event the complete removal, remediation and restoration project is not completed by the conclusion of the Occupancy Period, said Occupancy Period shall be extended on a month-to-month basis in consideration of the payment by [Emro Marketing] to [Mr. Melching and Mr. Bitler] of the sum of $891.00 per month until such time as the entire project is completed, including obtaining all approvals and clearances required under federal, state and local law. [Emro Marketing] agrees to provide [Mr. Melching and Mr. Bitler] with copies of any and all documents related to the removal, remediation and restoration project, and [Mr. Melching and Mr. Bitler] shall have the further right to review and obtain copies of all documentation related to said project during the course of the same and after its conclusion.

(Third Gilbert Aff., Ex. A-7 at 3–4.) The Hillsdale and Sturgis Master Amendments provided as follows regarding environmental issues related to the Plaintiffs' claims:

4.    [Emro Marketing] agrees that prior to vacating the Premises, it shall, at its own expense, clean up any petroleum related or petroleum caused contamination discovered at the Property provided that: a) the contamination exceeds acceptable or legal levels established by the state in which the property is located or the United States Environmental Protection Agency; and b) the cleanup will be to a level existing in law, regulations, or ordinances established by the State . . . or the United States Environmental Protection Agency or, if no such level is established, the cleanup will be to a level adequately protective of public health and safety, as determined by a scientific consultant retained by Emro. All remediation work in this regard, including, but not limited to, that work required by the removal of the underground storage tanks, shall be performed in accordance with all laws, rules and regulations applicable to such remediation, and [Emro Marketing] shall return the Premises to [Mrs. Melching and Mrs. Bilter or Mr. Melching and Mr. Bitler] as nearly as possible in the same condition as it was in prior to such remediation work, subject only to the removal of the contamination and normal wear from reasonable use of the property.

5.      [Emro Marketing] shall undertake the underground storage tank and piping removal during the Occupancy Period, and in the event the complete removal, remediation and restoration project is not completed by the conclusion of the Occupancy Period, said Occupancy Period shall be extended on a month-to-month basis in consideration of the payment by [Emro Marketing to Mrs. Melching and Mrs. Bilter or Mr. Melching and Mr. Bitler] of the monthly sum of money specified . . . until such time as the entire project is completed. Any governmental or otherwise required continuing groundwater monitoring or pumping or treating shall not be deemed to extend the remediation and restoration project or the obligation of [Emro Marketing] to pay rent to [Mrs. Melching and Mrs. Bilter or Mr. Melching and Mr. Bitler] unless said monitoring or pumping or treating materially interferes with [Mrs. Melching and Mrs. Bilter or Mr. Melching and Mr. Bitler's] use of the premises or [their] ability to sell or lease the same. [Emro Marketing] agrees to provide [Mrs. Melching and Mrs. Bilter or Mr. Melching and Mr. Bitler] with copies of any and all documents related to the removal, remediation and restoration project, and [Mrs. Melching and Mrs. Bilter or Mr. Melching and Mr. Bitler] shall have the further right to review and obtain copies of all documentation related to said project during the course of the same and after its conclusion.

(Third Gilbert Aff., Ex. A-8 at 3 and Ex. A-9 at 3–4.) The Hillsdale and Sturgis Master

Amendments also included a lease buyout term when the occupancy period ended before the

termination date of the relevant lease. In the Master Amendments, Emro Marketing agreed to

provide copies of all environmental reports submitted to state agencies, copies of correspondence

received from state agencies related to such reports, and periodic status reports relative to

remediation. The parties also agreed that the 1983 leases remained in full force and effect, except

as amended by the Monroe Amendment and the Hillsdale and Sturgis Master Amendments.


**B.      The Closure and Release Regarding the Hillsdale Property**

By letter dated September 18, 1997, Emro Marketing notified Mrs. Bitler and Mrs.

Melching that it permanently closed the gas station operated on the Hillsdale premises on

September 15, 1997; that the rent-free occupancy period would begin on October 1, 1997, and

continue through September 30, 1998; that it would not be making any rent payments from October 1, 1997, to September 30, 1998; and that it remained responsible for the real estate tax through September 30, 1998. In the years before this notification, the parties had agreed to extend or renew the 1983 lease of the Hillsdale property.

On or about December 18, 1997, Emro Marketing's leasehold interest in the Hillsdale property was assigned to Marathon Oil Company. On or about April 28, 1998, four underground storage tanks and related piping were removed. In a letter dated August 10, 1998, Marathon Oil Company notified Mrs. Bitler and Mrs. Melching of its intention to exercise the final-one-year renewal option, effective December 1, 1998.

By December 7, 1998, the underground storage tanks and related piping had been removed, but the remediation work remained. With a letter dated December 7, 1998, the Defendants provided Mrs. Melching copies of an Agreement of Termination and Mutual Release of Lease (Hillsdale Termination and Release Agreement) for Mrs. Melching and Mrs. Bitler to sign and return to the Defendants. The letter indicated that the effective date would be January 31, 1999, to facilitate or accommodate Mrs. Bitler and Mrs. Melching entering into a new lease of the Hillsdale property with Superior Auto. The Hillsdale Termination and Release Agreement indicated that the parties to the lease of the Hillsdale property desired to terminate the lease as amended and release each other from liability arising out of the leasehold. The Hillsdale Termination and Release Agreement provided in relevant part:

> 2.     Termination
> The Lease . . . covering the Premises, including any and all of the Tenant's rights, interest, and estate in the premises, is terminated, effective as of January 31, 1999. Neither [Marathon Oil Company], nor its successors, assigns, or sublessees, shall have or exercise any rights in the Premises upon the effective date of this agreement.

3.    Release

With the exception of [Marathon Oil Company's] responsibility and liability for environmental remediation of The Premises pursuant to the Lease as amended, [Mrs. Bitler and Mrs. Melching and Marathon Oil Company], each for themselves and for their respective successors and assigns, for good and valuable consideration, do hereby release and forever discharge the other from any and all debts, claims, obligations, liabilities, demands, damages, actions, causes of action, and penalties of every kind and description whatsoever from the beginning of the world to the date of this agreement, including but not limited to such as have arisen or may hereafter arise, whether now known or disclosed or hereafter discovered and disclosed, out of the execution and delivery of the Lease . . . , and any and all instruments and documents by whomever executed and delivered in connection with the Lease, and the termination and cancellation by [Marathon Oil Company]. [Mrs. Bitler and Mrs. Melching and Marathon Oil Company] understand and acknowledge that [Marathon Oil Company] shall not be liable for any rents, costs, expenses, or charges of any kind, nor required to do or perform any acts of any kind, in connection with said termination and cancellation.

4.    Successors and Assigns

This Agreement shall be binding upon and inure to the benefit of [Mrs. Bitler and Mrs. Melching and Marathon Oil Company] and their respective successors and assigns.

5.    Merger

Except as specifically set forth herein and expressly excepting a license agreement between the parties regarding environmental corrective action on The Premises, this Agreement constitutes the entire agreement between the parties. If any provision herein is deemed invalid under any applicable law, such provision shall be deemed omitted but the remaining provisions herein shall be applicable.

(Third Gilbert Aff., Ex. A-19 at 1–2.) The Hillsdale Termination and Release Agreement was signed by Mrs. Bitler and Mrs. Melching, as landlord, and by Marathon Oil Company, as tenant. The landlord's signatures were witnessed by Mr. Bitler and Mr. Melching. Mrs. Bitler signed the agreement on January 19, 1999, and Mrs. Melching signed it on January 13, 1999. The signatures of the parties and party representative executing this agreement were also witnessed by notaries public who attested that Mrs. Bitler and Mrs. Melching personally appeared before the notaries and acknowledged signing the agreement as their own free acts and deeds.

Mrs. Bitler and Mrs. Melching re-let the property to Superior Auto for use as a used car

lot, but Superior Auto did not renew its two-year lease in January 2001 because it purchased a larger property in the Hillsdale area that would better serve its business needs. (Later the property was re-let for use as a hair salon and then for use as a cellular phone business.)

With a letter to Mr. Melching dated December 28, 1998, Defendant Speedway SuperAmerica, LLC provided a signed license agreement between Speedway SuperAmerica and Mrs. Melching for the purpose of permitting the Defendants to conduct environmental assessment and remediation activities on the Hillsdale property. This license agreement was signed by a representative of the Defendants on December 28, 1998, and by Mrs. Melching on December 7, 1998. The term of the license agreement extended through the completion of the requisite assessment and remediation. The same parties executed a second license agreement in April 1999 for the same purpose. It was signed by a representative of Defendant Speedway SuperAmerica on April 22, 1999, and by Mrs. Melching on April 26, 1999. Its term also extended through the completion of the requisite assessment and remediation.

Along with a letter dated June 30, 2005, Geo Resources, Inc. (GRI) submitted a Closure Report to the Remediation and Redevelopment Division of the Michigan Department of Environmental Quality (MDEQ), and the property thereafter achieved residential closure. Although Mr. Melching and a representative of Superior Auto asked the Defendants in the latter part of 1998 and possibly in January 1999 to address some matters such as electrical or plumbing work and debris removal at the Hillsdale property, which the Defendants arranged to have addressed, neither the Bitlers nor the Melchings subsequently communicated with Mr. Gilbert regarding any dissatisfaction with the condition of the Hillsdale property.

