**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

BITLER INVESTMENT VENTURE II, LLC,   )
BITLER INVESTMENT VENTURE III, LLC,  )
BITLER INVESTMENT VENTURE V, LLC,   )
BITLER INVESTMENT VENTURE VI, LLC,  )
MELCHING INVESTMENT VENTURE II, LLC, )
MELCHING INVESTMENT VENTURE III, LLC, )
MELCHING INVESTMENT VENTURE V, LLC, )
MELCHING INVESTMENT VENTURE VI, LLC, )
and TWO PORTLAND PROPERTIES #1, LLC, )
                                           )
       Plaintiffs,                     )
                                           )
       v.                            )     CAUSE NO.: 1:04-CV-477-TS
                                           )
MARATHON ASHLAND PETROLEUM, LLC,  )
SPEEDWAY SUPERAMERICA, LLC, and     )
MARATHON OIL COMPANY,              )
                                           )
       Defendants.                  )

## OPINION AND ORDER

In this lawsuit, the Plaintiffs seek recovery under the theories of breach of contract and
waste for alleged damage to fourteen different pieces of commercial property in Indiana,
Michigan, and Ohio. The Defendants and/or their predecessors in interest leased several gasoline
stations from the Plaintiffs and/or their predecessors in interest, and the Plaintiffs claim that the
Defendants and their predecessors in interest neglected and destroyed the leased commercial
properties and thereby injured the Plaintiffs' rights and interests in the properties. This matter is
before the Court on the Plaintiffs' Motion for Summary Judgment on Breach of Lease at Angola,
Coldwater, Michigan Center and Battle Creek [ECF No. 138].

# BACKGROUND

On December 17, 2004, the Plaintiffs instituted this lawsuit. In their twenty-eight count Complaint [ECF No. 1], they named Marathon Ashland Petroleum as the Defendant. On January 21, 2005, they filed an Amended Complaint [ECF No. 17], adding Speedway SuperAmerica, LLC and Marathon Oil Company as Defendants. The Plaintiffs premise this Court's subject-matter jurisdiction on diversity of citizenship pursuant to 28 U.S.C. § 1332. On February 28, 2005, the Defendants filed their Answer [ECF No. 34], and on March 15, they filed their Amended Answer [ECF No. 40].

In their First Amended Complaint, the Plaintiffs allege generally that the Defendants left these properties in a damaged condition with remaining environmental uncertainties and that the Defendants returned the properties to the owners in a condition that was both unsaleable and untenantable at fair market rates. Counts 1 and 2 of the Amended Complaint relate to commercial property in Angola, Indiana, which is owned by Plaintiffs Bitler Investment Venture II, LLC and Melching Investment Venture II, LLC. Counts 7 and 8 relate to commercial property in Coldwater, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 15 and 16 relate to commercial property in Michigan Center, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 17 and 18 relate to commercial property in Battle Creek, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. In their breach of contract claims (Counts 1, 7, 15, and 17), the Plaintiffs allege that the Defendants failed to perform their obligations under the commercial lease agreements and that the Defendants, by their breach, have caused the Plaintiffs

to suffer damages.

On August 16, 2007, the Plaintiffs filed a Motion for Summary Judgment on Breach of Lease at Angola, Coldwater, Michigan Center and Battle Creek [ECF No. 138], a Brief in Support [ECF No. 139], and a Submission of Evidence [ECF No. 140] (with attached exhibits). On September 7, the Defendants filed a Response [ECF No. 156] (with attached exhibits) and an Appendix/Statement of Genuine Issues [ECF No. 157]. On September 25, the Plaintiffs filed a Reply [ECF No. 176] (with attached exhibits). The Defendants have filed a series of summary judgment motions (six in total) that together seek summary judgment on each of the twenty-eight counts asserted by the Plaintiffs, but the Motion addressed in this Opinion and Order is the only Motion for Summary Judgment filed by the Plaintiffs.

# FACTS[1]

## A.    The Relevant Parties and the Leases

In 1983, George O. Bitler, Mary Bitler, Max E. Melching, and Maxine Melching in various combinations as landlord or lessor entered into lease agreements with R.I. Marketing, Inc., involving their commercial properties, including the Angola, Coldwater, Michigan Center, and Battle Creek properties. These leases were for eleven-year terms, running from December 1,

---

[1] Additional facts as to the parties, the leasing relationships, and the ownership of the commercial properties are set forth in the Opinions and Orders [ECF Nos. 218, 224, & 234] the Court has already issued granting the following summary judgment motions: the Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Celina, Ohio Property (Counts 23 and 24) [ECF No. 91]; the Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Huntington, Indiana Property (Counts 5 and 6) and Ligonier, Indiana Property (Counts 25 and 26) [ECF No. 119]; and the Defendants' Motion for Partial Summary Judgment on All Issues Regarding the Hillsdale, Michigan (Counts 11 and 12), Monroe, Michigan (Counts 13 and 14), and Sturgis, Michigan (Counts 27 and 28) Properties [ECF No. 125].

1983, to November 30, 1994, and included renewal options. The lease agreements included a term regarding use of the leased premises to the effect that, during the lease term, the lessee would use the leased premises in a careful and proper manner and for lawful purposes only, and would, at its own expense, comply with any and all applicable statutes, ordinances, rules, and regulations relating to the occupancy or use of the leased premises. Another lease term provided that no building or improvement located or constructed on the leased premises would be removed or materially altered (except by way of addition) without the prior written consent of the lessors, except that existing buildings or improvements may be replaced, rehabilitated, or restored if the resulting improvements are worth at least as much after the replacement, rehabilitation, or restoration as before.

In 1989, the leases to the commercial properties were assigned to Emro Marketing Company, a wholly-owned subsidiary of Marathon Petroleum Company, which was previously Marathon Ashland Petroleum, LLC, and the Marathon Oil Company. New federal regulations governing underground storage tanks used to store gasoline and other petroleum products were promulgated in the late 1980s. These regulations required upgrades or replacement of existing tanks and piping by December 22, 1998.

On October 6, 1992, Mr. Bitler and Mr. Melching entered into a Master Amendment to Leases agreement with Emro Marketing involving the Angola, Coldwater, Michigan Center, and Battle Creek properties. In the Master Agreement to Leases, the parties amended "certain provisions of the Leases to provide for underground tank removal and related cleanup responsibilities." (ECF No. 133-3 at 31.) The Master Amendment to Leases agreement transferred to Emro Marketing ownership of the underground storage tanks and all related piping

at these premises, and Emro Marketing assumed responsibility for removing from the premises

the underground storage tanks and all related piping, prior to the end of the lease term and

subject to extension as provided in the Master Amendment. Emro Marketing agreed that its tank

and piping removal would fully comply with all applicable laws, rules, regulations, and

ordinances. In addition to replacing any asphalt, concrete, or other surface damaged or destroyed

in the removal process, Emro Marketing also agreed to backfill holes and trenches in compliance

with all applicable laws, rules, regulations, and ordinances and in a good business-practice

manner so as to leave the premises in a condition reasonably useful for future commercial use.

The Master Amendment included the following agreement to indemnify, defend, and

hold harmless:

2.      [Emro Marketing] shall be fully responsible for any and all liability,
losses, damages, costs and expenses resulting from its use of the Premises
and the removal of the underground storage tanks and piping, as said
liability may be determined by all applicable federal, state, and local laws,
rules and regulations. In this regard, [Emro Marketing] will indemnify,
defend and hold [Mr. Bitler and Mr. Melching] harmless from and against
any and all liability, claim, action, cause of action, loss, damage, cost and
expense, including reasonable attorney fees, which [Mr. Bitler and Mr.
Melching] may incur by reason of the occupation, leasing, subleasing, or
use of the Premises by [Emro Marketing], or any other party, up to and
including the termination date of the Lease, or the last day of any lease
extension period.

This Agreement to indemnify, defend, and hold [Mr. Bitler and Mr.
Melching] harmless shall also arise and take effect in the event [Mr. Bitler
and Mr. Melching] incurs any liability, loss or damage, including
reasonable attorney fees, as a result of claims, demands, costs, actions,
liens, damages or judgments arising out of the failure of [Emro Marketing]
or those acting on behalf of, at the direction of, or with the consent of
[Emro Marketing], to conform to or comply with the laws, rules or
regulations of any governmental authority in connection with the
occupation, leasing, subleasing or use of the Premises by [Emro
Marketing] or any other party up to and including the termination date of
the Lease, or the last day of any lease extension period, whether said non-

conformance or non-compliance is caused by or arises out of the acts or omissions of [Emro Marketing], its officers, agents, employees or [Emro Marketing's] predecessors in interest.

[Mr. Bitler and Mr. Melching] shall give written notice to [Emro Marketing] of any act or occurrence involving a liability, claim, demand, or costs indemnified against herein, within fifteen (15) days after the occurrence of such act or occurrence shall have come to [Mr. Bitler and Mr. Melching's] knowledge. Lessee agrees to reimburse [Mr. Bitler and Mr. Melching] for any expense, including reasonable attorney fees, or costs incurred by [Mr. Bitler and Mr. Melching] in the enforcement of any part of this indemnity within thirty (30) days after receiving written notice from [Mr. Bitler and Mr. Melching] that [they] ha[ve] incurred said expenses and costs.

(EFC No. 133-3 at 32.)

Paragraph 3 of the Master Amendment included a term regarding a rent-free occupancy period in the event Emro Marketing elected to discontinue the business operations on the premises on or before the termination date of the applicable lease or any extension. This term further provided:

[Mr. Bitler and Mr. Melching] shall extend to [Emro Marketing] a rent-free Occupancy Period to be calculated as specified in this Paragraph during which Occupancy Period [Emro Marketing] shall retain the right of possession of the Premises. [Emro Marketing] shall be obligated to notify [Mr. Bitler and Mr. Melching] in writing of the exact date of discontinuance of the business operation on the Premises, and the commencement of the Occupancy Period shall be the first day of the next calendar month following the closing of the business. [Emro Marketing] shall pay [Mr. Bitler and Mr. Melching] the full amount of rent for the month in which the business is discontinued.

(ECF No. 133-3 at 32–33.)

The Master Amendment provided as follows regarding Emro Marketing's clean up and remediation work at the properties:

4.      [Emro Marketing] agrees that prior to vacating the Premises, it shall, at its own expense, clean up any petroleum related or petroleum caused contamination discovered at the Property provided that: a) the

6

contamination exceeds acceptable or legal levels established by the state in which the property is located or the United States Environmental Protection Agency; and b) the cleanup will be to a level existing in law, regulations, or ordinances established by the State of Michigan or the State of Indiana or the United States Environmental Protection Agency or, if no such level is established, the cleanup will be to a level adequately protective of public health and safety, as determined by a scientific consultant retained by Emro. All remediation work in this regard, including, but not limited to, that work required by the removal of the underground storage tanks, shall be performed in accordance with all laws, rules and regulations applicable to such remediation, and [Emro Marketing] shall return the Premises to [Mr. Bilter and Mr. Melching] as nearly as possible in the same condition as it was in prior to such remediation work, subject only to the removal of the contamination and normal wear from reasonable use of the property.

5.      [Emro Marketing] shall undertake the underground storage tank and piping removal during the Occupancy Period, and in the event the complete removal, remediation and restoration project is not completed by the conclusion of the Occupancy Period, said Occupancy Period shall be extended on a month-to-month basis in consideration of the payment by [Emro Marketing] to [Mr. Bilter and Mr. Melching] of the monthly sum of money specified in Exhibit A [to the Master Amendment] until such time as the entire project is completed. Any governmental or otherwise required continuing groundwater monitoring or pumping or treating shall not be deemed to extend the remediation and restoration project or the obligation of [Emro Marketing] to pay rent to [Mr. Bilter and Mr. Melching] unless said monitoring or pumping or treating materially interferes with [Mr Bilter and Mr. Melching's] use of the premises or [their] ability to sell or lease the same. [Emro Marketing] agrees to provide [Mr. Bilter and Mr. Melching] with copies of any and all documents related to the removal, remediation and restoration project, and [Mr. Bilter and Mr. Melching] shall have the further right to review and obtain copies of all documentation related to said project during the course of the same and after its conclusion.

(ECF No. 133-3 at 33–34.)

Paragraph 6 of the Master Amendment included a lease buyout term in the event that the occupancy period ended before the termination date of the relevant lease. However, it also specified: "In the event that the Occupancy Period extends beyond the Lease termination date,

the above lease buyout provision shall not apply, and [Emro Marketing] shall have not rental

obligation other than that previously established to be paid on a month-to-month basis, but

[Emro Marketing] shall pay the real property taxes on the property during said extension until

the Occupancy Period expires." (ECF No. 133-3 at 34.) In the Master Amendment, Emro

Marketing agreed to provide copies of all environmental reports submitted to state agencies,

copies of correspondence received from state agencies related to such reports, and periodic status

reports relative to remediation. The parties also agreed that the 1983 leases remained in full force

and effect, except as amended by the Master Amendment.

     At the Angola property, the Defendants discontinued the operation of the gasoline station

business in May 1993, and the Defendants removed the underground storage tanks and related

piping in April 1994. The property has been used as a cigarette store. In 2004, the parties

apparently could not come to agreement regarding a further extension of the lease agreement.

Additionally, it appears that the Defendants must access the property to conduct required

quarterly groundwater sampling. As of 2007, the Indiana Department of Environmental

Management has not approved regulatory closure of the Angola property.

     At the Coldwater property, the Defendants provided notice of the discontinuance of

business operations in November 1998, and the Defendants removed the underground storage

tanks and related piping in December 1998. As of 2007, the State of Michigan has not approved

regulatory closure of the Coldwater property. The Defendants continue to pay rent on the

Coldwater property.

     At the Michigan Center property, the Defendants provided notice of the commencement

of the rent-free occupancy period (and the discontinuation of business operations) in December

1994, and the Defendants removed the underground storage tanks and related piping in 1995. Years later, with the consent of Mrs. Melching, the Defendants removed a building on the Michigan Center property after a Leoni Township citation was issued regarding the building. As of 2007, the State of Michigan has not approved regulatory closure of the Michigan Center property. The Defendants continue to pay rent on the Michigan Center property.

At the Battle Creek property, the Defendants provided notice of the commencement of the rent-free occupancy period (and the discontinuation of business operations) in May 1993, and the Defendants removed the underground storage tanks and related piping in July 1993. As of 2007, the State of Michigan has not approved regulatory closure of the Battle Creek property. The Defendants continue to pay rent on the Battle Creek property.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court in ruling on a

summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

## DISCUSSION

In their Motion for Summary Judgment on Breach of Lease at Angola, Coldwater, Michigan Center and Battle Creek, the Plaintiffs seek summary judgment on their breach of lease claims in Counts 1, 7, 15, and 17. In their Motion, the Plaintiffs seek summary judgment as to liability, not damages. The Plaintiffs' theory is that the Defendants breached by vacating those premises before completing remediation. The Plaintiffs' Motion states that "[r]emediation is ongoing to this day at all four locations, none of which ha[s] been given regulatory closure."[2] (ECF No. 138 at 1.) The Plaintiffs contend that buildings at these locations have been removed or are in a dilapidated state, that the Defendants have discontinued business operations and vacated the properties, that under the lease agreements the Defendants could not vacate the properties before completing remediation, and the properties have "been let to rot while remediation has continued." (ECF No. 138 at 2.) In support of their Motion, the Plaintiffs refer to the language in the Master Amendment that the Defendants agreed that "prior to vacating the Premises" they would "clean up any petroleum related or petroleum caused contamination discovered at the Property" subject to certain provisions. They also point to the requirement in the Master Amendment that the Defendants "return the Premises to [the Plaintiffs] as nearly as possible in the same condition as it was in prior to [the] remediation work, subject only to the

---

[2] It appears that the Plaintiffs decided to make their breach of lease claims regarding these four properties the subject of a summary judgment motion because these four properties have not been given any sort of regulatory closure. (ECF No. 138 at 2 n.2.)

removal of the contamination and normal wear from reasonable use of the property."[3] The

Defendants respond that ceasing business operations at the premises did not constitute vacating

the premises, that the Master Amendment clearly contemplated the Defendants continuing their

remediation work after ceasing business operations, and that they have not returned the

Coldwater, Michigan Center, and Battle Creek properties to the Plaintiffs' exclusive control.

The standards for reviewing contracts are well established. Under Indiana law, contracts

are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the

agreement, and if the language of the contract is clear and unambiguous, it should be given its

plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771

(Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four

corners of the agreement, and courts determine the meaning of a contract from an examination of

all of the contract's provisions, and not from a more narrow consideration of individual words,

phrases, or paragraphs read alone. *Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct.

App. 2009). Parol, or extrinsic evidence, is inadmissible to add to, vary, or explain clear and

unambiguous terms of a written instrument. *Evan v. Poe & Assocs. Inc.,* 873 N.E.2d 92, 101

(Ind. Ct. App. 2007). An ambiguity does not arise simply because the parties disagree on the

---

[3] The Plaintiffs also cite a clause of the Master Amendment regarding the Defendants' alleged responsibility for any and all liability, losses, damages, costs, and expenses resulting from the Defendants' use of the premises and removal of the underground storage tanks and related piping. This clause was included in Paragraph 2 of the Master Amendment. In their Reply, the Plaintiffs refine their argument claiming that the Defendants' breaches of Paragraph 4 of the Master Amendment by vacating the premises before completing remediation work constitute losses under Paragraph 2. The Defendants are correct in their observation that the Plaintiffs have taken this clause out of its context, which is an agreement to indemnify, defend, and hold harmless. The Court need not address the Plaintiffs' strained interpretation of Paragraph 2 in this Opinion and Order because the Court finds that the Plaintiffs, in asserting that the Defendants vacated the premises by discontinuing business operations and failing to obtain regulatory closure of these properties by 2007, have not shown an entitlement to relief on their breach of contract claims regarding the Angola, Coldwater, Michigan Center, and Battle Creek properties.

interpretation; rather, contract language is ambiguous only if reasonable people could come to different conclusions about its meaning. *Id.* at 98; *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005).

The language of the Master Amendment at issue in the Plaintiffs' Motion for Summary Judgment is not ambiguous. The Plaintiffs are correct that the Master Amendment requires the Defendants to clean up any petroleum related or petroleum caused contamination discovered at the properties before they vacate the premises, but the Defendants are correct that the Master Amendment contemplated that the Defendants would discontinue the business operations on the premises in advance of the Defendants vacating the premises and the leases terminating. This is reflected in the terms of the Master Amendment regarding the rent-free occupancy period (Paragraph 3), the remediation work (including the removal of the underground storage tanks and related piping and the remediation and restoration project) (Paragraphs 1, 4 and 5), and the lease buyout (Paragraph 6). Additionally, the Defendants are correct that "vacating the Premises" in the Master Amendment does not mean ceasing business operations, vacating buildings, or not using buildings.[4] Furthermore, the Plaintiffs assert that remediation is still ongoing at the four commercial properties that are addressed in their Motion for Summary Judgment, which suggests that the Defendants have continued to conduct some activities on the premises. This factual assertion undercuts the Plaintiffs' claim that the Defendants "long ago abandoned and 'vacated'

---

[4] The Defendants' contention that "vacating" means terminating occupancy of the property by terminating the occupancy period and turning the premises back over to the Plaintiffs seems a fairer reading of the Master Amendment than that put forward by the Plaintiffs. The Defendants are also correct that adopting the Plaintiffs' suggestion that the Defendants' discontinuation of the business operations constitutes vacating the premises would put these breach of contract claims outside the applicable statute of limitation. *See* Ind. Code § 34-11-2-7(2) & (3) (six-year statute of limitation governing actions for injuries to property other than personal property and for lost use, rents, and profits of real property); *Pflanz v. Foster*, 888 N.E.2d 756, 759–61 (Ind. 2008).

the properties—long before completion of the clean up." (ECF No. 139 at 2.) Consequently, based upon the parties' submissions and the materials related to the Plaintiffs' Motion for Summary Judgment, the Court finds that the Plaintiffs have not shown an entitlement to judgment as a matter of law on their breach of contract claims involving the Angola, Coldwater, Michigan Center, and Battle Creek properties.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Plaintiffs' Motion for Summary Judgment on Breach of Lease at Angola, Coldwater, Michigan Center and Battle Creek [ECF No. 138].

SO ORDERED on September 30, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT