**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| BITLER INVESTMENT VENTURE II, LLC, | ) | |
| BITLER INVESTMENT VENTURE III, LLC, | ) | |
| BITLER INVESTMENT VENTURE V, LLC, | ) | |
| BITLER INVESTMENT VENTURE VI, LLC, | ) | |
| MELCHING INVESTMENT VENTURE II, LLC, | ) | |
| MELCHING INVESTMENT VENTURE III, LLC, | ) | |
| MELCHING INVESTMENT VENTURE V, LLC, | ) | |
| MELCHING INVESTMENT VENTURE VI, LLC, | ) | |
| and TWO PORTLAND PROPERTIES #1, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:04-CV-477-TLS |
| | ) | |
| MARATHON ASHLAND PETROLEUM, LLC, | ) | |
| SPEEDWAY SUPERAMERICA, LLC, and | ) | |
| MARATHON OIL COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

In this lawsuit, the Plaintiffs seek recovery under the theories of breach of contract and

waste for alleged damage to fourteen different pieces of commercial property in Indiana,

Michigan, and Ohio. The Defendants and/or their predecessors in interest leased several gasoline

stations from the Plaintiffs and/or their predecessors in interest, and the Plaintiffs claim that the

Defendants and their predecessors in interest neglected and destroyed the leased commercial

properties and thereby injured the Plaintiffs' rights and interests in the properties.

This matter is before the Court on the following summary judgment motions: the

Defendants' Motion for Partial Summary Judgment on All Environmental Claims Brought Under

All Counts [ECF No. 129]; the Defendants' Motion for Partial Summary Judgment on Plaintiffs'

Non-Environmental Claims at Selected Properties [ECF No. 131]; and the Defendants' Motion

for Summary Judgment on Plaintiffs' Claims on All Counts [ECF No. 144].

## BACKGROUND

On December 17, 2004, the Plaintiffs instituted this lawsuit. In their twenty-eight count Complaint [ECF No. 1], they named Marathon Ashland Petroleum as the Defendant. On January 21, 2005, they filed a First Amended Complaint [ECF No. 17], adding Speedway SuperAmerica, LLC and Marathon Oil Company as Defendants. The Plaintiffs premise this Court's subject-matter jurisdiction on diversity of citizenship pursuant to 28 U.S.C. § 1332. On February 28, 2005, the Defendants filed their Answer [ECF No. 34], and on March 15, they filed their Amended Answer [ECF No. 40].

On August 2, 2007, the Defendants filed their Motion for Partial Summary Judgment on All Environmental Claims Brought Under All Counts [ECF No. 129] and a Brief in Support [ECF No. 130]. On September 4, the Plaintiffs filed a Brief in Response [ECF No. 154] with attached Appendix/Statement of Genuine Issues [ECF No. 154-2], and a Submission of Evidence [ECF No. 155] (with attached exhibits). On September 24, the Defendants filed a Reply [ECF No. 174].

On August 15, the Defendants filed a Motion for Partial Summary Judgment on Plaintiffs' Non-Environmental Claims at Selected Properties [ECF No. 131], a Brief in Support [ECF No. 132], a Submission of Evidence [ECF No. 133] (with attached Exhibits), and an Appendix/Statement of Material Facts [ECF No. 134]. On September 17, the Plaintiffs filed a Brief in Response [ECF No. 164] with attached Appendix/Statement of Genuine Issues [ECF No. 164-2] and a Submission of Evidence [ECF No. 165] (with attached exhibits). On October 5,

2

the Defendants filed a Reply [ECF No. 181].

On August 16, the Defendants filed a Motion for Summary Judgment on Plaintiffs'
Claims on All Counts [ECF No. 144] and a Brief in Support [ECF No. 145]. On September 18,
the Plaintiffs filed a Brief in Opposition [ECF No. 169] with attached Appendix/Statement of
Genuine Issues [ECF No. 169-2] and a Submission of Evidence [ECF No. 170] (with attached
exhibits). On October 8, the Defendants filed a Reply [ECF No. 182] (with attached exhibits).

These summary judgment motions are the last three in a series of summary judgment
motions filed by the parties that together seek summary judgment on each of the twenty-eight
counts asserted by the Plaintiffs. The Court has already issued Opinions and Orders [ECF Nos.
218, 224, & 234] granting the following summary judgment motions: the Defendants' Motion
for Partial Summary Judgment on All Issues Regarding the Celina, Ohio Property (Counts 23
and 24) [ECF No. 91]; the Defendants' Motion for Partial Summary Judgment on All Issues
Regarding the Huntington, Indiana Property (Counts 5 and 6) and Ligonier, Indiana Property
(Counts 25 and 26) [ECF No. 119]; and the Defendants' Motion for Partial Summary Judgment
on All Issues Regarding the Hillsdale, Michigan (Counts 11 and 12), Monroe, Michigan (Counts
13 and 14), and Sturgis, Michigan (Counts 27 and 28) Properties [ECF No. 125].[1] Consequently,

---

[1] The Court has issued an Opinion and Order [ECF No. 243] denying the Plaintiffs' Motion for
Summary Judgment on Breach of Lease at Angola, Coldwater, Michigan Center and Battle Creek [ECF
No. 138]. The Court has also ruled on the following motions, which were included in a series of motions
in limine and motions to strike filed by the Defendants: the Defendants' Motion to Strike the Affidavit of
Dr. Ravi Nagarajan [ECF No. 159]; the Defendants' Motion to Strike Portions of the Affidavit of Philip
Rodenbeck and the First Affidavit of J. Maxine Melching in Its Entirety [ECF No. 172]; and the
Defendants' Motion to Strike the Affidavit of Richard A. Ford and the Second Affidavit of J. Maxine
Melching in Whole or in Part [ECF No. 179]. Finally, the Court has denied as premature and without
prejudice the Defendants' Motion in Limine to Exclude the Testimony of Plaintiffs' Expert Witness
Andrew A. Gremos [ECF No. 117] and the Defendants' Motion in Limine to Exclude the Testimony of
Plaintiffs' Expert Witness James S. Kerwin [ECF No. 135].

Counts 1 to 4, 7 to 10, and 15 to 22 remain for the Court to address in ruling on the pending summary judgment motions, which the Court does in this Opinion and Order.

Counts 1 and 2 of the Amended Complaint relate to commercial property in Angola, Indiana, which is owned by Plaintiffs Bitler Investment Venture II, LLC and Melching Investment Venture II, LLC. Counts 3 and 4 of the Amended Complaint relate to commercial property in North Manchester, Indiana, which is owned by Plaintiffs Bitler Investment Venture II, LLC and Melching Investment Venture II, LLC. Counts 7 and 8 of the Amended Complaint relate to commercial property in Coldwater, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 9 and 10 of the Amended Complaint relate to commercial property in Adrian, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 15 and 16 of the Amended Complaint relate to commercial property in Michigan Center, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 17 and 18 of the Amended Complaint relate to commercial property in Battle Creek, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 19 and 20 of the Amended Complaint relate to commercial property in Owosso, Michigan, which is owned by Plaintiffs Bitler Investment Venture VI, LLC and Melching Investment Venture VI, LLC. Counts 21 and 22 of the Amended Complaint relate to commercial property in Portland, Michigan, which is owned by Plaintiff Two Portland Properties #1, LLC.

In their First Amended Complaint, the Plaintiffs allege generally that the Defendants left these properties in a damaged condition with remaining environmental uncertainties and that the

4

Defendants returned the properties to the owners in a condition that was both unsaleable and untenantable at fair market rates. In their breach of contract claims (Counts 1, 3, 7, 9, 15, 17, 19, and 21), the Plaintiffs allege that the Defendants failed to perform their obligations under the commercial lease agreements and that by their breach they have caused the Plaintiffs to suffer damages. In their waste claims (Counts 2, 4, 8, 10, 16, 18, 20, and 22), the Plaintiffs allege that the Defendants occupied the subject properties under valid and binding lease agreements, destroyed, misused, altered, mutilated, and damaged the properties, and left the properties in a damaged condition, that the Plaintiffs have had to spend their own monies to restore the properties, and that the Plaintiffs have suffered damages in the value of the properties. As to their waste claims on Michigan properties (Counts 8, 10, 16, 18, 20, and 22), the Plaintiffs allege that they are entitled to double the amount of their actual damages under Michigan Compiled Laws § 600.2919.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a

genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.


## FACTS[2]

### A.      The Relevant Parties and the Leases

In 1983, George O. Bitler (Mr. Bitler), his wife, Mary Bitler (Mrs. Bitler), Max E. Melching (Mr. Melching), and his wife, J. Maxine Melching (Mrs. Melching), in various combinations as landlord or lessor entered into lease agreements—identical in substance—with R.I. Marketing, Inc., involving their commercial properties, including the Angola, North Manchester, Adrian, Battle Creek, Coldwater, Michigan Center, Owosso and Portland properties. (Compl. Exs. 1, 8, 10, 13, 15, 20, 24, and 29, ECF No. 1.)[3] These leases were for eleven-year terms, running from December 1, 1983, to November 30, 1994, and included renewal options. The lease agreements included a term regarding use of the leased premises to the effect that, during the lease term, the lessee would use the leased premises in a careful and proper manner and for lawful purposes only, and would, at its own expense, comply with any and all applicable statutes, ordinances, rules, and regulations relating to the occupancy or use of the leased

---

[2] Additional facts as to the parties, the leasing relationships, and the ownership of the commercial properties are set forth in the Opinions and Orders [ECF Nos. 218, 224, 234, & 243] that the Court has already issued ruling on several of the parties' summary judgment motions.

[3] Additional amendments to these leases were later entered as to the Angola, Adrian, Coldwater, and Owosso properties, but those amendments were primarily to alter the extension options or the rent, and do not affect the issues before the Court. (Compl. Exs. 3, 12, 17, & 26.)

premises. Another lease term provided that no building or improvement located or constructed on the leased premises would be removed or materially altered (except by way of addition) without the prior written consent of the lessors, except that existing buildings or improvements might be replaced, rehabilitated, or restored if the resulting improvements were worth at least as much after the replacement, rehabilitation, or restoration as before.

In 1989, the leases to the commercial properties were assigned to Emro Marketing Company, a wholly-owned subsidiary of Marathon Petroleum Company, which was previously Marathon Ashland Petroleum, LLC, and the Marathon Oil Company. New federal regulations governing underground storage tanks used to store gasoline and other petroleum products were promulgated in the late 1980s. These regulations required upgrades or replacement of existing tanks and piping by December 22, 1998.

**B.     The October 6, 1992, Master Amendment**

On October 6, 1992, Mr. Bitler and Mr. Melching entered into a Master Amendment to Leases with Emro Marketing involving the Adrian, Angola, Battle Creek, Coldwater, and Michigan Center properties (Fourth Aff. of William Gilbert Ex. 7, ECF No. 133-3.) On the same date, Mrs. Melching and Mrs. Bitler entered into an identical Master Amendment to Leases with Emro Marketing involving the North Manchester and Owosso properties (*Id.* Ex. 8), and Mr. Bitler, Diane K. Melching, Marcia J. Rodenbeck and Philip Rodenbeck entered into an identical Master Amendment to Leases with Emro Marketing involving the Portland property. (*Id.* Ex. 9.) In the Master Amendment to Leases, the parties amended "certain provisions of the Leases to provide for underground tank removal and related cleanup responsibilities." (*Id.* Ex 7.) The

7

Master Amendment to Leases agreement transferred to Emro Marketing ownership of the underground storage tanks and all related piping at these premises, and Emro Marketing assumed responsibility for removing from the premises the underground storage tanks and all related piping, prior to the end of the lease term and subject to extension as provided in the Master Amendment. Emro Marketing agreed that its tank and piping removal would fully comply with all applicable laws, rules, regulations, and ordinances. In addition to replacing any asphalt, concrete, or other surface damaged or destroyed in the removal process, Emro Marketing also agreed to backfill holes and trenches in compliance with all applicable laws, rules, regulations, and ordinances and in a good business-practice manner so as to leave the premises in a condition reasonably useful for future commercial use.

The Master Amendment included the following agreement to indemnify, defend, and hold harmless:

2.      [Emro Marketing] shall be fully responsible for any and all liability, losses, damages, costs and expenses resulting from its use of the Premises and the removal of the underground storage tanks and piping, as said liability may be determined by all applicable federal, state, and local laws, rules and regulations. In this regard, [Emro Marketing] will indemnify, defend and hold [Mr. Bitler and Mr. Melching] harmless from and against any and all liability, claim, action, cause of action, loss, damage, cost and expense, including reasonable attorney fees, which [Mr. Bitler and Mr. Melching] may incur by reason of the occupation, leasing, subleasing, or use of the Premises by [Emro Marketing], or any other party, up to and including the termination date of the Lease, or the last day of any lease extension period.

This Agreement to indemnify, defend, and hold [Mr. Bitler and Mr. Melching] harmless shall also arise and take effect in the event [Mr. Bitler and Mr. Melching] incurs any liability, loss or damage, including reasonable attorney fees, as a result of claims, demands, costs, actions, liens, damages or judgments arising out of the failure of [Emro Marketing] or those acting on behalf of, at the direction of, or with the consent of [Emro Marketing], to conform to or comply with the laws, rules or

> regulations of any governmental authority in connection with the
> occupation, leasing, subleasing or use of the Premises by [Emro
> Marketing] or any other party up to and including the termination date of
> the Lease, or the last day of any lease extension period, whether said non-
> conformance or non-compliance is caused by or arises out of the acts or
> omissions of [Emro Marketing], its officers, agents, employees or [Emro
> Marketing's] predecessors in interest.
>
> [Mr. Bitler and Mr. Melching] shall give written notice to [Emro
> Marketing] of any act or occurrence involving a liability, claim, demand,
> or costs indemnified against herein, within fifteen (15) days after the
> occurrence of such act or occurrence shall have come to [Mr. Bitler and
> Mr. Melching's] knowledge. [Emro Marketing] agrees to reimburse [Mr.
> Bitler and Mr. Melching] for any expense, including reasonable attorney
> fees, or costs incurred by [Mr. Bitler and Mr. Melching] in the
> enforcement of any part of this indemnity within thirty (30) days after
> receiving written notice from [Mr. Bitler and Mr. Melching] that [they]
> ha[ve] incurred said expenses and costs.

(*Id.* Ex. 7, ¶ 2.)

Paragraph 3 of the Master Amendment included a term regarding a rent-free occupancy

period in the event Emro Marketing elected to discontinue the business operations on the

premises on or before the termination date of the applicable lease or any extension. This term

further provided:

> [Mr. Bitler and Mr. Melching] shall extend to [Emro Marketing] a rent-free
> Occupancy Period to be calculated as specified in this Paragraph during which
> Occupancy Period [Emro Marketing] shall retain the right of possession of the
> Premises. [Emro Marketing] shall be obligated to notify [Mr. Bitler and Mr.
> Melching] in writing of the exact date of discontinuance of the business operation
> on the Premises, and the commencement date of the Occupancy Period shall be
> the first day of the next calendar month following the closing of the business.
> [Emro Marketing] shall pay [Mr. Bitler and Mr. Melching] the full amount of rent
> for the month in which the business is discontinued.

(*Id.* Ex. 7, ¶ 3.)

The Master Amendment provided as follows regarding Emro Marketing's clean up and

remediation work at the properties:

9

4.    [Emro Marketing] agrees that prior to vacating the Premises, it shall, at its own expense, clean up any petroleum related or petroleum caused contamination discovered at the Property provided that: a) the contamination exceeds acceptable or legal levels established by the state in which the property is located or the United States Environmental Protection Agency; and b) the cleanup will be to a level existing in law, regulations, or ordinances established by the State of Michigan or the State of Indiana or the United States Environmental Protection Agency or, if no such level is established, the cleanup will be to a level adequately protective of public health and safety, as determined by a scientific consultant retained by Emro [Marketing]. All remediation work in this regard, including, but not limited to, that work required by the removal of the underground storage tanks, shall be performed in accordance with all laws, rules and regulations applicable to such remediation, and [Emro Marketing] shall return the Premises to [Mr. Bitler and Mr. Melching] as nearly as possible in the same condition as it was in prior to such remediation work, subject only to the removal of the contamination and normal wear from reasonable use of the property.

5.    [Emro Marketing] shall undertake the underground storage tank and piping removal during the Occupancy Period, and in the event the complete removal, remediation and restoration project is not completed by the conclusion of the Occupancy Period, said Occupancy Period shall be extended on a month-to-month basis in consideration of the payment by [Emro Marketing] to [Mr. Bitler and Mr. Melching] of the monthly sum of money specified in Exhibit A [to the Master Amendment] until such time as the entire project is completed. Any governmental or otherwise required continuing groundwater monitoring or pumping or treating shall not be deemed to extend the remediation and restoration project or the obligation of [Emro Marketing] to pay rent to [Mr. Bitler and Mr. Melching] unless said monitoring or pumping or treating materially interferes with [Mr Bitler and Mr. Melching's] use of the premises or [their] ability to sell or lease the same. [Emro Marketing] agrees to provide [Mr. Bitler and Mr. Melching] with copies of any and all documents related to the removal, remediation and restoration project, and [Mr. Bitler and Mr. Melching] shall have the further right to review and obtain copies of all documentation related to said project during the course of the same and after its conclusion.

(*Id.* Ex. 7, ¶¶ 4 & 5.)

Paragraph 6 of the Master Amendment included a lease buyout term in the event that the

occupancy period ended before the termination date of the relevant lease. However, it also

specified: "In the event the Occupancy Period extends beyond the Lease termination date, the above lease buyout provision shall not apply, and [Emro Marketing] shall have no rental obligation other than that previously established to be paid on a month-to-month basis, but [Emro Marketing] shall pay the real property taxes on the property during said extension and until the Occupancy Period expires." (*Id.* Ex. 7, ¶ 6.) In the Master Amendment, Emro Marketing agreed to provide copies of all environmental reports submitted to state agencies, copies of correspondence received from state agencies related to such reports, and periodic status reports relative to remediation. The parties also agreed that the 1983 leases remained in full force and effect, except as amended by the Master Amendment.

**C.     The Operations, Removal of Underground Storage Tanks, Remediation, and Use of the Individual Properties**

**1.     *The Angola, Indiana Property***

At the Angola property, the Defendants discontinued the operation of the gasoline station business in May 1993, and the Defendants removed the underground storage tanks and related piping in April 1994. The property has been used by the Defendants as a cigarette store. In 2004, the parties did not agree regarding a further extension of the lease agreement, so it appears the Defendants are no longer paying rent on the Angola property. Additionally, it appears that the Defendants must access the property to conduct required quarterly groundwater sampling. As of 2007, the Indiana Department of Environmental Management has not approved regulatory closure of the Angola property.

**2.     *The North Manchester, Indiana Property***

11

At the North Manchester property, the Defendants discontinued the operation of the gasoline station business in April 1993, and the Defendants removed the underground storage tanks and related piping in June 1994. The Indiana Department of Environmental Management issued a "No Further Action" letter on June 16, 2004.

3.      *The Coldwater, Michigan Property*

At the Coldwater property, the Defendants provided notice of the discontinuance of business operations in November 1998, closed the gas station in December 1998, and removed the underground storage tanks and related piping in December 1998. As of 2007, the State of Michigan has not approved regulatory closure of the Coldwater property. The Defendants continue to pay rent on the Coldwater property.

4.      *The Adrian, Michigan Property*

At the Adrian property, the Defendants discontinued the operation of the gasoline station business in December 1998, and the Defendants removed the underground storage tanks and related piping in April and May of 1999. In 2001, the Michigan Department of Environmental Quality granted environmental closure to the Adrian property. In April 1999, Mr. Melching consented to removal of the canopy at the Adrian property, and in September 2001, Mr. Melching consented to removal of the building.

5.      *The Michigan Center, Michigan Property*

At the Michigan Center property, the Defendants provided notice of the commencement

12

of the rent-free occupancy period (and the discontinuation of business operations) in December 1994, and the Defendants removed the underground storage tanks and related piping in July 1995. In August 2002, with the consent of Mrs. Melching, the Defendants removed a building and canopy on the Michigan Center property after a July 2002 Leoni Township citation was issued regarding the building. As of 2007, the State of Michigan has not approved regulatory closure of the Michigan Center property. The Defendants continue to pay rent on the Michigan Center property.

**6.**     *The Battle Creek, Michigan Property*

At the Battle Creek property, the Defendants provided notice of the commencement of the rent-free occupancy period (and the discontinuation of business operations) in May 1993, and the Defendants removed the underground storage tanks and related piping in July 1993. As of 2007, the State of Michigan has not approved regulatory closure of the Battle Creek property. The Defendants continue to pay rent on the Battle Creek property.

**7.**     *The Owosso, Michigan Property*

At the Owosso property, the Defendants discontinued the operation of the gasoline station business in December 1998, and the Defendants removed the underground storage tanks and related piping in May 1999. In 2001, the Michigan Department of Environmental Quality granted environmental closure at the Owosso property, with a commercial deed restriction.

**8.**     *The Portland, Michigan Property*

At the Portland property, the Defendants discontinued the operation of the gasoline station business in December 1998, and the Defendants removed the underground storage tanks and related piping in 1999 or 2000. In April 1999, Mr. Melching (signing for Mr. Bitler), Diane Melching, Marcia Rodenbeck, and Philip Rodenbeck consented to the removal of the canopy. In October 1999, the Michigan Department of Environmental Quality granted environmental closure to the Portland property.

## DISCUSSION

The pending summary judgment motions seek judgment as a matter of law on an array of grounds. In their Motion for Partial Summary Judgment on All Environmental Claims Brought Under All Counts [ECF No. 129], the Defendants seek summary judgment on the Plaintiffs' claims in Counts 1 to 28 that the Defendants committed waste and/or breach of contract at each property by failing to properly remediate environmental contamination. In their Motion for Partial Summary Judgment on Plaintiffs' Non-Environmental Claims at Selected Properties [ECF No. 131], the Defendants seek summary judgment on the Plaintiffs' non-environmental claims in Counts 1 and 2, Counts 7 and 8, Counts 9 and 10, Counts 15 and 16, Counts 17 and 18, Counts 19 and 20, and Counts 21 and 22, which relate to the Angola, Indiana, and Coldwater, Adrian, Michigan Center, Battle Creek, Owosso, and Portland, Michigan properties, respectively.[4] The Motion for Partial Summary Judgment on Plaintiffs' Non-Environmental Claims at Selected Properties addresses claims that the Defendants committed waste and/or

_____

[4] In this Motion, the Defendants do not seek summary judgment as to non-environmental claims in Counts 3 and 4 relating to the North Manchester, Indiana, property.

breach of contract by a failure to properly maintain or restore buildings and improvements on the properties. Finally, in their Motion for Summary Judgment on Plaintiffs' Claims on All Counts [ECF No. 144], the Defendants seek summary judgment on Counts 1 to 28 on the grounds that the Plaintiffs do not have admissible evidence of damages and that the Plaintiffs' claimed damages are not recognized by law. It is worthy of note here that the grounds put forward by the parties in the pending summary judgment motions vary substantially from those that provided the grounds for the Court's rulings on the summary judgment motions relative to the properties in Huntington and Ligonier, Indiana; Hillsdale, Monroe, and Sturgis, Michigan; and Celina, Ohio. As to those properties, the grounds included principally (1) termination/cancellation, waiver, and release agreements that barred claims, and (2) statutes of limitations that barred claims.

**A.      The Defendants' Arguments Addressing the Properties in Huntington and Ligonier, Indiana; Hillsdale, Monroe, and Sturgis, Michigan; and Celina, Ohio**

The Court has already granted summary judgment motions in favor of the Defendants on Counts 5 and 6 (the Huntington, Indiana property), Counts 11 and 12 (the Hillsdale, Michigan property), Counts 13 and 14 (the Monroe, Michigan property), Counts 23 and 24 (the Celina, Ohio property), Counts 25 and 26 (the Ligonier, Indiana property), and Counts 27 and 28 (the Sturgis, Michigan property). Consequently, to the extent that the Defendants' pending summary judgment motions seek judgment as a matter of law as to these claims and properties, the Defendants' motions are moot, and the Court will deny them as such.

**B.      The Defendants' Motion for Partial Summary Judgment on All Environmental**

15

**Claims Brought Under All Counts [ECF No. 129]**

The Defendants contend that summary judgment is warranted on all of the Plaintiffs'
environmental claims for failure to remediate, either under a breach of contract or waste theory.
The Defendants offer four grounds for their Motion, which the Court will address in turn, along
with the Plaintiffs' opposition. Because all four grounds offered by the Defendants affect the
Court's determination on the waste claims, the Court will address those claims last.

**1.      *The Testimony of Anthony A. Gremos***

First, the Defendants contend that the Plaintiffs' only proffered evidence in support of
their environmental claims consists of the untested hypotheses and inadmissible notions of their
environmental expert, Anthony A. Gremos. On March 31, 2010, the Court denied as premature
and without prejudice the Defendants' Motion in Limine to Exclude Mr. Gremos's testimony
[ECF No. 229]. The Court will not revisit that holding here. Because the Court concludes that
summary judgment is appropriate for the Defendants on the environmental claims whether Mr.
Gremos's testimony is admissible or not, the Court need not reach the admissibility of Mr.
Gremos's testimony concerning environmental damages. Whether Mr. Gremos will have any
relevant testimony to offer after the Court's rulings on the motions for summary judgment is a
determination more appropriately made at trial.

**2.      *The Existence of a Material Fact Question***

The Defendants argue, secondly, that Mr. Gremos's opinions (even if admitted) are
insufficient to create a question of material fact as to the Plaintiffs' environmental claims. The

Plaintiffs respond that issues of fact exist regarding the Defendants' remediation duties, the Defendants' performance, the delays, and the losses suffered. Because the Master Amendment is clear about the extent of the Defendants' responsibility for environmental cleanup, the Court agrees with the Defendants that if admitted, the testimony of Mr. Gremos would not create a triable issue of material fact.

According to his deposition and affidavit, Mr. Gremos would testify that there are various uncertainties relating to each of the properties that a potential buyer would have to resolve before purchasing the properties. Specifically, Mr. Gremos would testify about the following: environmental uncertainties at Angola, Indiana, and that the Indiana Department of Environmental Management has not issued a "No Further Action" letter for Angola (Gremos Aff., ECF No. 148-2 at 24–32); environmental uncertainties at North Manchester, Indiana, in spite of a "No Further Action" letter issued June 16, 2004 (*Id.* at 42–47); environmental uncertainties at Adrian, Michigan, in spite of regulatory closure by the Michigan Department of Environmental Quality (MDEQ) in 2001 (Gremos Aff., ECF No. 148-3 at 1–7); environmental uncertainties at Battle Creek, Michigan, and that the site has not been granted regulatory closure by the MDEQ (*Id.* at 8–14); environmental uncertainties at Coldwater, Michigan, and that the site has not achieved regulatory closure from the MDEQ (*Id.* at 15–24); environmental uncertainties at Michigan Center, Michigan, and that the site has not been granted regulatory closure by the MDEQ (*Id.* at 25–31); and environmental uncertainties at Owosso, Michigan, in spite of regulatory closure by the MDEQ in 2001 (*Id.* at 39–47). Finally, Mr. Gremos would testify that there are no environmental issues with the Portland, Michigan, property and that it achieved regulatory closure by 2001. (*Id.* at 46–50.) Essentially, Mr. Gremos's testimony would

17

be entered to show how the use of the properties as gasoline stations leads to financial harm to

the Plaintiffs. (Pls.' Br. Resp. Mot. in Limine to Exclude Test. of Andrew A. Gremos 1–2, ECF

No. 148.) However, Mr. Gremos would not testify that the Defendants have failed to comply

with federal, state or local laws, rules or regulations in their environmental remediation of the

properties. (Defs.' Br. Supp. Mot. to Exclude Test. of Andrew A. Gremos 1, ECF No. 118.)

Further, Mr. Gremos did not actually inspect the properties at issue. Therefore, he cannot testify

as to any of the properties that it is more likely than not that the potential environmental issues

he has identified actually exist. (*Id.*) The Plaintiffs seek to enter Mr. Gremos's testimony to show

how environmental uncertainty results in financial losses to the Plaintiffs, losses the Plaintiffs

claim are recoverable under Paragraph 2 of the Master Amendment. As Paragraph 2 is the

subject of frequent disagreement between the parties, the Court will address its contractual

significance first, then lay out how the rest of the provisions of the Master Amendment preclude

the Plaintiffs' claims even if Mr. Gremos's opinions were to be admitted.


a.      Paragraph 2 of the Master Amendment Does Not Apply to the Environmental Claims for
        Breach of Contract at the Closed Properties

        As articulated by this Court in its Opinion and Order of September 30, 2011, the

Plaintiffs repeatedly attempt to take the first sentence of Paragraph 2 out of its context. Read

together, Paragraph 2 is "an agreement to indemnify, defend, and hold harmless." *Bitler, Inv.*

*Venture II, LLC v. Marathon Ashland Petroleum, LLC*, No. 1:04-CV-477-TS, 2011 WL

4601047, at *6 n.3 (N.D. Ind. Sept. 30, 2011). The Court notes also the principles cited by the

Plaintiffs in their brief, that "[i]n reviewing the plain language of a contract to ascertain the

parties' intent, the court should not read particular words and phrases in isolation; rather, the

18

court should consider the contract as a whole and should avoid rendering any words, phrases or terms ineffective or meaningless." *Heritage Dev. of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 891 (Ind. Ct. App. 2002). Furthermore, "the court should favor a conclusion regarding the parties' intent that harmonizes the contract's provisions as opposed to one that causes the provisions to conflict." *Id.* The Court will read the contractual provisions in light of these principles.

The Plaintiffs would like to make Paragraph 2 into a broad agreement requiring the Defendants to pay for any and all harms that will ever result from use of the properties as gasoline stations. But examining the provision as a whole, the Court does not read Paragraph 2 so broadly. The first sentence—despite its expansive beginning—ends with the words "as said liability may be determined by all applicable federal, state, and local laws, rules and regulations." The parties intended to limit the sweep of the first sentence, and did so by enumerating the types of liability for which the Defendants[5] would be responsible. Moreover, Paragraph 2 includes a notice provision, whereby the Plaintiffs must give written notice within fifteen days of any "act or occurrence involving a liability, claim, demand, or costs indemnified against herein." Only after the Plaintiffs give such notice must the Defendants then reimburse the Plaintiffs for expenses as outlined in the rest of Paragraph 2. Reading Paragraph 2 together, there is no obligation for the Defendants to reimburse the Plaintiffs for expenses until the Plaintiffs have given notice. It is clear, then, that the types of harms the parties intended Paragraph 2 to

---

[5]Paragraph 13 of the Master Amendment makes it applicable to the successors in interest to Emro Marketing Company and Max E. Melching/George O. Bitler—i.e. to the Plaintiffs and the Defendants. For the sake of clarity and efficiency, rather than listing the parties' predecessors in interest each time a contract is discussed, the Court will refer to the Plaintiffs and the Defendants as parties to the contracts with responsibilities as outlined in the contracts.

indemnify the Plaintiffs against are those types of harms involving "applicable federal, state, and local laws, rules and regulations," and which can be the subject of at least fifteen days of notice before a payment demand.

The Court finds that the environmental claims at the closed properties fall outside of the indemnity agreement of Paragraph 2. This is so, first, because the Plaintiffs' evidence does not indicate the environmental remediation at the closed properties—that is, at the North Manchester, Adrian, Owosso and Portland properties—is in violation of federal, state or local laws, rules or regulations.[6] Furthermore, there is no evidence before the Court that the Plaintiffs gave the fifteen days' notice required under Paragraph 2 to make a proper demand for indemnification at the closed properties.[7] Because there is no indication in the record that the Plaintiffs ever met the prerequisites for the Defendants' obligation to reimburse under Paragraph 2, the Court finds Paragraph 2 inapposite to the environmental claims.[8]

The Court distinguishes on their facts the indemnity agreements in the cases cited by the Plaintiffs. In *NRC Corp. v. Amoco Oil Co.*, 205 F.3d 1007 (7th Cir. 2000), the Seventh Circuit approved the district court's award of lost rent damages against a tenant gasoline station operating company measured from termination of the lease until the projected end of

---

[6]The Court will address the justiciability of the claims at the open properties (Angola, Coldwater, Michigan Center, and Battle Creek) below, but notes that the Plaintiffs have also not produced evidence that the Defendants will fail to bring any of the open properties into compliance with all applicable laws, rules and regulations. Accordingly, even if the Plaintiffs' claims at the open properties were justiciable, the Court finds Paragraph 2 does not apply to the environmental claims there.

[7]As discussed in the previous note, the situation at the open properties is functionally identical to the situation at the closed properties regarding environmental remediation. Thus, there is also no indication that the Plaintiffs ever gave notice consistent with Paragraph 2 for the open properties.

[8]For the same reasons, the Court finds the language of Paragraph 2 inapplicable to the non-environmental claims, as discussed *infra*.

environmental remediation, where the tenant had promised to "save harmless the Lessor . . . from all claims, mechanic liens, damages, demands, actions, costs and charges arising out of or by reason of the . . . operation of the business herein authorized on the premises . . . during the term of this lease." *Id.* at 1011–12. Similarly, in *Jaasma v. Shell Oil Co.*, 412 F.3d 501 (3d Cir. 2005), the Third Circuit remanded to the district court to consider loss of use damages against a tenant gasoline station operating company measured from termination of the lease until the completion of remediation and achievement of regulatory closure, where the tenant had promised to "comply with all applicable environmental laws and [] hold the Lessor harmless and [] indemnify the Lessor against all claims whatsoever arising out of any violation of said laws or any contamination of the subject property by hazardous substances attributable to [the Lessee]." *Id.* at 504. In both *NRC* and *Jaasma*, the broad indemnity agreements applied to all claims, without a limitation that the indemnity agreements would only apply to claims arising under violations of law, rules or regulations. In neither *NRC* nor *Jaasma* did the indemnification agreement include a notice provision making reimbursement contingent on proper notification. Because Paragraph 2 contains different provisions from the indemnifications in *NRC* and *Jaasma*, the Court finds it does not apply to the loss of use damage calculations for environmental uncertainty or unmarketability during remediation to which the broader indemnifications from *NRC* and *Jaasma* did apply.

b.     Other Relevant Provisions of the Master Amendment Do Not Create Triable Issues of Material Fact on the Environmental Breach of Contract Claims at the Closed Properties

The Court will now address the other provisions of the Master Amendment and whether they would create a triable issue of material fact on the environmental claims if Mr. Gremos's

21

opinions were admitted.

    As an initial matter, the Court notes that the Master Amendment itself states in its preamble that the parties are entering into the Master Amendment "to provide for underground tank removal and related cleanup responsibilities." On its face, the Master Amendment purports to delineate the Defendants' cleanup responsibilities for the properties.

    Paragraph 4 addresses at length the Defendants' responsibility for environmental remediation. It states that the Defendants shall "clean up any petroleum related or petroleum caused contamination" but only if "a) the contamination exceeds acceptable or legal levels established by the state in which the property is located or the United States Environmental Protection Agency; and b) the cleanup will be to a level existing in law, regulations, or ordinances established by the State of Michigan or the State of Indiana or the United States Environmental Protection Agency or, if no such level is established, the cleanup will be to a level adequately protective of public health and safety, as determined by a scientific consultant retained by [the Defendants]." Finally, the remediation work itself "shall be performed in accordance with all laws, rules and regulations applicable to such remediation." In summary, Paragraph 4 outlines the type of remediation required of the Defendants, and the type of remediation required is that which complies with applicable laws and regulations.

    Finally, Paragraph 1 of the Master Amendment briefly touches on the remediation obligation. It states that the removal of underground tanks and piping "shall be in full compliance with all applicable federal, state and local laws, rules, regulations, and ordinances." It specifies that the Defendants "shall backfill the tank holes and trenches in compliance with all applicable federal, state and local laws, rules, regulations and ordinances and also in a good

business-practice manner and leave the Premises in a condition reasonably useful for future commercial use." Paragraph 1 also gives the Defendants responsibility for replacing asphalt, concrete or other landscaping damaged or destroyed by the removal operation.

Even if Mr. Gremos's opinions were admitted, these provisions read together do not create a triable issue of material fact as to whether the Defendants breached the contract provisions with respect to environmental remediation. Read alone, one phrase from Paragraph 1 might support the argument that the creation of environmental uncertainty leading to questionable marketability violates the contractual requirement that the Defendants "leave the Premises in a condition reasonably useful for future commercial use." But reading the rest of the sentence reveals that the sentence is about backfilling of tank holes and trenches, and the "reasonably useful for future commercial use" is offered in the same sentence as the recurring phrase "in compliance with all applicable federal, state and local laws, rules, regulations and ordinances."[9] Reading Paragraph 1 in conjunction with the remediation responsibilities in

---

[9]The Court distinguishes "reasonably useful for future commercial use" in Paragraph 1 of the Master Amendment from the promise in *Jaasma* that the tenant gasoline station operating company would be responsible for ensuring the property was "restored to its original state." 412 F.3d at 504. Although the Plaintiffs do not develop their "original state" argument, instead choosing to rely on their broad interpretation of Paragraph 2's indemnification, the Court distinguishes the "original state" promise in *Jaasma* with respect to environmental remediation from the "reasonably useful for future commercial use" promise in Paragraph 1 for the reasons discussed above.

Additionally, although not argued by the parties, the Court notes concerning the environmental claims that Paragraph 4's requirement for the Defendants to "return the Premises to Lessor as nearly as possible in the same condition as it was in prior to such remediation work" could be analogized to the "original state" promise from *Jaasma*. Even if the Plaintiffs had made the argument, however, the Court finds that the "same condition" language—falling again in the same sentence as "in accordance with all laws, rules and regulations applicable to such remediation"—would not allow for loss of use damages for uncertainty or unmarketability where: (1) the contract read together requires only remediation to the level required by laws, rules and regulations; (2) the paragraph specifies remediation to the level required by laws, rules and regulations; (3) the sentence itself specifies remediation to the level required by laws, rules and regulations; and (4) the final clause—"subject only to the removal of the contamination and normal wear from reasonable use of the property"—could be read to include some loss of use due to environmental uncertainty or unmarketability.

Paragraph 4 clarifies the contractual duties even further. The Defendants are responsible for cleaning up petroleum contamination only if it exceeds the levels established by the state or the EPA. It is impossible to read the specific remediation requirements of Paragraph 4 together with the language of Paragraph 1 and conclude the parties intended that the Defendants be responsible for environmental remediation beyond the levels established by applicable laws, rules and regulations. Further, as articulated above, Paragraph 2 is merely an indemnity agreement which, because of its specific provisions, is not germane to this discussion of the Defendants' environmental remediation responsibilities. Reading the provisions of the Master Amendment together, the Defendants' responsibility was to remediate in accordance with applicable laws, rules and regulations; even if Mr. Gremos's testimony concerning environmental uncertainty and unmarketability were admitted, the Plaintiffs would have no admissible evidence to show that the Defendants have violated the contractual provisions concerning the environmental claims. Accordingly, summary judgment is appropriate in favor of the Defendants on the Plaintiffs' environmental breach of contract claims at all of the closed properties (Counts 3, 9, 19 and 21[10]) because the Plaintiffs have failed to show the existence of a triable issue of material fact as to the breaches of contract.

**3.**     ***The Justiciability of Claims Regarding the Open Properties***

The Defendants contend that the Plaintiffs have failed to identify a justiciable injury-in-fact at the four properties where remediation and/or environmental monitoring efforts are ongoing (the Angola, Battle Creek, Coldwater, and Michigan Center properties). The Plaintiffs

---

[10]See additional discussion, *infra*, concerning the Portland property.

24

respond that a justiciable controversy exists as to these properties because clean-up was delayed, and the contracts contemplate damages for delay. Because the Master Amendment allows for delay in remediation, and because the Plaintiffs have not shown the Defendants' remediation time line to be objectively unreasonable, the Court agrees with the Defendants that the Plaintiffs have not identified justiciable injury at the four open properties.

This Court has previously rejected the Plaintiffs' argument that the "prior to vacating the Premises" language in Paragraph 4 of the Master Amendment required the Defendants to complete remediation before discontinuing business operations. *See Bitler*, 2011 WL 4601047, at *6–7. As previously stated, "the Master Amendment contemplated that the Defendants would discontinue the business operations on the premises in advance of the Defendants vacating the premises and the leases terminating." *Id.* at *7. The Court therefore denied the Plaintiffs' Motion for Summary Judgment [ECF No. 138].

The Court is similarly unpersuaded by the Plaintiffs' argument that the Master Amendment contemplated damages for delay in environmental remediation of the properties. On its face, the Master Amendment says nothing about how long remediation should take. Paragraph 3 sets out a rent-free Occupancy Period, and Paragraph 5 requires the Defendants to "undertake the underground storage tank and piping removal during the Occupancy Period," but specifically states that

> in the event the complete removal, remediation and restoration project is not completed by the conclusion of the Occupancy Period, said Occupancy Period shall be extended on a month-to-month basis in consideration of the payment by Lessee to Lessor of [monthly rent specified elsewhere] until such time as the entire project is completed.

Nothing in Paragraph 5 or elsewhere in the Master Amendment provides a sunset for the month-

to-month payment of rent. Indeed, if the Occupancy Period is extended, Paragraph 6 notes that the Defendants "shall have no rental obligation other than that previously established to be paid on a month-to-month basis." The Master Amendment merely states that rent shall be paid until remediation is completed.

The Court has already dealt with the Plaintiffs' argument that Paragraph 2 broadly allows for recovery of damages, and here rejects the Plaintiffs' specific argument that Paragraph 2 allows for the recovery of damages for delay in remediation. The Court will now briefly address the Plaintiffs' remaining contractual arguments for why remediation delay damages are recoverable under the Master Amendment. The Plaintiffs urge that "[p]resumptively, tank removal and remediation were to take place within the free occupancy period." (Pls.' Br. Resp. Mot. Summ. J. All "Environmental Claims" 8–9, ECF No. 154.) The Court agrees that tank removal was to be undertaken within the Occupancy Period, but disagrees with the Plaintiffs' conclusion that remediation was to be completed within the Occupancy Period, as the Master Amendment clearly contemplated remediation continuing past the free Occupancy Period. As for the Plaintiffs' unsupported assertions that "[m]onth to month tenancy commonly is short tenancy" and "[n]o landlord, especially one dealing with a large oil company operating an environmentally hazardous retail operation, would want to voluntarily subject himself to a month to month tenancy, the length of which is not within the control of the landlord" (*id.* at 9–10), these arguments do not contradict the plain language of the contract, which says nothing about how long remediation is to take. Finally, the Plaintiffs' assertion that the Defendants had "only a short window to complete remediation and restoration" (*id.* at 10), is also without support in the contract.

26

It is well-settled law in Indiana and Michigan that "[a]n unambiguous contract must be enforced as written." *Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co.*, 433 F. Supp. 2d 933, 947 (N.D. Ind. 2005) (applying Indiana law); *Montgomery v. Taylor & Gaskin, Inc.*, 209 N.W.2d 472, 475 (Mich. App. Ct. 1973) (enforcing an unambiguous contract). Further, "where no time for performance is specified in the contract the law will imply that it must be performed within a reasonable time." *Jay Clutter Custom Digging v. English*, 393 N.E.2d 230, 232 (Ind. App. Ct. 1979).

Here, though the Plaintiffs assert that "it would not be fair or reasonable to allow the defendants to have to the end of time to remediate these properties," they have not established what is unreasonable about the present remediation time frame. The Plaintiffs argue a rental agreement from 1992 cannot possibly fairly compensate them for rents due in 2011, but that is exactly what the Master Amendment allows by its terms. Although more than ten years might establish unreasonableness, the Defendants are correct that the Plaintiffs would have to show objective unreasonableness. *See, e.g., Bonnieview Homeowners Ass'n, LLC v. Woodmont Builders, LLC*, No. Civ.A. 03CV4317 (DRD), 2005 WL 2469665, *5 (D.N.J. Oct. 6, 2005) (expert testimony required to show that a professional inadequately performed duties). Expert testimony might establish that the current remediation regime is objectively overlong, but the Plaintiffs' unsupported assertions do not suffice to establish a triable issue of material fact as to the reasonableness of the time line. The Plaintiffs have not cited any case, nor evidence, nor state law, nor state policy that militates for this Court to undo the plain language of the contract to which the parties agreed. Therefore, the Court will enforce the unambiguous contract according to its terms and grant the Defendants' Motion for Summary Judgment as to the Plaintiffs'

environmental breach of contract claims at the four open properties (Counts 1, 7, 15, and 17). Because the contract is ongoing, and the contract allows all the conduct the Plaintiffs claim would constitute waste, the Motion for Summary Judgment will also be granted as to the Plaintiffs' environmental waste claims at the open properties (Counts 2, 8, 16, and 18).[11]

**4.**     *The Portland Property*

The Defendants believe summary judgment should be entered in the environmental claims at the Portland property because the Plaintiffs' own expert admits no environmental issues exist with the Portland property. The Plaintiffs respond that they have suffered a loss of value at the Portland property as a result of the Defendants' use of the premises. For many of the reasons discussed above, the Court agrees with the Defendants that summary judgment is appropriate on the Plaintiffs' environmental breach of contract claim concerning the Portland property. The evidence establishes that not only would the Plaintiffs' own expert be unable to testify to any uncertainty or lack of marketability at Portland, but that Mr. Gremos would also testify there are no environmental issues at all. As articulated above, the Master Amendment requires the Defendants to clean up petroleum contamination to a level comporting with applicable laws, rules and regulations. The undisputed evidence is that the Defendants have done just that. Accordingly, the Court will grant the Defendants' Motion for Summary Judgment as to the environmental breach of contract claim at the Portland property (Count 21).

**5.**     *Contracts Govern the Environmental Waste Claims at the Closed Properties*

---

[11]See the discussion of the interplay between breach of contract and waste claims, *infra*.

Where parties to a contract have specifically negotiated the terms of use of a property, uses of the property that are expressly permitted by the contract—even if such uses would otherwise constitute waste—are not waste. Essentially, parties may contract around waste. *See Stevens v. Mobil Oil Corp.*, 412 F. Supp. 809, 812 (E.D. Mich. 1976) ("Unauthorized removal of equipment . . . might well constitute waste. However, such actions were expressly permitted here by the terms of the lease"); *Niestadt v. Joseph*, 139 N.E. 336, 339 (Ind. App. Ct. 1923) (alterations included in the lease were not waste, but tenant's alterations beyond those contemplated by the lease constituted waste). First, the Court notes it is not clear the Plaintiffs have evidence of conduct by the Defendants that would constitute environmental waste if it were not expressly permitted by the contracts. Mr. Gremos's testimony, even if admitted, does not substantiate the existence of environmental waste since he cannot testify that it is more likely than not that environmental problems actually exist. Furthermore, the Plaintiffs in their brief do not rebut the principle that conduct expressly permitted in the contract does not constitute waste. Nor do they argue that the Defendants have committed environmental waste by any conduct distinct from the conduct which this Court has already found to be permitted by the contract (environmental remediation in conformity with law and regulation). The Plaintiffs merely argue that the contract requires more of the Defendants than environmental remediation to the level established by law and regulation. But given this Court's holding that Paragraph 2 of the Master Amendment is nothing more than an indemnity agreement the conditions of which were not met, and given the clear language of the Master Amendment regarding the extent of the Defendants' environmental remediation responsibilities, the interplay between breach of contract and waste is controlling. The Plaintiffs have not alleged any environmental conduct by the Defendants to be

29

waste which this Court has not already found to be allowed under the contracts.[12] The Master
Amendment outlined the Defendants' responsibilities for environmental cleanup, and if the
Defendants have not breached the contract specifically delineating their conduct, then they have
also not committed waste.

The Plaintiffs' evidence does not show that the Defendants' conduct went beyond what
was expressly permitted by the contract concerning environmental remediation. The facts before
the Court show that the Plaintiffs' expert Mr. Gremos cannot say it is more likely than not that
any environmental contamination outside of that proscribed by applicable laws and regulations
actually exists at any of the properties. As for the closed properties, he admits that they have
achieved regulatory closure from the relevant state agencies. As for the open properties, he
admits he cannot say whether they will or will not in the future be closed according to all laws
and regulations.[13] And as for the Portland Property, he admits not only that regulatory closure is

---

[12]Additionally, the Court notes that waste requires actual damage to property. *Finley v. Chain*,
374 N.E.2d 67, 77 (Ind. Ct. App. 1978) (overruled on other grounds) (waste is "destruction, misuse,
alteration, or neglect of the premises by one lawfully in possession to the prejudice of an estate or interest
therein of another."); *Stevens v. Mobil Oil Corp.*, 412 F. Supp. 809, 815 (E.D. Mich. 1976) (waste is
physical damage to property). Since Mr. Gremos cannot testify that it is more likely than not that
environmental harms actually exist on the properties, his testimony could not support waste claims even if
admitted. Further, his testimony about uncertainty or unmarketablility would not substantiate actual
damage to the properties, and no case cited by the Plaintiffs suggests that it would. The *NRC* and *Jaasma*
courts awarded damages for loss of use (lost rent) on breach of contract claims, not waste claims. *See
NRC*, 205 F.3d at 1014 ("this was a breach of contract case, and the court awarded damages under the
indemnity clause of the lease contract"); *Jaasma*, 412 F.3d at 509 (discussing contractual language,
contractual intent, and contractual duties).

[13]Although the Court concludes that the Plaintiffs' environmental claims at the open properties
are not justiciable, even if the Court were to consider those claims, the environmental waste claims would
also fail because the Plaintiffs establish no triable issue of material fact as to whether the Defendants have
breached the contract terms regarding environmental remediation where such remediation is ongoing,
particularly in light of this Court's holding, *supra*, that the contracts do not provide damages for delay in
remediation. Therefore, if environmental waste Claims 2, 8, 16 and 18 were not precluded for lack of
justiciability, they would be precluded because the Plaintiffs have not shown a breach of contract.

complete, but that there are no environmental issues to be remediated. Because the Plaintiffs

have presented no triable issue of material fact as to breach of contract, the Plaintiffs' waste

claims will also be defeated since waste claims will not lie when the contract expressly permitted

the Defendants' actions. Accordingly, the Court will grant the Defendants' Motion for Summary

Judgment on the environmental waste claims at the closed properties (Counts 4, 10, 20, and 22).

C.      **The Defendants' Motion for Partial Summary Judgment on Plaintiffs' Non-Environmental Claims at Selected Properties [ECF No. 131]**

The Defendants contend that summary judgment is warranted as to the Plaintiffs' non-

environmental claims as to the Angola, Coldwater, Adrian, Michigan Center, Battle Creek,

Owosso, and Portland properties. The Plaintiffs respond that issues of fact exist that prevent the

entry of summary judgment on these claims, that the Defendants breached their duty to maintain

and restore the properties during remediation, and that the Plaintiffs have suffered damages as a

result.

1.      *The Maintenance Obligations Under the Lease Agreements*

The Defendants contend that the lease agreements do not create maintenance obligations

and therefore no breach of contract has occurred. The Plaintiffs respond that the lease

agreements placed maintenance obligations on the Defendants that turned into restoration

obligations as the Defendants held the sites longer than agreed while allowing the improvements

to waste. Because the lease agreements do not speak to maintenance obligations, the Court

agrees with the Defendants that they are entitled to summary judgment on the Plaintiffs' non-

environmental breach of contract claims.

31

As this Court has previously noted, the standards for reviewing contracts are well established. Under Indiana law, contracts are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement, and if the language of the contract is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four corners of the agreement, and courts determine the meaning of a contract from an examination of all of the contract's provisions, and not from a more narrow consideration of individual words, phrases, or paragraphs read alone. *Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009). Parol, or extrinsic evidence, is inadmissible to add to, vary, or explain clear and unambiguous terms of a written instrument. *Evan v. Poe & Assocs. Inc.,* 873 N.E.2d 92, 101 (Ind. Ct. App. 2007). An ambiguity does not arise simply because the parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable people could come to different conclusions about its meaning. *Id.* at 98; *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005).

The Plaintiffs urge that the 1983 leases and the 1992 Master Amendment—read together—create maintenance obligations for the buildings and improvements on the properties, which became restoration obligations as the buildings fell into disrepair, and which should now be properly understood as rebuilding obligations at the sites where the buildings and improvements have been razed. The Plaintiffs construct this argument from a combination of six different provisions within the two different contractual agreements. The Plaintiffs point to: 1) the 1983 lease requirement that the properties be used in a "careful and proper manner"; 2) the

1983 lease requirement that the Defendants "comply with any and all applicable statutes, ordinances, rules and regulations"; 3) the 1983 lease requirement that the Defendants "shall not abandon . . . the leased premises until termination of the lease"; 4) the 1992 promise that the Defendants "leave the Premises in a condition reasonably useful for future commercial use"; 5) the 1992 requirement that the Defendants clean up petroleum related contamination "prior to vacating the Premises"; and 6) the 1992 requirement that the Defendants return each property "as nearly as possible in the same condition as it was in prior to such remediation work." The Plaintiffs argue that these six provisions, taken together, show the intent of the parties that the Defendants would be responsible for maintaining and/or restoring the properties. Maintaining the buildings, the Plaintiffs urge, is careful and proper use, is necessary to comply with law and regulation, is required to not abandon and to not vacate, is required in order to leave the properties in the same condition as they were in before remediation, and is necessary to leave the premises reasonably useful for future commercial use.[14]

The Plaintiffs' many arguments for why the contract implies[15] maintenance obligations

---

[14]But as the Defendants note in a later brief, commercial use can include a spectrum of uses, including redevelopment by third parties. (Defs.' Reply Supp. Mot. Summ. J. on Pls.' Claims on All Counts 7–8, ECF No. 182.) On its face, then, "reasonably useful for future commercial use" does not require that the premises be returned in a condition ready for immediate income production.

[15]The Plaintiffs urge the Court to find an implied covenant to maintain and/or restore the buildings and improvements. Under Indiana law, "[a]n implied covenant may be found if (1) the obligation arises from the parties' presumed intention as gathered from the contract's language, or appears, from the contract as a whole, to be indispensable to give effect to the parties' intent; and (2) it is so clearly within the parties' contemplation that they deem it unnecessary to express it." *Mass. Mut. Life Ins. Co. v. Associated Dry Goods Corp.*, 786 F. Supp. 1403, 1421 (N.D. Ind. 1992) (citing *D'Angelo, Inc. v. A & R Realty*, 553 N.E.2d 515, 521 (Ind. Ct. App. 1990)). As the Defendants point out, the Plaintiffs are asking the Court to imply a covenant in fact, which is "not favored in the law." *D'Angelo*, 553 N.E.2d at 521. Because the Court finds a duty to maintain and/or restore buildings and improvements is not indispensable to give effect to the parties' intent, nor was such a duty so clearly within the parties' contemplation that they deemed it unnecessary to express it, the Court will not imply the existence of such a covenant.

only underscore the undeniable reality—nowhere do the 1983 leases or the 1992 Master

Amendment state that the Defendants have an obligation to maintain or restore the buildings and

improvements. On their face, the 1983 leases speak to obligations regarding the buildings at

Article V, Section 1. The most pertinent sentences are these:

> No building or improvement now or hereafter located or constructed on the leased
> premises shall be removed or materially altered (except by way of addition)
> without the prior written consent of the Lessors, except that existing buildings or
> improvements may be replaced, rehabilitated or restored if the resulting
> improvements are worth at least as much after the replacement, rehabilitation or
> restoration as before.

This provision anticipates removal of and material alterations to buildings and improvements

with consent, and allows for restoration of buildings and improvements if there is no loss of

value. But Article V does not address a maintenance or restoration obligation.

Nowhere else do the contracts speak specifically to the buildings and improvements on

the properties. The Plaintiffs' arguments about the 1992 Master Amendment creating building

maintenance obligations are unavailing because on its face the Master Amendment says nothing

about buildings or improvements at all. Indeed, as previously noted, the preamble specifically

states that the parties are entering into the Master Amendment "to provide for underground tank

removal and related cleanup responsibilities." In other words, the Master Amendment is about

remediation responsibilities, not building maintenance and/or restoration obligations. The only

contractual provision addressing buildings and improvements is Article V of the 1983 leases, and

on its face Article V says nothing about maintenance or restoration obligations.

Finally, the Plaintiffs ask the Court to consider extrinsic evidence to substantiate a duty

to maintain and/or restore. Specifically, the Plaintiffs point to a September 1, 2000, letter from

William Gilbert (property manager for Defendant Speedway SuperAmerica) to Mr. and Mrs.

34

Melching where Mr. Gilbert states that "Speedway SuperAmerica LLC has some liability on the

condition of" the Adrian property. (Gilbert Letter, ECF No. 165-3, Ex 1.) Moreover, they point

to Mr. Gilbert's offer to pay for repairs at the Hillsdale and Adrian properties. Most

significantly, the Plaintiffs argue the Court must consider Mr. Gilbert's November 7, 2000,

letter, where he responds to Mr. Melching's request for a timeline for "completion of restoring

buildings to reasonable usefulness." (Melching Letter, ECF No. 165-3, Ex 2.) Mr. Gilbert's

response is as follows:

> We will address the pavement and building restoration obligations as the sites are
> turned back over to you via lease cancellations, or as you find new tenants for
> them (North Mancester, Portland, Adrian, Battle Creek, Coldwater, Michigan
> Center, Owosso). It doesn't make sense to restore the pavement while remediation
> continues, nor to refurbish an unoccupied building. Rest assured, Marathon
> Ashland Petroleum LLC fulfills its obligations.

(Gilbert Letter, ECF No. 165-3, Ex 3.) The Plaintiffs urge the Court to consider this letter from

Mr. Gilbert to show a duty to maintain and/or restore. But, as stated above, extrinsic evidence is

inadmissible to add to, vary, or explain clear and unambiguous terms of a written instrument.

*Poe & Assocs.*, 873 N.E.2d at 101. Further, an ambiguity does not arise simply because the

parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable

people could come to different conclusions about its meaning. *Id.* at 98. The Court will not look

to extrinsic evidence where a written instrument is clear and unambiguous. Because the Court

concludes that the 1983 leases and the 1992 Master Amendment are clear and unambiguous in

that they do not create maintenance or restoration obligations for the buildings and

improvements on the properties, the Court will not look to Mr. Gilbert's statements to determine

35

the intent of the parties.[16] The Plaintiffs have not shown a triable issue of material fact as to the Defendants' failure to comply with the plain language of the contracts. All evidence before the Court suggests that the Defendants have complied with Article V of the 1983 leases with respect to the buildings and improvements.[17] Accordingly, the Court will grant the Defendants' Motion for Summary Judgment as to the non-environmental breach of contract claims[18] at the five properties subject to this motion where the buildings and improvements remain (Angola, Coldwater, Battle Creek, Owosso and Portland).[19]

### 2.    *The Consent to Remove Improvements, Damages Evidence, and Failure to Mitigate*

---

[16]Even were the Court to consider extrinsic evidence, the Court notes that Mr. Gilbert's letter references only building restoration and refurbishing. The word rebuilding does not appear here or in any other document before the Court. Therefore even were this extrinsic evidence before the Court, it would mean that the Plaintiffs' non-environmental breach of contract claims could go forward only at the properties where buildings are still standing. It would not allow the Plaintiffs' non-environmental breach of contract claims to go forward where the buildings have been razed with consent, nor would it allow the Plaintiffs to proceed on the non-environmental waste claims where the buildings are gone. See *infra* for a discussion of the consents to remove.

Because the Court is not looking to extrinsic evidence, it need not consider the Defendants' argument from a later brief that the repairs authorized by Mr. Gilbert were no more than courtesies, and did not establish a maintenance obligation. (*See* Defs.' Reply Supp. Mot. Summ. J. on Pls.' Claims on All Counts 6.)

[17]See below for a discussion of the consents as to the building and canopy at Adrian and Michigan Center, and the canopy at Portland. Additionally, the Court notes that based on its finding that the contracts do not create a duty to maintain and/or restore the buildings and improvements, it need not reach the Defendants' further argument that even if there were such a duty the Plaintiffs have not shown that any damages were caused by a failure to maintain.

[18]The Plaintiffs have not argued—and the Court does not find—that the promise in the 1983 leases that no building be "materially altered" amounted to a promise not to commit waste. The Plaintiffs' argument for breach of contract as to the non-environmental claims is firmly rooted in the Plaintiffs' expansive reading of Paragraph 2. The Court finds, as discussed above, that an appropriate reading of Paragraph 2 does not support the non-environmental breach of contract claims under the facts of this case.

[19]The Court notes that this motion does not request summary judgment on the claims at the North Manchester property, and thus the Court will not grant summary judgment as to the non-environmental breach of contract or waste claim at North Manchester (Counts 3 and 4).

36

The Defendants contend that buildings and canopies were removed with consent at the Adrian, Michigan Center, and Portland properties and that even if the consents were invalid, the Plaintiffs have no relevant evidence regarding the difference in the values of the properties with or without the improvements. They also contend that the Plaintiffs cannot prove that damages were suffered at the properties where the buildings are still standing (Angola, Battle Creek, Coldwater, Owosso, and Portland) because they lack evidence showing cost of repair and diminution in value of the properties. Finally, the Defendants argue that the Plaintiffs failed to mitigate any damages. The Plaintiffs respond that consent to remove buildings and canopies should be read in the context of the larger agreements and contractual obligations, that the persons signing the consents suffered from undue influence and lack of mental capacity, and that the persons signing the consents did not have actual or apparent authority to bind the Plaintiffs. The Plaintiffs also argue that they have provided expert testimony on the cost to replace the buildings, that they have provided interrogatory responses as to the costs of extensive repairs, that proof as to the exact dollar amounts should be left for trial, that the Plaintiffs have not failed to mitigate, that the Defendants must prove their affirmative defense of failure to mitigate, and that they have various reasons for not attempting to restore the properties neglected by the Defendants.

a.      Consents to Remove

At three of the properties, buildings and/or canopies were removed with the written consent of a representative of the Plaintiffs. The Defendants argue that these consents preclude the Plaintiffs' breach of contract and waste claims as to each of these buildings and canopies.

The Plaintiffs argue the consents were not valid, and in any case the consents do not waive the Defendants' building restoration obligations.

On April 12, 1999, Mr. Gilbert requested permission to remove the canopy at the Portland property "[i]n order to facilitate the underground tank removal and any required remediation," and the consent was granted by Mr. Melching (signing for Mr. Bitler), by Diane Melching, by Marcia Rodenbeck, and by Philip Rodenbeck. (Fourth Gilbert Aff. Ex 22, ECF No. 133-4 at 40.) On April 27, 1999, Mr. Gilbert requested permission to remove the canopy at the Adrian property "[i]n order to expedite the remediation," and Mr. Melching signed giving consent—signing both for himself and for Mr. Bitler. (*Id.* Ex. 10, ECF No. 133-4 at 16.) On September 12, 2001, Mr. Gilbert requested permission to remove the building at the Adrian property, and Mr. Melching signed giving consent on September 20, 2001. (*Id.* Ex. 11, ECF No. 133-4 at 17.) On August 5, 2002, Mr. Gilbert requested permission to remove the building and canopy at the Michigan Center property, and Mrs. Melching signed giving consent. (*Id.* Ex. 18, ECF No. 133-4 at 35.) Mrs. Melching previously signed giving consent to remove the building at the Monroe property on or about August 17, 2000, with the stated understanding from Mr. Gilbert that "I am assuming that you have the full power to sign for Landlords George O. Bitler and Max E. Melching." (*Id.* Ex. 19, ECF No. 133-4 at 36.)

The Plaintiffs argue that the consents are nothing more than licenses for the tenants to show to the wrecking crews, and do not relieve the Defendants of their obligations under the Master Amendment. The Court agrees with that argument in part. It is true that the consents—even the consents that reference the remediation responsibilities in the Master Amendment—do not in any way alter the parties' agreement in the Master Amendment. But as

38

the Court has already determined that the Master Amendment does not speak to the buildings and improvements on the properties or create a building maintenance and/or restoration obligation, this is unavailing to the Plaintiffs. The Plaintiffs are arguing that there is ambiguity as to whether the consents worked to undo the Defendants' maintenance obligation under the contracts, but as the Court has determined that no such obligation existed under the contracts, the consents cannot have altered it.

The relevant feature of the consents is that they are silent about whether the Defendants are required to rebuild the buildings and canopies they are demolishing. The Plaintiffs' argument that the consents contain a latent ambiguity because they do not address building restoration obligations is unavailing.. A latent ambiguity arises in the context of a "contract term," and "only upon attempting to implement the contract." *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distr., Inc.*, 837 N.E.2d 1058, 1070–71 (Ind. Ct. App. 2005) (quoting *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002) and *Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1144 (Ind. Ct. App. 2003)). Here there is no contract term suggesting building restoration obligations—not in the consents, not in the 1992 Master Amendment, and not in the 1983 leases. Nor does an ambiguity arise in attempting to implement the consents. The plain language of the consents merely states that the Defendants have permission to remove the buildings and improvements at issue. This is especially pertinent because it is exactly what is required by the only contractual provision speaking directly to the buildings and improvements. Article V of the 1983 leases requires that "[n]o building or improvement . . . shall be removed or materially altered . . . without the prior written consent of the Lessors," and each of these consents works to satisfy that requirement. Absent evidence that

39

the Defendants were in any way obligated under contract to restore the buildings and improvements they were removing,[20] the Court will not read the consents as anything more than what they are—written consents by the Lessors to remove buildings and improvements, as required under the 1983 leases.

As to the Plaintiffs' argument that Paragraph 2 of the Master Amendment made the Defendants responsible for any and all remediation costs including replacement of demolished buildings and canopies, the Court again rejects it as an over-broad reading of Paragraph 2. The Plaintiffs have not shown that replacing these buildings or canopies would be required by applicable laws or regulations as part of remediation, nor that the Plaintiffs gave the requisite notice under Paragraph 2. Thus the Plaintiffs' reliance on Paragraph 2 is again unavailing.

The Plaintiffs next argue that Mr. Melching's consent was invalid as to the Adrian building in that he lacked actual authority to consent for the Bitlers; the Plaintiffs additionally argue that Mrs. Melching's consent was invalid as to the Michigan Center building and canopy in that she lacked actual and apparent authority to sign for Mr. Melching or for the Bitlers. The Plaintiffs do not argue that the consent for removal of the Portland canopy or the Adrian canopy was invalid for lack of proper authority, so the Court need not address authority for those consents.[21] The Plaintiffs point the Court to *Bain v. Board of Trustees of Starke Memorial Hospital*, 550 N.E.2d 106 (Ind. Ct. App. 1990), arguing that questions of actual or apparent

---

[20]The Court notes again that Mr. Gilbert's statements do not suggest there was any responsibility to rebuild structures that were removed. Even Mrs. Melching's recital of Mr. Gilbert's statements about a maintenance obligation or promises to restore buildings do not suggest that Mr. Gilbert obligated the Defendants to rebuild buildings that were removed. (See Second Aff. J. Maxine Melching ¶¶ 11, 12 & 13.)

[21]But the Court finds those consents were clothed with at least apparent authority, as articulated below.

authority should generally survive summary judgment. But *Bain* stands for the proposition that the question of the existence of apparent authority should survive summary judgment if the facts lead to two possible conclusions about whether belief in the apparent authority of the agent was justified. *Id.* at 109 ("the facts do not lead only to the conclusion that [the plaintiff's] belief in the apparent authority of [the agents] would be unjustified. Rather, several facts indicate that [the plaintiff] could have reasonably believed that [the agents] had the authority to act on behalf of [the defendants]"). The facts before the Court suggest only that the Defendants were justified in their belief that Mr. and Mrs. Melching had authority to bind the Bitlers. Mr. Gilbert states in his affidavit that he was informed at a meeting with Mr. Bitler and Mr. Melching that Mr. Melching would be his primary contact with regard to the Angola, Adrian, Battle Creek, Coldwater, Michigan Center, Owosso and Portland properties. (Fourth Aff. William Gilbert 5–6, ECF No. 133-2.) Prior to sending the consent for removal of the building at the Adrian property, Mr. Gilbert spoke to Mr. Melching, who did not inform Mr. Gilbert that any consent besides his own was required, leading Mr. Gilbert to conclude that Mr. Melching had full authority to consent to the removal of the Adrian building. (*Id.* 7–8.) Similarly, prior to sending the consent for removal of the building and canopy at the Michigan Center property, Mr. Gilbert had received a consent from Mrs. Melching for removal of the building at the Monroe property affirming that she had authority to sign for Mr. Bitler and Mr. Melching. (*Id.* 10.) In this case, it appears Mr. Melching had actual authority and Mrs. Melching had (at least) apparent authority. The Plaintiffs' undeveloped argument points to no facts which would suggest that Mr. and Mrs. Melching did not have authority to sign the consents to which the Plaintiffs object. Absent facts which lead to two reasonable conclusions about whether the belief in the authority of the agent was reasonable,

the Court rejects the Plaintiffs' argument that Mr. Melching lacked actual authority to consent to removal of the Adrian building and that Mrs. Melching lacked actual or apparent authority to consent to removal of the Michigan Center building and canopy.

Finally, the Court has previously rejected the Plaintiffs' arguments concerning undue influence upon and lack of mental capacity of Mr. Melching. *See Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 779 F. Supp. 2d 858, 882–85 (N.D. Ind. 2011). Here, the Plaintiffs argue that Mr. Melching did not have the mental capacity to consent to the removal of the Adrian building on September 20, 2001. As this Court has previously stated, under Indiana law, on the question of whether mental capacity exists to contract the Court must determine "'whether the person was able to understand in a reasonable manner the nature and effect of his act.'" *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 227 (Ind. Ct. App. 2009) (quoting *Wilcox Mfg. Group, Inc. v. Mktg. Servs. of Ind., Inc.*, 832 N.E.3d 559, 562–63 (Ind. Ct. App. 2005)). Based on this Court's previous ruling on the Defendants' Motion to Strike Portions of the Affidavit of Philip Rodenbeck and the First Affidavit of J. Maxine Melching in its Entirety, in which the Court struck inadmissible opinions relating to Mr. Melching's mental capacity, *see Bitler*, 779 F. Supp. 2d at 871–79, the Court again concludes that the Plaintiffs have failed to come forward with admissible evidence that creates a triable issue of material fact as to Mr. Melching's mental capacity. The Plaintiffs' presentation of some health problems experienced by Mr. Melching does not create a reasonable inference that he lacked mental capacity to enter into a binding consent on September 20, 2001, and the Plaintiffs' mental capacity argument therefore does not vitiate the consent given by Mr. Melching for removal of the Adrian building.

As to undue influence, the Plaintiffs offer an undeveloped argument that Mr. Gilbert's

choice to contact Mr. Melching for the September 2001 consent somehow overbore Mr.

Melching's will. Again, as previously stated by this Court, undue influence under Indiana law

requires "the exercise of sufficient control over the person, the validity of whose act is brought

into question, to destroy his free agency and constrain him to do what he would not have done if

such control had not been exercised." *Nichols*, 910 N.E.2d at 228 (quotation marks and citations

omitted). The facts before the Court do not suggest that the Defendants exercised control over

Mr. Melching such that his free agency was overborne and such that he was constrained to do

what he would not have done if such control had not been exercised. The Plaintiffs' undue

influence argument therefore also fails to vitiate the consent given by Mr. Melching for removal

of the Adrian building.

      Because the Court determines the consents to remove the Portland canopy, the Adrian

canopy, the Adrian building, and the Michigan City canopy and building were valid, the Court

will grant the Defendants' Motion for Summary Judgment as to those non-environmental breach

of contract claims (Counts 9, 15, and 21). Furthermore, waste claims will not lie for the removal

of buildings or improvements to which the Plaintiffs consented. *See* Mich. Comp. Laws Ann. §

600.2919(2) (conduct is not waste when there is "a lawful license" for the conduct); *Niestadt*,

139 N.E. at 339 (covenant allowing conduct which would otherwise be waste abrogates waste

claim for such conduct). The Court will therefore grant the Defendants' Motion for Summary

Judgment as to the consented non-environmental waste claims as well (Counts 10, 16, and 22).[22]

---

[22]The Court notes that it need not address the Defendants' argument that Plaintiff Bitler
Investment VI lacks standing to pursue claims for damages accruing to the Adrian property prior to
October 21, 2001, since all claims relating to the Adrian property are now foreclosed as a matter of law.
      Further, because the Court finds the consents to be binding, it need not address the Defendants'
argument that the Plaintiffs lack evidence to show the value of the buildings and canopies before the
consents were signed.

b.      Evidence of Damages

The Defendants argue that summary judgment is appropriate on the Plaintiffs' non-environmental claims at the five properties with standing buildings because the Plaintiffs have failed to prove either the cost of repair to the buildings where damage is non-permanent or the diminution in value of the properties where damage is permanent. The Defendants frequently invoke this legal proposition (indeed, their final summary judgment motion is addressed almost exclusively to this argument), but have failed to cite a single case where a motion for summary judgment was granted based on the failure to show the amount of damages. Within the confines of this Motion for Partial Summary Judgment on Plaintiffs' Non-Environmental Claims at Selected Properties, the Defendants cite a variety of cases articulating the standard for measuring damages when there is damage to structures. *See, e.g., Sanborn Elec. Co. v. Bloomington Athletic Club*, 433 N.E.2d 81, 88 (Ind. Ct. App. 1982) ("In the case of tortious injury [to a building], where the injury is permanent, that is, where the cost of restoration exceeds the value of the building before the injury, the measure of damages is the value of the property before the injury. On the other hand, where the injury is non-permanent, the measure of damages is the cost of restoration"; further, the burden is on the party desiring a market value measure of damages to demonstrate the difference in property value, else restoration/repair costs will be the measure of damages); *Tillson v. Consumers' Power Co.*, 256 N.W. 801, 805–06 (Mich. 1934) (same damages formulation, with no discussion of which party bears the burden for showing

_____

Finally, this holding only relates to the specific improvements removed by consent. Thus, the Court is granting summary judgment as to the waste claim for removal of the Portland canopy, but not as to the waste claim regarding the Portland building, which still stands.

44

diminution in market value). Certainly the Defendants are correct that "[i]t was Plaintiffs responsibility, as well as their obligation, to produce evidence of damages." (Defs.' Reply Supp. Mot. Partial Summ. J. Pls.' Non-Environmental Claims Selected Properties 13, ECF No. 181.) But the Defendants' implication that the Plaintiffs must produce evidence of the specific amount of damages before trial is not supported by precedent.

As the Court has already rejected the Plaintiffs' non-environmental breach of contract claims at the properties where the buildings remain (Angola, Coldwater, Battle Creek, Owosso and Portland), the Court is here concerned with whether there is evidence of damages that a jury could find to be waste at those properties. As previously stated, under Indiana law, waste is "destruction, misuse, alteration, or neglect of the premises by one lawfully in possession to the prejudice of an estate or interest therein of another." *Finley*, 374 N.E.2d at 77. Additionally, under Michigan law, waste is physical damage to property. *Stevens*, 412 F. Supp. at 815. The Plaintiffs do have eye-witness evidence of the condition of the buildings at the five properties where the buildings remain. (*See* Defs.' Br. Supp. Mot. Partial Summ. J. on Pls.' Non-Environmental Claims at Selected Properties 12–13, ECF No. 132) (summarizing testimony from Philip Rodenbeck and Carl Bitler's depositions regarding the Angola, Battle Creek, Coldwater, Owosso and Portland properties); (First Aff. of J. Maxine Melching ¶ 3, ECF No. 172-3.) Additionally, the Plaintiffs have produced approximations of the cost to repair these properties and/or approximations of the cost to replace the buildings.[23] (*See* Pls.' Supplemental

---

[23]The Court notes that the standard damages formulation speaks of cost to repair buildings, not cost to replace them. *See Sanborn*, 433 N.E. 2d at 88 ("repair costs" contrasted with market value diminution); *Tillson*, 256 N.W. at 806 ("cost of making repairs" contrasted with market value diminution).

Additionally, the Court expresses no opinion about the Plaintiffs' assertion that Mr. Kerwin would have relevant, admissible evidence to offer on damages. As the Court has previously held, the

Answers to Def. Marathon Ashland Petroleum, LLC's First Set of Interrogs. Relating to Indiana

Properties, ECF No. 170-2); (Pls.' Supplemental Answers to Def. Marathon Ashland Petroleum,

LLC's First Set of Interrogs. Relating to Michigan Properties, ECF No. 170-3.) As to the

Defendants' argument that the Plaintiffs' interrogatory responses are not admissible because

Philip Rodenbeck and/or Carl Bitler do not have personal knowledge of the cost of repair to the

properties, the Court need not reach admissibility as to the dollar amounts of repair at this stage.

The Plaintiffs are not required to prove the exact dollar amount of damages. Indeed, as the

Plaintiffs note in a later brief, "less certainty is required to prove the amount of loss than is

required to prove the fact that" there were actually damages. *Jerry Alderman Ford Sales, Inc. v.*

*Bailey*, 291 N.E.2d 92, 106 (Ind. Ct. App. 1972). In order to survive summary judgment, the

Plaintiffs are required to produce some evidence of damages, and the Court holds that at the five

properties where the buildings still stand the Plaintiffs have produced evidence sufficient to

survive summary judgment. Accordingly, as to the waste claims at the Angola, Battle Creek,

Coldwater, Owosso and Portland properties, the Court rejects the Defendants' argument that

these claims are precluded for failure to prove costs of repair or market value diminution.

c.      Failure to Mitigate

        The Defendants offer a brief, undeveloped argument that the Plaintiffs have failed to

mitigate damages, and the Plaintiffs' non-environmental claims should therefore fail. To be sure,

there is a duty to mitigate damages if a plaintiff wishes to recover on a contract. *Pierce v. Drees*,

---

Court will take up the admissibility of Mr. Kerwin's damages formulations at trial if necessary. (*See* ECF
No. 229.)

607 N.E.2d 726, 729 (Ind. Ct. App. 1993) ("a non-breaching party must mitigate damages");

*Winshall v. Ampco Auto Parks, Inc.*, 417 F. Supp. 334, 337 (E.D. Mich. 1976) (a landlord in a

non-rent action may recover actual losses "that could not be reduced by his own reasonable

efforts"). But as the Plaintiffs argue, the duty to mitigate is an affirmative defense to reduce the

amount of damages a defendant must pay, not a defense to liability. *Foster v. Owens*, 844 N.E.2d

216, 221 (Ind. Ct. App. 2006) ("mitigation of damages is not an affirmative defense to liability . .

. [but] rather an affirmative defense that may reduce the amount of damages a plaintiff is entitled

to recover after liability has been found."). Just as the Defendants have failed to cite a case

where summary judgment was granted based on the failure to prove the amount of damages, the

Defendants have also failed to cite a case where summary judgment was granted based on the

failure to mitigate damages. If the Defendants are found liable to the Plaintiffs for damages, then

evidence of the Plaintiffs' alleged failure to mitigate will be relevant.[24] It does not serve,

however, to support the Defendants' Motion for Summary Judgment as to the non-environmental

claims.


3.      *The Statute of Limitation*

        The Defendants contend that Michigan's three-year statute of limitation (Mich. Comp.

Laws § 600.5805(10)) governing actions to recover damages for injury to property (including

real property) renders the Plaintiffs' waste claims as to the Michigan properties time-barred. The

_____

        [24]The Court notes that the Plaintiffs' argument about any failure to mitigate—at least with regard
to the properties listed by Mr. Gilbert in his November 7, 2000, letter where he speaks of building
restoration and refurbishing obligations—is compelling. The Plaintiffs' failure to mitigate during the time
when Mr. Gilbert had told them the Defendants would restore and/or refurbish, may be a reasonable
argument at trial.

Plaintiffs respond that Indiana's six-year statute of limitation applies and that issues of fact preclude summary judgment. The Court previously resolved this issue in its Opinion and Order of March 11, 2011, holding that Indiana's six-year statue of limitation applied to the waste claim at Sturgis, Michigan instead of Michigan's three-year statue of limitation. *Bitler*, 779 F. Supp. 2d at 889 ("the Court agrees with the Plaintiffs that Indiana law supplies the statue of limitation for the Plaintiffs' waste claim related to the Sturgis property."). A brief review of the Court's analysis will suffice.

The Court, sitting in diversity jurisdiction, applies the choice of law rules of the forum state—here, Indiana. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "Because in Indiana statutes of limitations are procedural in nature, Indiana choice-of-law rules state that the statute of limitations of the forum state, Indiana, will apply." *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F. Supp. 1374, 1385 (S.D. Ind. 1989) (citations omitted), *aff'd*, 917 F.2d 278 (7th Cir. 1990). Further, the Court agrees with the Plaintiffs that the three-year statue of limitation in Michigan Compiled Laws § 600.5805(10), which is directed to "all other actions to recover damages for . . . injury to . . . property," is not specifically directed to the statutory waste claim created in Michigan Compiled Laws § 600.2919(2), and therefore under the *Kalmich v. Bruno*, 553 F.2d 549, 553–54 (7th Cir. 1977), analysis, the Court would apply the Indiana statue of limitation. The Indiana Supreme Court has held that "[c]laims for waste . . . related to real property are governed by a six-year statute of limitation." *Pflanz v. Foster*, 888 N.E.2d 756, 760 (Ind. 2008) (citing Ind. Code § 34-11-2-7). The Court will therefore apply Indiana's six-year statue of limitation to the remaining waste claims at the five Michigan properties where the buildings are still standing. This cause of

action commenced on December 17, 2004; the six-year statue of limitation will bar these waste claims if they accrued before December 17, 1998. As the earliest date by which the Defendants argue that the Plaintiffs knew or should have known of the neglect of the Michigan properties is the summer of 1999, the Court finds that the Indiana six-year statue of limitation does not bar the remaining waste claims. Accordingly, the Court will deny the Defendants' Motion for Summary Judgment on the non-environmental waste claims at the Coldwater, Battle Creek, Owosso and Portland properties (Counts 8, 18, 20, and 22).

**4.**    *The Absence of Evidence of Waste at the Angola Property*

The Defendants contend that the Plaintiffs' own evidence shows that there is no waste by the Defendants at the Angola property. The Plaintiffs respond that the Defendants failed to meet their obligations under the lease agreements when they leased the Angola property and left the property in a condition below that permitted by the lease agreements and that the Angola property is unmarketable and without value. The Defendants' argument is again premised upon the Plaintiffs' alleged failure to produce evidence of the cost of repair at the Angola property, and failure to mitigate damages. Consistent with this Court's holding above, the Court finds that the Plaintiffs have designated evidence of damages to the Angola building. (*See* Defs.' Br. Supp. Mot. for Partial Summ. J. on Pls.' Non-Environmental Claims at Selected Properties 20–21) (discussing deposition testimony of Philip Rodenbeck and of a Plaintiffs' real estate expert.) Additionally, the Plaintiffs have produced evidence of cost to repair the Angola structure.[25] (*See*

---

[25]The Court again expresses no opinion about whether Mr. Kerwin's opinions as to replacement cost of the Angola property would be admissible.

49

Pls.' Supplemental Answers to Def. Marathon Ashland Petroleum, LLC's First Set of Interrogs. Relating to Indiana Properties.) Further, the Court agrees with the Plaintiffs that any alleged failure of the Plaintiffs to mitigate damages is proper for the Defendants to raise at trial. Accordingly, though the Court rejects the Plaintiffs' argument that the Master Amendment required a standard of maintenance at the Angola property, the Court will deny the Defendants' Motion for Summary Judgment as to the non-environmental waste claim at the Angola property (Count 2).

**D.      The Defendants' Motion for Summary Judgment on Plaintiffs' Claims on All Counts [ECF No. 144]**

The Defendants contend that the Plaintiffs have no admissible evidence to support their damages allegations, that the Plaintiffs' claimed damages are not recognized at law, and that James A. Kerwin's opinions do not constitute evidence of damages under an appropriate damages framework. The Plaintiffs argue that this Motion by the Defendants should be denied summarily, that issues of fact exist on the issue of damages at the properties, that they have come forward with evidence of damages, that uncertainty as to the exact amount of damages does not preclude this case going forward to trial, and that the Defendants have to establish their failure to mitigate affirmative defense. On March 31, 2010, the Court denied as premature and without prejudice the Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Witness, James S. Kerwin [ECF No. 135]. As with its ruling on the Motion to Exclude Mr. Gremos's testimony, the Court will not revisit its ruling with respect to Mr. Kerwin. Because the Court concludes that the Plaintiffs have produced some evidence of damages with respect to the non-environmental waste claims at the five properties where buildings are still standing regardless of whether Mr.

50

Kerwin's opinions are admissible, a determination as to the admissibility of Mr. Kerwin's testimony is proper for trial. Many of the arguments in this final set of briefs mirror those already resolved by the Court, but insofar as distinct contentions arise, the Court will address them here.

1.    *The Requirement for Expert Opinion*

The crux of the Defendants' argument is that the Plaintiffs cannot show a cognizable injury without expert opinion, a fact the Defendants argue the Plaintiffs have tacitly admitted by submitting Mr. Kerwin's expert report. (Defs.' Br. Supp. Mot. Summ. J. on Pls.' Claims on All Counts 3, ECF No. 145.) But the facts show that the Plaintiffs have multiple avenues available for showing cognizable injury, as discussed above. The Defendants are correct that damages are an "essential element[]" of the Plaintiffs' claims. *Meloy v. Computer Assocs. Int'l, Inc.*, No. 1:06-CV-0188-SEB-JMS, 2007 WL 1724908, at *8 (S.D. Ind. June 12, 2007) (quoting *Rice v. Hulsey*, 829 N.E.2d 87, 89 (Ind. Ct. App. 2005)).  But the further cases cited by the Defendants do not prove the proposition for which they are offered. The Defendants cite cases where summary judgment was granted because the plaintiff failed to prove causation of damages. *Palm Beach Polo Holdings, Inc. v. Ryder*, No. 259730, 2006 WL 2060652, at *2 (Mich. Ct. App. 2006) (summary judgment appropriate where "plaintiff failed to show that its damages were caused by any breach"); *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *19 (S.D. Ind. Sept. 18, 2006) (summary judgment granted in part where significant portion of plaintiffs' proposed expert testimony was excluded, and where the damages alleged "require[d] determinations that are dependent on evidence from those with specialized knowledge"); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904–05 (7th Cir. 2007) (summary judgment approved

where only evidence of causation—a causation expert—was properly excluded). The

Defendants, however, have not suggested the Plaintiffs lack evidence of causation of damages.

Neither have the Defendants shown that the type of damages the Plaintiffs would need to survive

summary judgment on the non-environmental claims at the Angola, Battle Creek, Coldwater,

Owosso and Portland properties—evidence of damages to structures—requires determinations

by experts.

   Further, as discussed above, the Plaintiffs have produced some evidence of the existence

of damages. Indeed, as even the Defendants note in their brief, the Plaintiffs have evidence of

damage at each of the five properties.  (Defs.' Br. Supp. Mot. Summ. J. on Pls.' Claims on All

Counts 10–11.) The Defendants are correct that if the Plaintiffs could not prove damages at all,

summary judgment would be appropriate. *Player v. Motiva Enters. LLC*, No. Civ. 02-

3216(RBK), 2006 WL 166452, at *9–11 (D.N.J. Jan. 20, 2006). If the Plaintiffs' proof of

causation of damages depended on Mr. Kerwin's expert testimony, and if the Court found his

testimony inadmissible, then the Defendants would be correct that summary judgment was

appropriate. Or if the only evidence that there were any damages at all were the testimony of Mr.

Kerwin, and if the Court found his testimony inadmissible, then the Defendants would again be

correct that summary judgment was appropriate. But here the Defendants concede the existence

of some damages at the properties where the buildings remain. The Defendants wish to contend

with the Plaintiffs' formulation of the measure of damages and/or mitigation of damages. As

discussed below, such arguments are premature. The issue before the Court is whether the

Plaintiffs have enough evidence that damages exist to survive summary judgment. The Court

holds they have. The Defendants still fail to cite a case where summary judgment was granted

because of the exclusion of a damages expert where the plaintiff had multiple witnesses to testify to the existence of damages.

**2.**     *The Plaintiffs' Damages Formulation*

The Defendants argue that most of the damages claimed by the Plaintiffs are not recoverable as a matter of law. Specifically, the Defendants argue that the Plaintiffs' claims for various forms of lost rent during the contractual period and stretching twenty years into the future are not recoverable, and that the Plaintiffs' claims for replacement cost new (RCN) damages are not recoverable where the proper measure of damages for injury to property is either the cost to repair or the diminution in market value of the property. The Court will not rule on the damages formula at this stage of the litigation. The Court notes, however, first, that the Plaintiffs' claims about the proper measure of damages in waste are not well-developed or supported by case law. Second, the Plaintiffs' citation concerning the cost of *restoration* as the appropriate measure of damage for injury to property does not amount to the cost of *rebuilding* where a structure is still standing. *See Spesco, Inc. v. Gen. Elec. Co.*, 719 F.2d 233, 240 (7th Cir. 1983) (where injury to real estate is non-permanent, "then the measure of damages is the cost of restoration") (quoting *Gen. Outdoor Adver. Co. v. LaSalle Realty Corp.*, 218 N.E.2d 141, 150 (Ind. Ct. App. 1966). Rather, as the Indiana Court of Appeals stated when analyzing the issue in *General Outdoor Advertising Co.* (the case cited by *Spesco* for the damages rule), the cost of restoration amounts to "repair costs." *See Gen. Outdoor*, 247 N.E.2d at 151. And third, the Court distinguishes the Plaintiffs' damages argument based on *Keene v. Elkhart County Park & Recreation Board*, 740 N.E.2d 893 (Ind. Ct. App. 2000). In *Keene*, the Indiana Court of Appeals

held that the plaintiffs were entitled to a modern bridge where the 1924 contract called for the defendants to "construct and forever maintain a proper bridge over the canal" to support farming operations. The Plaintiffs argue that the promise in Paragraph 1 of the Master Amendment to return the premises "in a condition reasonably useful for future commercial use" should be interpreted in light of *Keene*, to require the Defendants to provide new buildings, canopies and pumps meeting modern industry standards. Such a measure of damages is not supported by the Plaintiffs' precedent because the *Keene* court held that "the intent of the parties" to provide an up-to-date bridge was "unmistakable." *Id.* at 899. By contrast, the intent of the parties in forming the Master Amendment was not unmistakably that the Defendants should be responsible for furnishing brand new, modern gas stations and improvements. Rather, the parties agreed only that after remediation, the Defendants would complete backfilling of tank holes, replace asphalt, concrete and landscaping destroyed in the removal of the tanks and pipes, and leave the premises "reasonably useful for future commercial use." Such an agreement does not support the Plaintiffs' argument for damages based on *Keene*.

Finally, with respect to the measure of damages, the Court again rejects the Plaintiffs' repeatedly-stated argument that the first sentence of Paragraph 2 of the Master Amendment is the proper measure of damages. Paragraph 2 is an indemnity provision, the specific requirements of which were not met, and it is inapposite to the question of damages in this case. Further, even were Paragraph 2 the controlling standard, neither the *NRC* court nor the *Jaasma* court awarded the kind of damages the Plaintiffs claim here. *See NRC*, 205 F.3d at 1010–11 (under broad indemnity agreement, affirming the district court's award of damages including damages for lost rent until the projected end of remediation, damages for costs of monitoring remediation, and

damages for court costs); *Jaasma*, 412 F.3d at 511 (under broad indemnity agreement, remanding to the district court to consider damages for lost rent during time of uncertainty following remediation, damages for costs of remediation, and damages for diminution in property value). Here, the Plaintiffs are asking for damages for lost rent during the same time period they were receiving rent under Paragraph 5 of the Master Amendment. They are further asking for lost rent damages twenty years into the future. They are even asking for damages for lost rent during the exact period that they contracted to be rent free. The Plaintiffs have pointed to no precedent where such damages were allowed.

### 3.       *The Defendants' Mitigation Arguments*

Finally, turning to the Defendants' arguments about difficulties the Plaintiffs may experience in attempting to prove damages at trial, such arguments are also premature. That the Plaintiffs lack evidence of the value of the properties and improvements at the time the Plaintiffs resumed possession, that the Plaintiffs have failed to mitigate damages from the time they took possession, that Mr. Kerwin's opinions do not address the properties' value at the time surrendered to Plaintiffs, that Mr. Kerwin's opinions do not address the long-term life of the improvements, and that Mr. Kerwin's opinions assume replacement of buildings instead of weighing the cost of repair—all are proper arguments for trial, not for the summary judgment stage. The Defendants may or may not be successful at trial in showing why damages should be less than the Plaintiffs assert, but such arguments do not show that summary judgment is appropriate.

Because the Court finds the Defendants' damages arguments to be either unavailing or

appropriate for trial, the Court will deny summary judgment on this basis as to all claims and counts still before the Court (Counts 1, 2, 3, 4, 7, 8, 9, 10, 15, 16, 17, 18, 19, 20, 21, and 22). However, in light of the Court's rulings on all motions in this case, the only claims surviving summary judgment are the non-environmental waste claims in Counts 2, 4, 8, 18, 20, and 22[26], and the non-environmental breach of contract claim in Count 3.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' Motion for Partial Summary Judgment on All Environmental Claims Brought Under All Counts [ECF No. 129], GRANTS IN PART and DENIES IN PART the Defendants' Motion for Partial Summary Judgment on Plaintiffs' Non-Environmental Claims at Selected Properties [ECF No. 131], and DENIES the Defendants' Motion for Summary Judgment on Plaintiffs' Claims on All Counts [ECF No. 144]. Accordingly, judgment is entered in favor of the Defendants and against the Plaintiffs as to Counts 1, 7, 9, 10, 15, 16, 17, 19, and 21. The non-environmental aspects of Counts 2, 3, 4, 8, 18, 20, and 22 remain before the Court.

SO ORDERED on December 20, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[26]The Court reiterates that the surviving non-environmental waste claim at the Portland property does not include a claim for the canopy, which was removed with proper consent.