**C.      The Closure and Release Regarding the Monroe Property**

On or about November 11, 1990, a gasoline release on the Monroe property was reported to the MDEQ. In August 1991, soon after the Monroe Amendment was executed, the underground storage tanks and related piping were removed. By letter dated October 10, 1991, Marathon Oil Company notified Mrs. Melching that it discontinued its business operations on the Monroe property on November 27, 1990. The letter indicated that its rental payments continued between the date when it discontinued operations and the date of the letter, that the rent-free occupancy period would begin on November 1, 1991, and end on April 16, 1993. On or about December 18, 1997, Emro Marketing's leasehold interest in the Monroe property was assigned to Marathon Oil Company.

Consolidated Environmental Services, Inc. (CES), Emro Marketing's environmental consultant, prepared a Closure Report dated July 26, 1996, requesting Tier 1 residential closure, and this report was submitted to the MDEQ. In an audit letter dated October 28, 1996, the MDEQ responded that the site was not eligible for a residential closure. In a letter dated December 30, 1996, CES responded to the MDEQ with a Response to Audit of Correction Actions, requested Tier 1 residential closure, and stated that no further corrective action was required. The MDEQ made no comment or response to CES's December 30, 1996, letter. In 1998, Techna Corporation performed an environmental assessment of the Monroe property on behalf of a party who was interested in purchasing the property for use as a restaurant. The assessment report, dated March 27, 1998, was submitted to the MDEQ. The MDEQ approved the environmental assessment and concluded that the existing impacts at the Monroe property would not pose an unacceptable human health risk for the new proposed use.

In a letter dated August 18, 1999, Marathon Oil Company formally notified Mr. Bitler and Mr. Melching that the lease on the Monroe property was terminated effective August 31, 1999. The letter indicated that the property was no longer an active remediation site and that the MDEQ had not responded within six months to the last assessment report and request for closure. Along with the letter, the Defendants provided Mr. Bitler and Mr. Melching copies of the July 26, 1996, Closure Report, the October 28, 1996, request from MDEQ for additional information, and the December 30, 1996, supplemental report. The August 18, 1999, letter stated that copies of an Agreement of Termination and Mutual Release of Lease (Monroe Termination and Release Agreement) were enclosed for Mr. Bitler and Mr. Melching to sign and return to the Defendants. The Monroe Termination and Release Agreement indicated that the parties to the lease of the Monroe property desired to terminate the lease as amended and release each other from liability arising out of the leasehold. The Monroe Termination and Release Agreement provided in relevant part:

> 2.    Termination
>        The Lease . . . covering the Premises, including any and all of the Tenant's rights, interest, and estate in the premises, is terminated, effective as of August 31, 1999. Neither [Marathon Oil Company], nor its successors, assigns, or sublessees, shall have or exercise any rights in the Premises upon the effective date of this agreement.
> 3.    Release
>        With the exception of [Marathon Oil Company's] responsibility and liability for environmental remediation of The Premises pursuant to the Lease as amended, [Mr. Bitler and Mr. Melching and Marathon Oil Company], each for themselves and for their respective successors and assigns, for good and valuable consideration, do hereby release and forever discharge the other from any and all debts, claims, obligations, liabilities, demands, damages, actions, causes of action, and penalties of every kind and description whatsoever from the beginning of the world to the date of this agreement, including but not limited to such as have arise[n] or may hereafter arise, whether now known or disclosed or hereafter discovered and disclosed, out of the execution and delivery of the Lease . . . , and any and all instruments and documents by whomever executed and delivered in

15

connection with the lease, and the termination and cancellation by [Marathon Oil Company]. [Mr. Bitler and Mr. Melching and Marathon Oil Company] understand and acknowledge that [Marathon Oil Company] shall not be liable for any rents, costs, expenses, or charges of any kind, nor required to do or perform any acts of any kind, in connection with said termination and cancellation.

4.    Successors and Assigns

This Agreement shall be binding upon and inure to the benefit of [Mr. Bitler and Mr. Melching and Marathon Oil Company] and their respective successors and assigns.

5.    Merger

Except as specifically set forth herein, this Agreement constitutes the entire agreement between the parties. If any provision herein is deemed invalid under any applicable law, such provision shall be deemed omitted but the remaining provisions herein shall be applicable.

(Third Gilbert Aff., Ex. A-24 at 1–2.) The Monroe Termination and Release Agreement was signed by Mr. Bitler and Mr. Melching, as landlord, and by Marathon Oil Company, as tenant. The landlord's signatures were witnessed by Lori Adams of Fort Wayne, Indiana. Mr. Bitler signed the agreement on August 24, 1999, and Mr. Melching signed it on August 19, 1999. The signatures of Mr. Bitler and Mr. Melching were also witnessed by notaries public who attested that Mr. Bitler and Mr. Melching personally appeared before the notaries and acknowledged signing the agreement as their own free acts and deeds.

In a letter dated August 17, 2000, Marathon Ashland Petroleum, LLC asked for Mrs. Melching's consent to allow the Defendants to remove a building from the Monroe property, as demanded by a Frenchtown Charter Township Ordinance. The letter states an assumption that Mrs. Melching possessed the authority to sign for Mr. Bitler and Mr. Melching, the landlords of the Monroe property, and directs Mrs. Melching to return a copy to Mr. Gilbert in a self-addressed envelop. Mrs. Melching's signature appears at the bottom of the letter manifesting consent.

In December 2005, the Monroe property obtained Tier 1 closure status with the MDEQ

in accordance with Michigan regulations. Neither the Bitlers nor the Melchings communicated

with Mr. Gilbert regarding any dissatisfaction with the condition of the Monroe property.

**D.       The Closure and Release Regarding the Sturgis Property**

By letter dated April 16, 1993, Emro Marketing notified Mr. Bitler and Mr. Melching

that it would be permanently closing the gas station operated on the Sturgis premises on April

28, 1993; that the rent-free occupancy period would begin on May 1, 1993, and continue through

February 11, 1995; that it would not be making any more rental payments on that station

effective immediately; and that it remained responsible for the real estate taxes through

November 30, 1994. All known underground storage tanks and associated piping were removed

in April 1994.

Tol Test, Inc., Emro Marketing's environmental consultant, prepared a Closure Report,

which was dated April 26, 1995, and was submitted to the MDEQ. In a letter dated May 4, 1995,

Emro Marketing informed Mr. Melching that its occupancy of the Sturgis property would

terminate effective June 30, 1995, referenced an attached letter of Julius Blanco, one of its

environmental engineers, and indicated that the property was ready for Mr. Melching to market

as either a sale or a lease. In a letter dated June 13, 1995, to Emro Marketing, MDEQ denied

closure and recommended additional testing.

Mr. Bitler and Mr. Melching were informed that MDEQ had requested additional

environmental work on the Sturgis premises and that work was being performed after the

submission of the April 1995 Closure Report. Mr. Melching and Mr. Bitler re-let the Sturgis

property to Superior Auto on January 1, 1996, for use as a used car lot. (This lease was extended

through January 2007. Superior Auto did not thereafter renew the lease of the Sturgis property because it found a larger property in Sturgis that better suited its commercial needs.) In a letter to Emro Marketing dated March 30, 1996, Mr. Melching requested a reimbursement payment in the amount of $611.86 for repairs due to frozen plumbing and electrical lines damaged during the removal of the underground storage tanks. Emro Marketing paid for these repairs. Otherwise, neither Mr. or Mrs. Bitler nor Mr. or Mrs. Melching requested any repairs, expressed any dissatisfaction with the condition in which the premises was returned to them upon the termination of the lease, or communicated any dissatisfaction with renting the premises as a used car lot.

After additional environmental testing, Belsito Environmental Services, Inc. (BES) prepared and submitted a second Closure Report, dated August 28, 1996. With a letter dated September 6, 1996, Marathon Oil Company provided Mr. Bitler and Mr. Melching with a copy of the Closure Report. In a letter dated November 5, 1996, MDEQ again denied closure. Additional work and testing was performed at the Sturgis property. BES then prepared and submitted a Final Assessment Report dated October 1, 1997, to the MDEQ.

On May 20 and 28, 1998, respectively, Mr. Melching and Mr. Bitler signed a License Agreement with the Defendants that provided the Defendants and their representatives access to the Sturgis property to conduct environmental assessment and remediation activities. A representative of the Defendants signed the agreement on June 25, 1998. By letter dated July 2, 1998, Attorney Peter G. Mallers sent Mr. Melching and Mr. Bitler a copy of this agreement.

In a letter dated November 17, 1998, MDEQ requested that groundwater be investigated. Groundwater testing was performed. NESA & Associates, Inc. prepared a third Closure Report,

which was dated December 2, 1998, and submitted it to the MDEQ. In a letter dated December

7, 1998, the Defendants provided Mr. Melching with the third Closure Report. The six-month

review period then passed, and the Sturgis property has Tier 1 environmental closure in

compliance with applicable MDEQ regulations.


# ANALYSIS

## A.        The Defendants' Motion to Strike [ECF No. 172]

Before addressing the Defendants' Motion for Partial Summary Judgment, the Court will

address the Defendants' Motion to Strike Portions of the Affidavit of Philip Rodenbeck and the

First Affidavit of J. Maxine Melching in Its Entirety. The Plaintiffs submitted these two

affidavits as part of their evidentiary submission in support of their Response [ECF No. 153-14

& ECF No. 153-15] to the Defendants' Motion for Partial Summary Judgment, and the

Defendants submitted them along with their Motion to Strike [ECF No. 172-2 & 172-3].

Under Federal Rule of Civil Procedure 56(c)(4), any affidavit or declaration "used to

support or oppose a motion for summary judgment must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." On a motion for summary judgment, a court must not consider

parts of an affidavit that fail to comply with the rule. *Cooper-Schut v. Visteon Auto. Sys.*, 361

F.3d 421, 429 (7th Cir. 2004); *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987). At

the summary judgment stage, a court does not evaluate the relative veracity of each party's facts,

provided the claims are not implausible on their face, even if the one-sidedness of the allegations

causes the court to raise a brow. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761–62 (7th

Cir. 2006). Likewise, a court "do[es] not vouch for the truth of the facts, but rather merely use[s] them to determine whether the case can be resolved as a matter of law." *Id.* at 762 (citation omitted). A court may rely on all admissible evidence, even if the evidence is not presented in admissible form. *Stinett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). Affidavit testimony must concern matters within the affiant's personal knowledge. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003); *see also* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Personal knowledge is not a rigid requirement; it also "includes opinions and inferences grounded in observations or other first-hand experience." *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) (citing *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)). The following statements do not comply with the rule and should be disregarded: (1) conclusory allegations lacking supporting evidence; (2) legal argument; (3) self-serving statements without factual support in the record; (4) inferences or opinions not grounded in observation or other first-hand experience; and (5) mere speculation or conjecture. *Smith v. Hydro Aluminum N. Am., Inc.*, No. 3:08-CV-153, 2010 WL 1382113, at *1 (N.D. Ind. Mar. 30, 2010); *Heltzel v. Dutchmen Mfg., Inc.*, No. 3:06-CV-227, 2007 WL 4556735, at *4 (N.D. Ind. Dec. 20, 2007) (quotation marks and citations omitted). Although "self-serving statements in affidavits without factual support in the record carry no weight," *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis omitted), "a self-serving affidavit supported by facts in the record [can] defeat summary judgment," and the record "may include the self-serving affidavit itself, provided that the affidavit meets the usual requirements for evidence on summary judgment—including the requirements that it be based on

personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial," *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (quotation marks and citations omitted).

The Defendants argue that the Affidavit of Philip Rodenbeck and the Affidavit of J. Maxine Melching are replete with inadmissible hearsay, unsupported assertions, and "beliefs" that are not admissible evidence. They request that the statements be stricken or, in the alternative, ignored by the Court in ruling on the various motions for summary judgment. As to the Rodenbeck Affidavit, they identify Paragraphs 2, 4, and 8 through 11. As to the Melching Affidavit, they identify Paragraphs 3, 4, 6, 8 through 15, and 17 through 20. The Plaintiffs respond that the affidavits should not be stricken because each, when read as a whole and in the context of the matters at issue, demonstrates the personal knowledge of the affiant, shows the affiant is competent, and sets forth facts as would be admissible at trial.

In this Section of this Opinion and Order, the Court will evaluate the statements challenged by the Defendants in their Motion to Strike. In the next Section, as the Court addresses the legal issues presented by the Defendants' Motion for Partial Summary Judgment and analyzes the facts under the governing procedural and substantive law, the Court will sift through the evidence, consider each piece under the applicable federal rules, consider the admissibility of the Plaintiff's statements, and determine whether there are any irrelevant, inadmissible, conclusory, or speculative assertions that should be disregarded.

1.      *The Rodenbeck Affidavit*

Phil Rodenbeck is the son-in-law of Mr. Melching and has been married to Mr.

Melching's daughter for more than forty years. The Defendants challenge the following statements in Paragraph 2 of the Rodenbeck Affidavit:

> I watched Mr. Melching's health decline through the 1990s as he suffered more and more from Parkinson's Disease and depression. . . . By the middle of 1999, he could no longer conduct any matters relating to his real estate business.

Mr. Rodenbeck has it within personal knowledge, and he is competent to testify to, what he observed regarding Mr. Melching's health decline and suffering from certain illnesses. He is not, however, competent to testify to the effect of any of Mr. Melching's illnesses on his mental ability. Although Mr. Rodenbeck could testify to matters such as not seeing Mr. Melching conduct business after the middle of 1999, the record does not provide a sufficient evidentiary basis as to his personal knowledge and competence to testify as to Mr. Melching's ability to conduct matters related to his real estate business or the effect of Mr. Melching's illness on his abilities. The Court will grant the Motion to Strike as to those matters beyond Mr. Rodenbeck's personal knowledge and competence in Paragraph 2.

The Defendants challenge the following statement in Paragraph 4:

> Mr. Melching saved all papers received from Marathon relating to the sites while he looked after the properties . . . .

Mr. Rodenbeck has not provided supporting evidence for this conclusory statement. What Mr. Melching did or did not do with any or all papers received from Defendant Marathon Oil Company relating to the sites is beyond Mr. Rodenbeck's personal knowledge. The Court will grant the Motion to Strike as to the first half of the second sentence of Paragraph 4.

The Defendants challenge the following statement in Paragraph 8:

> In 2004, Mr. Jack Lawson, our attorney at the time, requested all environmental reports from Mr. Bill Gilbert.

Mr. Rodenbeck has provided no supporting evidence for this conclusory statement regarding Mr. Lawson's request. There is no basis for viewing this as a matter within his personal knowledge. The Court will grant the Motion to Strike as to the first sentence of Paragraph 8.

The Defendants challenge the following statemens in Paragraph 9:

In part because of Marathon's failure and refusal to provide the environmental reports agreed to be provided in the "Master Amendment to Leases," . . . .

Mr. Rodenbeck's statement includes a legal argument and conclusion regarding what was owed under the Master Amendment and the Defendants' failure to perform. The statement also lacks support for the causal assertion that a certain action was taken for certain reasons, and there is no foundation for Mr. Rodenbeck's knowledge of what reports were or were not provided by the Defendants. The Court will grant the Motion to Strike as to the first part of the first sentence in Paragraph 9.

The Defendants challenge the following statement in Paragraph 10:

Based on the ages and physical conditions of Mr. Melching and George Bitler and the status reports provided by Marathon, among other things, I believe that the Plaintiffs exercised reasonable diligence in ascertaining the environmental issues at Celina.

Mr. Rodenbeck's statement asserts a legal argument regarding the Plaintiffs' alleged exercise of reasonable diligence, and it lacks factual support. The statement regarding ascertaining environmental issues at the Celina, Ohio, property appears not to be relevant to the issues in this Motion for Partial Summary Judgment. The Court will grant the Motion to Strike as to the second sentence of Paragraph 10.

The Defendants challenge the following statements in Paragraph 11:

Based on my review of our records and my contacts with Marathon, it is my belief that Marathon's practice was to not forward environmental reports to Mr.

Melching or anyone associated with him. I believe this failure is a breach of
Paragraph 9 of the Master Amendment.

Mr. Rodenbeck's statement regarding his review of records and contacts with the Defendants

lacks factual support, and his statement about the Defendants' document mailing practice is

conclusory, speculative, and not within his personal knowledge. His statement regarding a

breach of the Master Amendment is a legal conclusion. The Court will grant the Motion to Strike

as to Paragraph 11.


2.      *The Melching Affidavit*

Mrs. Melching is the widow of Mr. Melching and the mother-in-law of Mr. Rodenbeck.

The Defendants challenge the following statements in Paragraph 3 of the Melching Affidavit:

There was a marked decline in the appearance of the properties after gasoline
stations were closed and the underground storage tanks removed. Each of the
buildings was boarded up and left to decay.

Considering the supporting evidence and the foundation laid, these statements appear to be made

on the personal knowledge of Mrs. Melching, and it appears that she is competent to testify on

these matters. The Defendants are correct that her statements have inherent ambiguities, but

those concerns relate to the credibility and the weight of the evidence, which the Court does not

determine or weigh at this stage. The Court will deny the Motion to Strike as to these two

sentences in Paragraph 3.

The Defendants challenge the following statements in Paragraph 4:

My husband's physical and mental health deteriorated through the 1990s. He
began having balance problems and experienced slips and falls. In 1996 he was
diagnosed with depression. Around 1996 he also was diagnosed with early stages
of Parkinson's disease. By mid year 1999, he could no longer engage in any
matters relating to his real estate business. He had difficulty making entries on the

> check book register. He lost the ability to do mathematical computations. . . .
> Based on my observations as his wife, he was easily influenced and without
> sufficient mental capacity to engage in his business dealings from 1996, when he
> was diagnosed with Parkinson's disease forward, until his death in October 2005.

Although the record does not show that Mrs. Melching is qualified to provide a medical opinion

regarding Mr. Melching's physical and mental health, it appears that she has personal knowledge

and is competent to testify as to what she observed regarding the deterioration of his physical

and mental health, balance problems and slips and falls she witnessed, and the diagnoses of his

illnesses. She appears to have personal knowledge and is competent to testify regarding her

observation of his difficulty in making entries on a check book register. However, she is not

competent or qualified to testify to the effect of any of Mr. Melching's illnesses on his mental

ability, his mental capacity, his ability to engage in business, his ability to perform mathematical

computations, or his susceptibility to influence. The Court will grant the Motion to Strike as to

the fifth, seventh, and ninth sentences of Paragraph 4.

> The Defendants challenge the following statement in Paragraph 6:

> As stated above, starting in the mid 90s, [Mr. Melching] became less and less able
> to undertake th[e] role [as the primary contact person for the Bilter/Melching
> leasehold group].

Mrs. Melching has personal knowledge and is competent to testify to what she observed

regarding Mr. Melching's performance of acts, but testimony regarding his mental ability to

perform certain acts or functions goes beyond her personal knowledge and competence. To the

extent that Mrs. Melching's statement expresses her opinion that Mr. Melching lacked the

mental ability or capacity to undertake this role, the Court will grant the Defendants' Motion to

Strike as to the second sentence in Paragraph 6.

> The Defendants challenge the following statement in Paragraph 8:

Mr. Gilbert consistently held himself out as knowledgeable on all matters relating to gasoline station sites. . . . Mr. Gilbert repeatedly professed understanding of the [environmental] work [that outside environmental consultants] were doing and in fact was our sole contact person wit[h] these issues and all other issues concerning the sites.

It appears that Mrs. Melching has it within her personal knowledge and is competent to testify regarding how Mr. Gilbert held himself out to her, what his role was as a contact person, and what he conveyed as to the environmental work being performed at the properties. These statements are supported by her testimony that she talked with Mr. Gilbert numerous times on the telephone. The Court will deny the Motion to Strike as to these two sentences in Paragraph 8.

The Defendants challenge the following statements in Paragraph 9:

Because of our ages and inexperience with environmental issues, all four of us relied greatly on Mr. Gilbert and his explanations and status reports. We also relied greatly on his interpretation of his client's obligations at the sites.

Mrs. Melching has the personal knowledge and competence to testify as to her inexperience and reliance on Mr. Gilbert and his explanations, status reports, and interpretations, but her conclusory statements regarding the inexperience of others and their reliance on Mr. Gilbert's explanations, status reports, and interpretations lack supporting evidence. The Court will grant the Motion to Strike Paragraph 9 as it applies to individuals other than Mrs. Melching.

The Defendants challenge the following statements in Paragraph 10:

Mr. Gilbert presented Max and George with various documents through the nineties. I do not recall that he ever encouraged us to get independent advice about the documents.

To the extent that Mrs. Melching observed Mr. Gilbert present documents to Mr. Melching and Mr. Bilter, she has personal knowledge as to those facts, and she has personal knowledge and is competent to testify that she does not recall Mr. Gilbert encouraging them to get independent

advice about the documents. The Court will deny the Motion to Strike as to Paragraph 10.

The Defendants challenge the following statements in Paragraph 11:

> Mr. Gilbert repeatedly professed that as owners of the sites, Max and George, and to a lesser extent, Mary and I, faced serious liability if the properties were not brought to "EPA standards" as Mr. Gilbert told me. We took him at his word and were concerned that Marathon would not pay for the remediations.

Mrs. Melching has personal knowledge and is competent to testify regarding what Mr. Gilbert told her, how he told her, how she responded, and what her concerns were, but her conclusory allegations regarding others taking him at his word and being concerned lack supporting evidence. The Court will grant the Motion to Strike Paragraph 11 as it applies to individuals other than Mrs. Melching.

The Defendants challenge the following statements in Paragraph 12:

> It was my understanding, based on statements of Mr. Gilbert, that under the terms of the leases and the law, Marathon would restore buildings that decayed after they were boarded up and would replace pavement and any other improvements damaged or removed as a result of Marathon's need to remediate the properties. Specifically, he told me that Marathon would bring the buildings back to a condition equal or better than they were in when Marathon closed them. I remember that Mr. Gilbert paid for repairs at Ligonier in 1995[,] Sturgis in 1996, and at Hillsdale in 1998. The payment for those repairs lead [sic] Max and me to believe that Marathon would restore buildings as needed and would replace the pavement, as well as other losses that we might not discover until a later date.

Mrs. Melching has personal knowledge and is competent to testify regarding her understanding, her recollection, and her belief about what Mr. Gilbert told her and what occurred. Her allegation regarding what Mr. Melching believed lacks evidentiary support. The Court will grant the Motion to Strike Paragraph 12 as it applies to what Mr. Melching is alleged to have believed.

The Defendants challenge the following statements in Paragraph 13:

> Mr. Gilbert sent me the "Agreement of Termination and Mutual Release of Lease" in December 1998 for the Hillsdale site. By that time, Max was unable to

27

provide advice as to the legal significance of the various documents. I understood from Mr. Gilbert that our signatures were required on the documents, as written, to allow Superior Auto to begin leasing the site. Mr. Gilbert explained that we were not giving up any rights . . . by signing the document and that Marathon would continue its uncompleted remediation efforts.

As to the Agreement and her communications with Mr. Gilbert, Mrs. Melching has personal knowledge and is competent to testify regarding her recollection of what Mr. Gilbert sent to her, what he explained to her, and what her understanding was. The Defendants are correct that details related to her statements are missing, but this concerns the credibility and the weight of the evidence, which the Court does not determine or weigh at this stage. However, Mrs. Melching's testimony regarding Mr. Melching's inability to provide advice regarding the legal significance of documents, which expresses her opinion that Mr. Melching lacked the mental ability or capacity to perform certain cognitive or analytical functions, goes beyond her personal knowledge and competence. The Court will grant the Defendants' Motion to Strike as to the second sentence in Paragraph 13.

The Defendants challenge the following statements in Paragraph 14:

We were repeatedly assured in the mid nineties that the site was clean, although Emro did not share the environmental reports being generated on the site with us. On August 19, 1999, we received an overnight package from Marathon about the Monroe site. In that letter, a Cynthia Snyder informed us that Marathon would no longer pay rent at the site and requested that we sign a termination document. . . . I did not know Ms. Snyder but she did represent again that the Monroe site was a clean site. The letter she sent states that the overnight package had three lengthy environmental documents. If I looked at those documents, neither Max nor I would have understood them. . . . Based on all the circumstances of the signing of that document I do not believe that any of the four of us understood its purpose.

Mrs. Melching has personal knowledge and is competent to testify regarding her recollection of what she was told, what documents she received, and what her understanding was. What documents others received and what others understood documents to mean or their purpose are

beyond her personal knowledge and competence without additional supporting evidence, which is lacking here. The Defendants are correct that some of her statements lack details, but this concerns the credibility and the weight of the evidence, which the Court does not determine or weigh at this stage. To the extent that the contents of Ms. Snyder's August 18, 1999, letter are an issue, the Court will, consistent with Federal Rule of Evidence 1002, consider the letter itself, which is attached to Mr. Gilbert's Third Affidavit. To the extent that Mrs. Melching's statements offer opinions about what documents others received and what they would or would not have understood, the Court will grant the Motion to Strike Paragraph 14.

The Defendants challenge the following statements in Paragraph 15:

> In August 2000, Mr. Gilbert sent me a letter requesting permission to tear down the Monroe building, which he stated in the letter to be "demanded." He did not mention to me that the release signed earlier had released Marathon from liability for the condition of the building and any responsibility for tearing it down. To the contrary, he had continually informed us that Marathon had not properly maintained the buildings and that there were outstanding building obligations. . . . I could not review the document with either Max or George because of the declining physical and mental health of both of them, which I believe was understood by Mr. Gilbert.

Mrs. Melching has personal knowledge and is competent to testify regarding her recollection of what she was told, what documents she received, and what her understanding was. Although her statements do not provide some details, that is a matter of credibility and evidentiary weight, which the Court does not determine or weigh at this stage. Her assertion about her inability to review the document with Mr. Melching and Mr. Bitler because of their declining physical and mental health and her assertion of Mr. Gilbert's understanding of Mr. Melching's and Mr. Bitler's physical and mental health lack evidentiary support and extend beyond her personal knowledge and competence. The Court will grant the Motion to Strike as to the last sentence of

Paragraph 15.

The Defendants challenge the following statements in Paragraph 17:

On November 7, 2000, Mr. Gilbert responded. His response is attached as Exhibit 1. From his responses, I understood Mr. Gilbert to be reaffirming his earlier conversations with me that the buildings would be restored and pavement replaced. I also understood from the letter that he was agreeing that Marathon had let the properties decay but that Marathon intended to make us whole. Because he worked for such a large company, . . . I believed . . . .

Mrs. Melching has personal knowledge and is competent to testify regarding her recollection and understanding of Mr. Gilbert's response. The lack of details the Defendants emphasize is a matter of credibility and evidentiary weight. The Court will deny the Motion to Strike these statements in Paragraph 17.

The Defendants challenge the following statements in Paragraph 18:

By December 1998, when the environmental documents relating to Sturgis apparently were generated, neither Max Melching nor George Bitler had the energy or experience to deal with them.

Mrs. Melching's conclusory statements regarding the energy and the experience of Mr. Melching and Mr. Bitler "to deal with" environmental documents related to the Sturgis property lack supporting evidence, are speculative, and extend beyond her personal knowledge and competence. The Court will grant the Motion to Strike Paragraph 18.

The Defendants challenge the following statements in Paragraph 19:

I believe that Mr. Gilbert was well aware that both Max and George were failing both physically and mentally by the mid to late 1990s. He had enough communication with Max, and then me, to be apprised of the health problems we were experiencing.

Mrs. Melching has personal knowledge and is competent to testify regarding her communication with Mr. Gilbert regarding health problems Mr. Melching was experiencing, but her conclusory

statements about Mr. Gilbert's awareness of Mr. Melching's and Mr. Bitler's physical and mental health and Mr. Gilbert's communications with Mr. Melching lack evidentiary support, are speculative, and extend beyond her personal knowledge and competence. The Court will grant the Motion to Strike Paragraph 19, except to the extent that it states that she had some communication with Mr. Gilbert that Mr. Melching was experiencing health problems.

The Defendants challenge the following statements in Paragraph 20:

Because of the declining health of Max and George, I believe that we acted as other elderly people in our positions would have acted in attempting to discover our losses resulting from Marathon's use of the premises. I did not begin to discover the losses until late 2003 or early 2004, after obtaining the assistance of family members, specifically Phil Rodenbeck.

Under Federal Rule of Evidence 701, Mrs. Melching may give an opinion or draw an inference that is rationally based on her perception, helpful to a clear understanding of her testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Federal Rule of Evidence 702. The Court is unpersuaded that it should strike her statements because she has not demonstrated her competency to testify as to what other elderly people would have done. Her statements appear to be appropriate opinion testimony by a lay witness. Additionally, the Court is unconvinced that her statements should be stricken because she does not explain why she did not enlist Mr. Rodenbeck's assistance earlier. Nevertheless, the Court is mindful that these statements by Mrs. Melching in Paragraph 20 are not entirely consistent with her statements in Paragraph 3. In Paragraph 3, she asserts that she and Mr. Melching periodically visited each of the properties through the 1990s, both before and after the underground storage tanks were removed; that there was marked decline in the appearance of the properties after the gasoline stations were closed and the underground storage

tanks removed; and that each of the buildings was boarded up and left to decay. These internal inconsistencies call into question the veracity of her statements. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 505 n.5 (7th Cir. 2004) (stating that "[i]nternally contradictory affidavits are generally disfavored").

The Court will grant the Defendants' Motion to Strike as noted above, but will otherwise deny the Motion.

**B.      The Defendants' Motion for Partial Summary Judgment [ECF No. 125]**

The Defendants seek summary judgment on Counts 11, 12, 13, 14, 27, and 28 based on various grounds. They argue that Counts 11, 12, 13, and 14 are barred by the release agreements and regulatory closures, that Counts 12, 14, 27, and 28 are time-barred under the applicable statutes of limitation, and that the Plaintiffs have no admissible evidence to support their claims of breach of contract and waste at the Hillsdale property, the Monroe property, or the Sturgis property. The Court finds the first two dispositive, and the Court will address these grounds beginning with the release agreement argument.

**1.      The Claims Asserted in Counts 11, 12, 13, and 14 Are Barred by the Release Agreements and Regulatory Closures**

Under the familiar rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938), a federal court sitting in diversity applies the substantive law of the state in which it sits. *See Gacek v. American Airlines, Inc.,* 614 F.3d 298, 301 (7th Cir. 2010). Thus, a federal court sitting in diversity applies state law to resolve substantive questions, and when neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal

court sits. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008).

The parties are in agreement that Indiana substantive law governs questions regarding the validity and enforceability of the parties' mutual releases. Consequently, the Court will apply the substantive law of Indiana, the forum state, in determining the meaning and the enforceability of the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement.

a.        *The Terms of the Release Agreements and the Remediation*

The Defendants contend that the Hillsdale Termination and Release Agreement executed by Mrs. Bitler and Mrs. Melching and Marathon Oil Company and the Monroe Termination and Release Agreement executed by Mr. Bitler and Mr. Melching and Marathon Oil Company bar the Plaintiffs' claims related to the Hillsdale property and the Monroe property. The Plaintiffs do not directly respond to the Defendants' interpretation of the terms of the release agreements or the Defendants' arguments and evidence showing their satisfaction of the remediation obligations. The thrust of their response is that the releases are not enforceable because the releases were not supported by consideration, Mr. Bitler and Mr. Melching lacked mental capacity, Mr. Bitler and Mr. Melching were subject to undue influence as to the Monroe release, and Mrs. Melching was subject to undue influence as to the Hillsdale release.

Under Indiana law, a valid release bars any subsequent lawsuit on the claims covered by the release. *See Gonzalez v. Kokot*, 314 F.3d 311, 316 (7th Cir. 2002) (citing *McWaters v. Parker*, 995 F.2d 1366, 1370 (7th Cir. 1993) (citing *Lechner v. Reutepohler*, 545 N.E.2d 1144, 1147 (Ind. Ct. App. 1989))). As to the standards governing release agreements, the Indiana Court

of Appeals has provided the following summary of the applicable law in Indiana:

> A separate release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action. Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes. Interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. Absent an ambiguity, release provisions are interpreted as a matter of law, and we look only to the instrument to ascertain the parties' intent.

*Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009) (quotation marks and internal citations omitted). Additionally, "'[a] release executed in exchange for proper consideration works to release only those parties to the agreement unless it is clear from the document that others are to be released as well.'" *Evan v. Poe & Assocs., Inc.,* 873 N.E.2d 92, 98 (Ind. Ct. App. 2007) (quoting *Huffman v. Monroe County Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992)).

The standards for reviewing contracts are well established. Under Indiana law, contracts are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement, and if the language of the contract is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four corners of the agreement, and courts determine the meaning of a contract from an examination of all of the contract's provisions, and not from a more narrow consideration of individual words, phrases, or paragraphs read alone. *Moore*, 903 N.E.2d at 531. Parol, or extrinsic evidence, is inadmissible to add to, vary, or explain clear and unambiguous terms of a written instrument. *Evan,* 873 N.E.2d at 101. An ambiguity does not arise simply because the parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable people could come to

different conclusions about its meaning. *Id.* at 98; *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005).

In this case, the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement are clear and unambiguous, and these documents constituted the entire agreement between the parties. From the language of the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement, it is manifestly apparent that the parties to these mutual termination/release agreements intended to (and did in fact terminate) the lease agreements related to the Hillsdale property and the Monroe property (the Hillsdale Indenture of Lease and Hillsdale Master Amendment and the Monroe Indenture of Lease and the Monroe Amendment). From the terms of these agreements, it is clear that the parties intended to broadly release and discharge each other from any and all debts, claims, obligations, liabilities, demands, damages, actions, causes of action, and penalties of every kind and description. The agreements specify that the releases extend to claims that have already arisen or may arise and that are already known or disclosed or later discovered and disclosed. The parties also expressly agreed that the agreements would bind and inure to the benefit of the Mrs. Bitler and Mrs. Melching (in the case of the Hillsdale property) and Mr. Bitler and Mr. Melching (in the case of the Monroe property) and Marathon Oil Company and their respective successors and assigns. Thus, in these release agreements, the parties mutually agreed to terminate the underlying lease agreements and to release each other from any and all claims and liabilities, which would encompass the Plaintiffs' breach of lease claims and their waste claims to the extent that they allege a failure to maintain and care for the improvements and premises during the lease term.

Under the terms of the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement, the only exception to the broad releases from any and all claims and liabilities relates to the Defendants' responsibility and liability for environmental remediation of the properties. The Hillsdale lease agreement (as amended by the Hillsdale Master Amendment) obligated the Defendants to clean up petroleum related and petroleum caused contamination discovered at the Hillsdale property when the contamination exceeds acceptable or legal levels established by the state of Michigan or the federal Environmental Protection Agency (EPA), and the clean up had to achieve a certain threshold level—namely, a level existing under EPA or Michigan law, regulations, or ordinance, or a level adequate to protect public health and safety. The Monroe lease agreement (as amended by the Monroe Amendment) obligated the Defendants to remove all existing environmental contamination (by which was meant the uncontained presence of any hazardous substance, pollutant, or contaminant or the presence of waste of any kind in, on, or under the premises that may require remediation under any applicable law). The Hillsdale property and the Monroe property have now achieved Tier 1 regulatory closure status with the state of Michigan, and remediation at these properties satisfied the applicable standards under Michigan law.[2] The Plaintiffs have failed to come forward with relevant, credible, and admissible evidence showing a failure by the Defendants to remediate pursuant to the lease agreements. Thus, the Plaintiffs have failed to show any triable issue of fact regarding the Defendants' performance of their remediation

---

[2] The testimony of the Plaintiffs' environmental expert, Andrew Gremos, does not dispute this. He opined that the Hillsdale property was likely cleaned up to a level existing in the laws, regulations, and ordinances of Michigan, but he interjected as a qualification that the presence of ethylene glycol (antifreeze), which is not a petroleum product, was not investigated. He stated that he cannot opine within a reasonable degree of environmental certainty that the Monroe property was more likely than not not cleaned up in accordance with the laws and regulations of Michigan.

obligations under the lease agreements.

For these reasons, the Court should give effect to the intent of the parties as reasonably manifested in the mutual termination/release agreements, unless the Plaintiffs can prevail in showing that consideration was lacking, that Mr. Bitler and/or Mr. Melching lacked mental capacity to execute the Monroe Termination and Release Agreement, that Mr. Bitler and Mr. Melching were subject to undue influence in executing the Monroe Termination and Release Agreement, or that Mrs. Melching was subject to undue influence in executing the Hillsdale Termination and Release Agreement.

b.      *The Alleged Lack of Consideration*

The Plaintiffs challenge the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement by claiming that no consideration was given for these agreements and that genuine issues of fact exist as to whether consideration was given. As the Court noted earlier in this Section, a separate release agreement is a species of contract. Indiana law is well settled that offer, acceptance, plus consideration make up the basis for a contract. *Zimmerman v. McColley*, 826 N.E.2d 71, 76 (Ind. Ct. App. 2005). Because consideration consists of any bargained-for exchange, the consideration requirement is satisfied if there is "a benefit accruing to the promisor or a detriment to the promisee." *B-Day Owners Ass'n v. B-Dry Sys., Inc.*, 636 N.E.2d 161, 163 (Ind. Ct. App. 1994). "A detriment occurs when the promise[e] forbears a legal right, and a benefit results when the [promisor] receives a legal right to which he would not otherwise be entitled." *Hastetter v. Fetter Props., LLC*, 873 N.E.2d 679, 684 (Ind. Ct. App. 2007).

The termination/release agreements explicitly state that the parties mutually agreed to the terms of the agreements and that both parties desire to terminate the underlying lease agreements. The record before the Court shows that the Plaintiffs wanted to re-let or sell the properties and that this desire was at least to some extent hindered by the leasehold interested that had not terminated. The termination/release agreements also state that these agreements evidence the termination of the leases and the release of each party from liability arising out of the leaseholds and that each party, for good and valuable consideration, releases and discharges the other party. The parties mutually cancelled the underlying lease agreements and mutually released the other party thereby relieving the other party of potential liabilities, claims, and obligations. Thus, the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement were mutual and contemplated a complete release of all obligations (with the exception of environmental remediation) related to the leases on these two properties. *See Greensburg Water Co. v. Lewis*, 128 N.E. 103, 107 (Ind. 1920) (observing that "the relinquishment by both parties of their respective rights under the contract is a sufficient consideration to support an agreement by each party to absolve the other from all obligations imposed by the contract; or, as more frequently stated, the mutual release from the obligations of the old contract is an adequate consideration for the rescission") (citing cases); *see also Gonzalez*, 314 F.3d at 317 (applying Indiana contract law, observing that consideration need not be monetary and that the dismissal of criminal charges is of some value, and finding that the releases of any claims were supported by consideration). The Court finds that the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement were supported by consideration.

c.    *The Mental Capacities of Mr. Bitler and Mr. Melching*

The Plaintiffs challenge the Monroe Termination and Release Agreement by arguing that Mr. Bitler and Mr. Melching lacked the mental capacity to execute the agreement. Under Indiana law, the mental capacity required to enter into a contract "'is whether the person was able to understand in a reasonable manner the nature and effect of his act'" on the date of the agreement. *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 227 (Ind. Ct. App. 2009) (quoting *Wilcox Mfg. Group, Inc. v. Mktg. Servs. of Ind., Inc.*, 832 N.E.2d 559, 562–63 (Ind. Ct. App. 2005)).

In their attempt to undermine Mr. Bitler's mental capacity, the Plaintiffs point to health problems experienced by Mr. Bitler, including polio, a heart attack, weight loss, lost energy, confusion, a stroke, and post-polio syndrome. The Plaintiffs rely upon the Plaintiffs' Responses to Defendant Marathon Petroleum Company, LLC's Second Set of Interrogatories to Plaintiffs, which are signed by Mr. Rodenbeck. It does not appear that Mr. Rodenbeck has the personal knowledge or is competent to testify to many of the facts presented in these Responses upon which the Plaintiffs rely to undermine Mr. Bitler's mental capacity, such as his sleep patterns, his confusion, his suffering from post-polio syndrome, and his dementia, and they are not otherwise supported in the record. Consequently, these factual assertions should be disregarded for purposes of determining whether issues of fact exist as to Mr. Bitler's mental capacity. The Plaintiffs also rely upon the Affidavit of Dr. Ravi Nagajaran, Mr. Bitler's treating physician up to Mr. Bitler's death on November 27, 2000. However, in its August 31, 2009, Opinion and Order [ECF No. 224], the Court ordered the Affidavit of Dr. Ravi Nagajaran stricken because it does appear that Dr. Nagarajan's conclusory opinion regarding Mr. Bitler's mental capacity in 1994 and 1995 is based on his personal knowledge or is grounded in observation or other first-

39

hand experience during the relevant period and because he has not provided any qualifications establishing his competence to diagnose mental incapacity, dementia, or other mental conditions. The Plaintiffs submitted the Nagarajan affidavit [ECF No. 153-16] along with their Brief in Response, and the Court will again order this affidavit stricken. In their attempt to undermine Mr. Melching's mental capacity, the Plaintiffs point to health problems experienced by Mr. Melching, including balance problems, slips and falls, depression, Parkinson's disease, shuffling his fees, slouching over, and passing out. The Plaintiffs rely upon the Affidavit of Philip Rodenbeck and the First Affidavit of J. Maxine Melching to support their claim that Mr. Melching lacked the mental capacity. However, the Court has determined that the portions of their affidavits that make statements or offer opinions regarding Mr. Melching's mental capacity and understanding that are not founded upon their personal knowledge or to which they are not competent or qualified to testify should be stricken, and the Court will disregard those statements and opinions here.

The Plaintiffs' presentation of some of the health problems experienced by Mr. Bitler and Mr. Melching does not create a reasonable inference that either of these men lacked the mental capacity to enter into a binding contract in August 1999. Both Mr. Bitler and Mr. Melching signed the Monroe Termination and Release Agreement, and their signatures were separately witnessed by notaries public who attested that Mr. Bitler and Mr. Melching personally appeared and acknowledged their execution of the agreement as free acts and deeds. The Court finds that the Plaintiffs have failed to come forward with evidence that creates a triable issue of material fact regarding Mr. Bitler's mental capacity or Mr. Melching's mental capacity at the time of contracting, and the evidence before the Court shows that Mr. Bitler and Mr. Melching were able

to understand in a reasonable manner the nature and effect of their actions when they executed the Monroe Termination and Release Agreement in August 1999.

d.      *The Alleged Undue Influence*

The Plaintiffs challenge the Hillsdale Termination and Release and the Monroe Termination and Release Agreement by arguing that Mrs. Melching (as to the Hillsdale property) and Mr. Bitler and Mr. Melching (as to the Monroe property) was subject to undue influence in executing these agreements. Under Indiana law, "undue influence" is "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *Nichols*, 910 N.E.2d at 228 (quotation marks and citations omitted). Weakness of mind when combined with other factors is sufficient to support a finding of undue influence. *Id.* at 229. Certain legal and domestic relationships (i.e., attorney-client, guardian-ward, principal-agent, pastor-parishioner, and parent-child) raise a presumption of trust and confidence as to the subordinate and a corresponding influence as to the dominant party on the other. *Hamilton v. Hamilton*, 858 N.E.2d 1032, 1036 (Ind. Ct. App. 2006). The law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void if the plaintiff's evidence establishes (1) the existence of such a relationship, and (2) the questioned transaction between the parties resulted in an advantage to the dominant party in whom the subordinate party had placed his or her trust and confidence. *Id.*

In support of their claim of undue influence, the Plaintiffs argue that Mr. Bitler and Mr. Melching "were old and feeble at the time the Monroe Termination/release was signed," and

they recite some of their health issues. (Pls.' Brief in Resp. 18.) They assert that Mrs. Melching "did not understand that she might be giving away rights due to her for the remediation yet to be completed at Hillsdale under the 1983 Hillsdale lease or the Master Amendment." (*Id.*)

Both Mrs. Bitler and Mrs. Melching signed the Hillsdale Termination and Release Agreement, and their signatures were separately witnessed by notaries public who attested that Mrs. Bitler and Mrs. Melching personally appeared and acknowledged their execution of the agreement as free acts and deeds. Mr. Bitler and Mr. Melching also witnessed the signatures of Mrs. Bitler and Mrs. Melching on the Hillsdale Termination and Release Agreement. Both Mr. Bitler and Mr. Melching signed the Monroe Termination and Release Agreement, and their signatures were separately witnessed by notaries public who attested that Mr. Bitler and Mr. Melching personally appeared and acknowledged their execution of the agreement as free acts and deeds. Mr. Bitler and Mr. Melching had known each other well from the many business dealings (including building a profitable gasoline distribution system, selecting sites for gasoline stations, developing gas stations, entering into lease agreements regarding gasoline stations, jointly owning properties, and serving as oil company officers) they had engaged in together for several decades. Mrs. Bitler and Mrs. Melching had joined their husbands in some of these dealings, and they had their own commercial properties that they leased for use as gasoline stations. The record before the Court does not show that the Defendants exercised control over Mr. Bitler, Mr. Melching, or Mrs. Melching such that their free agency (to which the notaries public specifically and affirmatively attested in each document) was overborne and such that they were constrained to do what they would not have done if such control had not been exercised. The Plaintiffs have not come forward with evidence sufficient to show weakness of

mind on the part of Mr. Bitler, Mr. Melching, or Mrs. Melching. They have also not shown that some sort of special relationship existed between the parties that would create a presumption of trust and confidence as to the subordinate (from the Plaintiffs' perspective, Mr. Bitler, Mr. Melching, and Mrs. Melching) and a corresponding influence as to the dominant party (from the Plaintiffs' perspective, the Defendants) on Mr. Bitler, Mr. Melching, and Mrs. Melching. The Plaintiffs have not demonstrated with evidence that the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement resulted in an advantage to the Defendants or that Mrs. Melching or Mr. Bitler and Mr. Melching placed their trust and confidence in the Defendants. Because the Plaintiffs have not established with evidence the two factors under Indiana undue influence law (namely, the existence of a special relationship, and a questioned transaction resulting in an advantage to the dominant party), no presumption arises that the transactions were the result of undue influence exerted by the Defendants. As a consequence, the Plaintiffs have failed to come forward with evidence that creates a triable issue of material fact regarding undue influence, and the evidence before the Court shows that the parties negotiated at arm's length, that the Defendants did not have a special relationship of trust and confidence with Mrs. Melching or Mr. Bitler and Mr. Melching that resulted in the Defendants' control or influence over Mrs. Melching or Mr. Bitler and Mr. Melching, and that the parties' mutual termination/release agreements related to the Hillsdale property and Monroe property were the result of their free agency.

For these reasons, the Court finds that the Hillsdale Termination and Release Agreement, the Monroe Termination and Release Agreement, and the regulatory closure of the Hillsdale property and the Monroe property bar the Plaintiffs from bringing the claims alleged in Counts

11,12, 13, and 14 of the First Amended Complaint. The Court will, therefore, grant the

Defendants' Motion for Partial Summary Judgment as to these claims.

**2.      The Claims Asserted in Counts 27 and 28 Are Barred by the Statute of Limitation**

The Defendants contend that the Plaintiffs' breach of contract claim related to the Sturgis

property (Count 27) is barred by Indiana's six-year statute of limitation (Ind. Code § 34-11-2-7)

governing actions for injuries to property other than personal property and for lost use, rents, and

profits of real property. They also argue that the Plaintiffs' claim for waste related to the Sturgis

property (Count 28) is barred by Michigan's three-year statute of limitation (Mich. Comp. Laws

§ 600.5805(10)) governing actions to recover damages for injury to property (including real

property).[3] The Plaintiffs respond that a different Indiana statute of limitation (Ind. Code § 34-

11-2-11) applies to the breach of contract claim related to the Sturgis property, that issues of fact

exist as to when that breach of contract cause of action related to the Sturgis property accrued,

that the Michigan statute of limitation does not apply to their waste claim, and that issues of fact

exist as to when the causes of action for waste accrued at the Sturgis property.

Statutes of limitation are considered substantive matters for purposes of the *Erie* doctrine.

*Guaranty Trust v. York,* 326 U.S. 99, 110 (1945). Moreover, "[l]ike the statute of limitations

itself, rules that are an 'integral part of the statute of limitations,' such as tolling and equitable

estoppel, are treated as substantive for purposes of the *Erie* doctrine." *Hollander v. Brown,* 457

---

[3] The Defendants also contend that the waste claims on the Hillsdale property and the Monroe property (Counts 12 and 14) are barred by this same Michigan statute of limitation. Because the Court has determined that the Hillsdale Termination and Release Agreement and the Monroe Termination and Release Agreement and the regulatory closures bar Counts 11, 12, 13, and 14, the Court need not address the Defendants' request for summary judgment on these counts based upon the statute of limitation.

F.3d 688, 694 (7th Cir. 2006) (quoting *Walker v. Armco Steel Corp.,* 446 U.S. 740, 751–53 (1980)).

a.    *The Breach of Contract Claim Regarding the Sturgis Property (Count 27)*

The Plaintiffs do not dispute the Defendants' argument that Indiana law supplies the applicable statute of limitation for their breach of contract claim related to the Sturgis property. The Plaintiffs do, however, dispute the Defendants' contention that the six-year statute of limitation set by Indiana Code § 34-11-2-7 applies. The Plaintiffs argue that the ten-year statute of limitation set by Indiana Code § 34-11-2-11 applies.

Statutes of limitation seek to provide security against stale claims, which promotes judicial efficiency and advances the peace and welfare of society. *Cooper Indus. v. City of South Bend*, 899 N.E.2d 1274, 1279 (Ind. 2009). Indiana statutes set the following time limitations (among others) for bringing causes of action: ten years under the general statute of limitation, Ind. Code § 34-11-1-2(a); six years for actions for use, rents, and profits of real property and for actions for injuries to property other than personal property, Ind. Code § 34-11-2-7(2) & (3); and ten years for actions upon written contracts, Ind. Code § 34-11-2-11. The substance of a cause of action (i.e., how parties characterize facts in their pleadings), rather than its form, determines the applicability of the statute of limitation. *Cooper Indus.*, 899 N.E.2d at 1284–85.

In a relatively recent case involving underground storage tanks and remediation that required the Indiana Supreme Court to determine which of several Indiana statutes of limitation applied to the claims, the court determined that the six-year statute of limitation in Indiana Code § 34-11-2-7 applies to claims for stigma damages, as well as claims for waste and negligence

related to real property, but that the ten-year statute of limitation in Indiana Code § 34-11-1-2(a) applies to contribution claims. *Pflanz v. Foster*, 888 N.E.2d 756, 759–61 (Ind. 2008). It is helpful to consider how that court distinguished among the claims in reaching its conclusions. According to the court, a contribution or indemnification claim is not a claim for damage to the property itself; rather, it seeks damages for the monetary obligation incurred as a result of another party's actions (such as the costs of cleanup required by a state agency). *Id.* at 759. Such claims are not brought until after the obligation to pay is incurred. *Id.* Under Indiana law, recovery of stigma damages is permitted for losses in the fair market value of property after remediation of environmental contamination, and such damages are warranted where the plaintiff can show that an imperfect market rendered the property less valuable despite complete restoration. *Id.* Such a claim ripens only after remediation has been substantially completed because only then can the parties determine the impact of environmental contamination on property value. *Id.* Claims for stigma damages are similar to contribution claims in that the damage is not the environmental contamination itself, but a diminution in property value despite acceptable remediation of the environmental contamination. *Id.* at 760. Notwithstanding that similarity, different statutes of limitation apply to contribution claims and claims for stigma damages.

Considering the potentially relevant Indiana statutes of limitation, the Indiana Supreme Court's application of these statutes, and the substance of the claim asserted by the Plaintiffs, the Court finds that the Plaintiffs' claim for breach of contract regarding the Sturgis property (Count 27) is governed by the six-year statute of limitation in Indiana Code § 34-11-2-7. *See Hellyer Commc'ns., Inc. v. WRC Props., Inc.*, 888 F. Supp. 94, 96 n.3 (S.D. Ind. 1995) (applying rule of statutory construction requiring that specific statutes of limitation prevail over more general

statutes and applying the six-year statute of limitation in a dispute over rent payments under a written commercial lease agreement); *cf. Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 263–64 (7th Cir. 1998) (predicting, in determining which Indiana statute of limitation should apply to a cause of action on a mineral lease, that the Indiana Supreme Court would use the six-year statute of limitation in Indiana Code § 34-11-2-7 rather than the longer statute of limitation in Indiana Code § 34-11-2-11 for disputes over written contracts). In the prefatory allegations to this claim in the First Amended Complaint, the Plaintiffs allege that "[t]he rent Superior Auto and other potential tenants have been willing to pay has been adversely impacted by the deplorable condition in which [the Defendants] had left the building and grounds, as well as by ongoing environmental assessment and remediation." (Pls.' First Am. Compl. ¶ 282.) They also allege that this property was "returned to the owners in a condition both unsaleable and untenantable at fair market rates" and that "[g]iven its location in an active commercial area, it could have been converted to more profitable commercial use, were it not for [the Defendants'] substandard maintenance and careless use of the premises and the continuing environmental concerns." (Pls.' First Am. Compl. ¶ 283.) The Plaintiffs' allegations regarding this breach of contract claim conclude by stating that, as a result of the Defendants' breach, the "Plaintiffs have suffered damages, consisting of lost rents, costs of returning the Sturgis property to the condition in which it would have been had [the Defendants] performed [their] obligations, and miscellaneous expenses." (Pls.' First Am. Compl. ¶ 288.) Accordingly, this claim is in the same category of claims the Indiana Supreme Court in *Pflanz* found to be governed by the six-year statute of limitations in Indiana Code § 34-11-2-7.

Indiana Code § 34-11-2-7 required the Plaintiffs to bring this claim within six years after

the cause of action accrued. Under Indiana's discovery rule, a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in exercise of ordinary diligence should have known of the injury. *Cooper Indus.*, 899 N.E.2d at 1280; *Pflanz*, 888 N.E.2d at 759. The determination when a cause of action accrues is generally a question of law. *Cooper Indus.*, 899 N.E.2d at 1280. Additionally, third parties are usually held accountable for the time running against their predecessors in interest. *Id.* at 1279.

The Plaintiffs commenced this action on December 17, 2004. As a consequence, if their breach of lease claim accrued before December 17, 1998, then the statute of limitation bars this claim. The Defendants identify several dates when the Plaintiffs knew or, in the exercise of ordinary diligence, should have known of the alleged breach of contract regarding the Sturgis property. They argue that the property was turned back over to the Plaintiffs' predecessors in interest by no later than June 30, 1995, that by no later than January 1, 1996, Mr. Bitler and Mr. Melching had re-let the premises to Superior Auto, and that by no later than March 1996, Mr. Bitler and Mr. Melchinghad inspected the premises and requested certain repairs. They also argue that although Mr. Bitler and Mr. Melching knew or should have known of the condition of the property with respect to improvements by no later than June 30, 1995, when Emro Marketing terminated the 1983 Sturgis lease, there is no dispute that they had actual knowledge by no later than March 30, 1996, when Mr. Melching requested a reimbursement payment for repairs made to damaged plumbing and electrical piping. By this date, the Plaintiffs' predecessors were collecting rent on the property for use as a used car lot. The Plaintiffs respond that there are issues of fact as to the reasonable time for discovery of the claim, that Mr. Bitler and Mr. Melching had lost the mental capacity to conduct business and were subject to undue influence,

that Mr. Bitler and Mr. Melching did not reasonably discover the injury, and that the injury was discovered by their children in late 2003 and early 2004.

The Court finds that the Plaintiffs' claim accrued before December 17, 1998, and that this claim is, therefore, time-barred. At the Sturgis property, the underground storage tanks and associated piping were removed in April 1994. Mr. Bitler and Mr. Melching gained possession and control of the property by June 30, 1995, and they leased the property to Superior Auto for use as a used car lot on January 1, 1996, which would have permitted them to discover any injury related to the alleged breach of the lease by the Defendants. Mr. Melching sent a letter to Emro Marketing on March 30, 1996, seeking reimbursement, and Mr. Bitler and Mr. Melching were aware of work and testing that was being done on the property related to the underground storage tank closure. Additionally, in the First Affidavit of J. Maxine Melching, Mrs. Melching states:

> I assisted my husband [Mr. Melching] and George Bitler throughout the time that they owned properties that they together leased as gas stations, including the 14 properties that are the subject of this lawsuit. My husband and I visited each of the properties periodically, including through the 1990s, before and after times when the underground storage tanks were removed from the sites. There was a marked decline in the appearance of the properties after gasoline stations were closed and the underground storage tanks removed. Each of the buildings was boarded up and left to decay. I am not aware of any significant repair or rehabilitation undertaken by Marathon after they removed underground storage tanks from a property.

(First Aff. Mrs. Melching ¶ 3.) The Plaintiffs' assertions that "Mr. Bitler and Mr. Melching did not reasonably discover their injuries at all" and that "[t]hose injuries were discovered through the exercise of reasonable diligence by their children in late 2003 and early 2004" are disputed by their own evidence, including Mrs. Melching's own statements. (Pls.' Br. in Resp. 20.) Furthermore, the Court has already determined that the Plaintiffs have not shown any triable

issue of fact on the questions of Mr. Bitler's and Mr. Melching's mental capacities and undue influence; in fact, the record before the Court shows otherwise.

Accordingly, the Plaintiffs' breach of lease cause of action regarding the Sturgis property accrued, and the statute of limitation began to run, on June 30, 1995, when Mr. Bitler and Mr. Melching took possession of the property, but no later than March 30, 1996, when the Plaintiffs' predecessors in interest knew or in exercise of ordinary diligence should have known of their alleged injury. By not bringing their claim for breach of contract regarding the Sturgis property until December 17, 2004, the Plaintiffs failed to bring this cause of action within six years of their accrual, and thus this claim is time-barred under Indiana Code § 34-11-2-7. The Court will, therefore, grant the Defendants' Motion for Partial Summary Judgment as to Count 27 of the Plaintiffs' First Amended Complaint.

**b.**     ***The Waste Claim Regarding the Sturgis Property (Count 28)***

The Plaintiffs dispute the Defendants' argument that Michigan law supplies the applicable statute of limitation for their statutory waste claim related to the Sturgis property. The Plaintiffs contend that Indiana law supplies the applicable statute of limitation. On this issue, the Court agrees with the Plaintiffs that Indiana law supplies the statute of limitation for the Plaintiffs' waste claim related to the Sturgis property.

The basis for this Court subject-matter jurisdiction in this case is diversity of citizenship, and Indiana is the forum state for this litigation. Consequently, Indiana's choice-of-law rules apply. *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476, 478 (7th Cir. 1995). "Because in Indiana statutes of limitations are procedural in nature, Indiana choice-of-law rules

state that the statute of limitations of the forum state, Indiana, will apply." *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F. Supp. 1374, 1385 (S.D. Ind. 1989) (citations omitted), *aff'd*, 917 F.2d 278 (7th Cir. 1990). *See also Miller v. Javitch, Block & Rathbone*, 397 F. Supp. 2d 991, 1002–03 (N.D. Ind. 2005) (stating that "under Indiana law, statutes of limitation are procedural, rather than substantive, and are not subject to parties' choice of law disputes") (citing cases); *McLaughlin Equip. Co. v. Servaas*, No. IP98-127-C-T/K, 2004 WL 1629603, at *45–46 (S.D. Ind. Feb. 18, 2004) (applying Indiana's choice of law rules including its statute of limitations to the plaintiff's state law claims, even though another state's substantive law governed those claims); *Bailey v. Skipperliner Indus., Inc.*, 278 F. Supp. 2d 945, 952 (N.D. Ind. 2003) (concluding that, under Indiana choice-of-law rules, statutes of limitation are procedural and applying an Indiana statute of limitation even though the substantive law of another state may apply to certain claims); *Dart Indus., Inc. v. Adell*, 517 F. Supp. 9, 10 (S.D. Ind. 1980) (following the rule that the statute of limitations is a procedural matter under Indiana law and a federal court sitting in diversity should therefore apply Indiana's limitations).

Considering the potentially relevant Indiana statutes of limitation, the Indiana Supreme Court's application of these statutes, and the substance of the waste claim asserted by the Plaintiffs, the Court finds that the Plaintiffs' claim for waste regarding the Sturgis property (Count 28) is governed by the six-year statute of limitation in Indiana Code § 34-11-2-7, which applies to actions for use, rents, and profits of real property and for actions for injuries to property other than personal property. *See Phlanz*, 888 N.E.2d at 760 ("Claims for waste and negligence related to real property are governed by a six-year statute of limitation.") (citing Ind.

Code § 34-11-2-7). Indiana Code § 34-11-2-7 required the Plaintiffs to bring this claim within six years after the cause of action accrued. Because the Plaintiffs commenced this action on December 17, 2004, the statute of limitation bars this claim if their waste claim accrued before December 17, 1998.

The Court finds that the Plaintiffs' waste claim accrued before December 17, 1998, and that this claim is, therefore, time-barred. The underground storage tanks and associated piping were removed from the Sturgis property in April 1994. Mr. Bitler and Mr. Melching gained possession and control of the property by June 30, 1995, and they leased the property to Superior Auto for use as a used car lot on January 1, 1996. Mr. Melching sent a letter to Emro Marketing on March 30, 1996, seeking reimbursement for repairs to damaged plumbing and electrical lines, and Mr. Bitler and Mr. Melching were aware of environmental work and testing being done on the Sturgis property related to the underground storage tank closure. Their concrete awareness that the Defendants were still performing work and testing on the property and that the Defendants no longer had a possessory interest is memorialized in the License Agreement they both signed in May 1998 permitting the Defendants and their representatives to access the Sturgis property to conduct assessment and remediation activities. In July 1998, the Plaintiffs' attorney provided them with a copy of this agreement. Additionally, Mrs. Melching has attested to her and her husband's periodic visits to each of the fourteen properties that are the subject of this lawsuit both before and after the underground storage tanks were removed from the properties, and she has indicated her awareness of a "marked decline in the appearance of the properties after gasoline stations were closed and the underground storage tanks removed" and "of the buildings [being] boarded up and left to decay." (First Aff. Mrs. Melching ¶ 3.) These

events occurred before the December 17, 1998, date, and remediation was substantially completed before this time. Consequently, the Plaintiffs' predecessors in interest knew or, in exercise of ordinary diligence, should have known of the alleged injury before this date.

The Plaintiffs' assertions that "[t]here is no evidence that any of [the Bitlers or the Melchings] did in fact know of the waste claims asserted at the [Sturgis] site[]" and that "[t]he family members discovered the [waste] claims in late 2003 or 2004 when they met with counsel" are disputed by Mrs. Melching's own statements. (Pls.' Br. in Resp. 20.) Furthermore, the Plaintiffs have not shown any triable issue of fact on the questions of Mr. Bitler's and Mr. Melching's mental capacities and undue influence, and thus they have not established a basis for tolling the statutory period because of the mental incapacity.

Accordingly, the Plaintiffs' waste cause of action regarding the Sturgis property accrued, and the statute of limitation began to run before December 17, 1998. Based upon the evidence before the Court, well before this date, the Plaintiffs' predecessors in interest knew or, in exercise of ordinary diligence, should have known of their alleged injury. By not bringing their claim for waste regarding the Sturgis property until December 17, 2004, the Plaintiffs failed to bring this cause of action within six years of their accrual, and thus this claim is time-barred under Indiana Code § 34-11-2-7. The Court will, therefore, grant the Defendants' Motion for Partial Summary Judgment as to Count 28 of the Plaintiffs' First Amended Complaint.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Defendants' Motion for Partial Summary Judgment [ECF No. 125] on the Hillsdale property (Counts 11 and 12), the Monroe

property (Counts 13 and 14), and Sturgis property (Count 27 and 28) and GRANTS IN PART and DENIES IN PART the Defendants' Motion to Strike Portions of the Affidavit of Philip Rodenbeck and the First Affidavit of J. Maxine Melching in Its Entirety [ECF No. 172].

SO ORDERED on March 11, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT